FILED

AUG 29 2012

Phil Lombardi, Clerk
U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OKLAHOMA

(1) THE CHEROKEE NATION, )
(2) CHEROKEE NATION ENTERTAINMENT, LLC, )
)
)
Plaintiff(s) )
vs. )
)
(3) KENNETH L. SALAZAR )
*in his official capacity as* )
Secretary of the Interior )
U.S. Department of the Interior )
)
(4) MICHAEL S. BLACK )
*in his official capacity as* )
Acting Assistant Secretary for Indian Affairs )
U.S. Department of the Interior )
)
Defendant(s) )

**12 CV - 493 GKF TLW**

Civil Action No. _____

## COMPLAINT
(Declaratory and Injunctive Relief)

Plaintiffs, the Cherokee Nation (the "Nation") and Cherokee Nation Entertainment,

L.L.C. ("CNE"), by and through their counsel, hereby allege as follows:

## NATURE OF THE ACTION

1.      The Nation, a federally recognized Indian Tribe, and CNE, a wholly owned

subsidiary of a wholly owned subsidiary of the Nation, bring this action against Defendants,

Secretary of the Department of the Interior and the purported Acting Assistant Secretary for

Indian Affairs (collectively the "Department" or "Secretary"), seeking declaratory and injunctive

relief from the Department's July 30, 2012, administrative agency decision (the "2012

Decision"). That decision found, *inter alia,* that "the former reservation of the [Nation] is also

the former reservation of the [United Keetoowah Band of Cherokee Indians of Oklahoma ("UKB")]" for purposes of applying the "former reservation" exception in the Indian Gaming Regulatory Act, 25 U.S.C. § 2719(a)(2)(i).  The 2012 Decision also found, based on its conclusion that the Cherokee Nation and United Keetoowah Band ("UKB") share a reservation, that the Nation's consent to UKB acquisition of trust land is not required under 25 C.F.R. § 151.8 *See* 2012 Decision Letter, p.4 (Exhibit 1 to the Complaint).

2.     The Secretary's "former reservation" conclusion is contrary to an unbroken line of prior Departmental rulings and to a series of decisions by this Court.  This conclusion, however, was the basis for the Department's unlawful decision to approve the acquisition of 2.03 acres of land (the "Subject Tract") located within the last treaty boundaries of the Nation (the "Nation's Treaty Territory") into trust under the federal Indian Gaming Regulatory Act (the "IGRA"), 25 U.S.C. § 2701 *et seq.* for the use and benefit of the United Keetoowah Band (the "UKB") Corporation.[1]

3.     Further, the Department's conclusion that the Secretary possesses "implicit" general authority to acquire land in trust for a tribal corporation organized under section 3 of the Oklahoma Indian Welfare Act of 1936 ("OIWA"), 25 U.S.C. § 503, even though the OIWA's implementing regulations (which also implement the Indian Reorganization Act, 25 U.S.C. §461, et seq.) expressly prohibit the Secretary from acquiring land in trust for a corporation, except under circumstances not present here, is illegal.

4.     The agency's decision is also contrary to section 5 of the Indian Reorganization Act of 1934 ("IRA"), 25 U.S.C. § 465, which bars the Secretary from acquiring land in trust for

---

[1] The 2012 Decision purports to accept the Subject Tract into trust for the UKB.  In the Notice of the 2012 Decision published in the Federal Register, the Secretary states he is accepting the Subject Tract in trust for the UKB Corporation

any entity that was not "under federal jurisdiction" at the time the IRA was enacted in 1934, see *Carcieri v. Salazar*, 555 U.S. 379 (2009).

5.      Finally, regardless of whether the Secretary was accepting the Subject Tract in trust for the UKB or the UKB Corporation, the Secretary failed to follow the Department's own regulatory guidelines (25 C.F.R. §§ 151.1 et seq.) in violation of his duty as set forth in 25 U.S.C. § 465.

6.      The Department's decision is unsupported by statutory or regulatory authority, was made without the consent and over the objection of the Cherokee Nation, and is in derogation of the Nation's Treaty-protected rights.  For these and other reasons, this Court should issue an order declaring the Department's action to be arbitrary and capricious, an abuse of discretion, contrary to law, and, as such,  in violation of the Administrative Procedure Act, 5 U.S.C. §§ 701-706 (the "APA").

7.      The Secretary further gave notice on August 7, 2012, of the Department's intention to place the Subject Tract into trust after 30 days from the date of the published notice. *See* 77 Fed. Reg. 47089 (Exhibit 2 to the Complaint).  The notice states the 30-day waiting period "is to afford interested parties the opportunity to seek judicial review of final administrative decisions to take land into trust for Indian tribes . . . before transfer of title to the property occurs." *Id.*  Plaintiffs seek a temporary restraining order and preliminary injunction preventing the Secretary from taking the Subject Tract into trust pending litigation of the issues raised in this Complaint as required in 25 C.F.R. §151.12(b).

## JURISDICTION AND VENUE

8.      The Nation and CNE bring this action under the APA and 25 U.S.C. § 465.  This Court has jurisdiction under 28 U.S.C. §1331, and may issue declaratory relief and reverse, delay, or postpone the Department's actions or otherwise issue an injunction under the Declaratory Judgment Act, 28 U.S.C. §§2201-2202 and the APA §§ 701-706.

9.      Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(e)(1).  The claims of the Nation and CNE in this action arise from the improvident action and decision by the Department which threatens the sovereignty, authority and economic health of the Nation within and throughout the Nation's Treaty Territory.  It also threatens the economic health of CNE, which has its principal place of business in Catoosa, Oklahoma and is thus a resident of this judicial district.

10.     The Nation's Treaty Territory extends throughout eight of the eleven counties within the Northern District of Oklahoma.[2]   The improvident action and decision of the Department threatens a devastating impact on the Nation's long-established sovereignty, jurisdiction and governance throughout the Nation's Treaty Territory.

## PARTIES

11.     The Nation is a federally recognized Indian Tribe.  Although the Nation is sometimes referred to as the "Cherokee Nation of Oklahoma," under its Constitution its name is the "Cherokee Nation."  The Cherokee Nation possesses jurisdiction exclusive of any other Indian tribe or band over all tribal trust lands situated within the boundaries of the Nation's Treaty Territory.

---

[2] The Nation's Treaty Territory includes land within Craig, Delaware, Mayes, Nowata, Ottawa, Rogers, Tulsa and Washington counties, all within the Northern District of Oklahoma.

12. CNE is a wholly owned subsidiary of a wholly owned subsidiary of the Nation which owns and operates the gaming and hospitality businesses of the Nation. It owns and operates a number of casinos throughout the Nation's Treaty Territory, including a large hotel and casino in Catoosa, Oklahoma.

13. Kenneth L. Salazar is the Secretary of the United States Department of the Interior and as such is responsible for its decisions and operations. He is named in his official capacity.

14. Michael S. Black is the Director of the Bureau of Indian Affairs (the "BIA") and was purportedly the Acting Assistant Secretary for Indian Affairs for the United States Department of the Interior when he authored and signed the 2012 Decision that is the subject of this action. He is named in his official capacity.

## HISTORICAL FACTS

### A.     The Cherokee Nation Treaty Territory

15. The Nation possesses rights of self-government which predate the formation of the United States and which were guaranteed by the United States in its treaties with the Nation, including the Treaty of December 29, 1835, 7 Stat. 478 (Proclamation, May 23, 1836) ("Treaty of New Echota"), reprinted in KAPPLER'S INDIAN LAWS AND TREATIES, V. 2 at 439-449, and the Treaty of July 19, 1866, 14 Stat. 799 (Proclamation August 11, 1866), reprinted in KAPPLER'S INDIAN LAWS AND TREATIES, V. 2 at 942-950 ("1866 Treaty"). . See *Talton v. Mayes*, 163 U.S. 376, 380, 384 (1896).

16. In 1835, the citizens of the Nation were removed to what was then Indian Territory under the Treaty of New Echota. The Nation acquired fee patent title to its new lands in

5

1838. The Nation's lands were reduced to its present Treaty Territory size under the 1866 Treaty and by Agreement ratified by Congress by Act of March 3, 1893, ch. 209 27 Stat. 612, 640, reprinted in KAPPLER'S 1 at 484, 489 -492 § 10.

17.       Article 5 of the 1835 Treaty of New Echota guaranteed the Nation the right to self-governance, so long as consistent with the Constitution and laws enacted by Congress regulating trade with Indians. Article 13 of the 1866 Treaty reaffirmed and declared in full force all provisions of prior treaties not inconsistent with the provisions of the 1866 Treaty.

18.       The Nation adopted a written Constitution in 1827, and again in 1839, after removal to Indian Territory.  The Cherokee Nation maintained a government with an executive, legislative, and judicial branch over its domain in Indian Territory.

19.       The Treaty of 1866 expressly provides a mechanism whereby other tribes might be settled within Cherokee country:

> The United States may settle any civilized Indians, friendly with the Cherokees and adjacent tribes, within the Cherokee country, on unsurveyed lands east of 96E, on such terms as may be agreed upon by any such tribe and the Cherokees, subject to the approval of the President of the United States . . . .

Article 15 (emphasis added).

20.       Section 26 of the 1866 Treaty separately protects the right of the Cherokee Nation to the "quiet and peaceable" possession of the Nation's Treaty Territory, "against the hostilities of other tribes". In that Treaty provision, the United States expressly:

> guarantee[d] to the people of the Cherokee Nation the quiet and peaceable possession of their country and protection against domestic feuds and insurrections, and against hostilities of other tribes.   They shall also be protected against interruptions or intrusion from all unauthorized citizens of the United States who may attempt to settle on their lands or reside in their territory.

21.     The Nation shares a common federal legal history with the other four so-called "Five Civilized Tribes" (the Chickasaw, Choctaw, Muscogee (Creek) and Seminole Nations) ("Five Tribes").  Between 1893 and 1906 Congress enacted a series of laws in order to force allotment of tribal lands of the Five Tribes.  The Nation was, and is, a large tribe; there were approximately 41,800 Cherokee citizens within the Nation's Treaty Territory at the time of allotment in the early 1900's and there are now approximately 120,426 Cherokee citizens within the Nation's Treaty Territory, many of whom are also UKB members.

22.     After Oklahoma statehood in 1907, Department officials and employees historically took the position that the Five Tribes had been terminated, refused to recognize tribal governmental actions, refused to release tribal funds to Five Tribes governments, and insisted that Five Tribes chiefs could only be appointed by federal officials for purposes of signing deeds to tribal lands.

23.     The Nation's constitutional government structure has been in continual existence since its 1839 Constitution.  The Nation adopted a new Constitution in 1976[3] under the Nation's inherent sovereign authority.  Article XVI of the 1976 Constitution provides: "The provisions of this Constitution overrule and supersede the provisions of the Cherokee Nation Constitution enacted the 6th day of September 1839."  The Nation later adopted a new Constitution that replaced the 1976 Constitution in 2003[4].  The federal courts have long acknowledged the Cherokee Nation's Constitution and constitutional government.  *See,* e.g., *Wheeler v. U.S Department of the Interior, Bureau of Indian Affairs*, 811 F.2d 549 (10th Cir. 1987).

---

[3] The Constitution was drafted in 1975, but final adoption did not occur until 1976.  In Cherokee law, this Constitution is referred to as the "Constitution of 1975" or "1975 Constitution."
[4] This Constitution was drafted by Convention in 1999, but was not formally approved and adopted until 2003.  It is alternatively referred to as either the 1999 Constitution or the 2003 Constitution.  They are the same document

24.      In *Harjo v. Kleppe*, 420 F. Supp. 1110, 1129 (D.D.C. 1976), *aff'd sub nom, Harjo v. Andrus*, 581 F.2d 949 (D.C. Cir. 1978) the Department took the position that federal laws had stripped the Five Tribes of essentially all governmental authority.  After a detailed review of treaties and federal legislation concerning the Five Tribes, the federal district court concluded that the BIA had illegally engaged in "bureaucratic imperialism" in its dealings with the Creek Nation, and that the existence of the tribal governments had continued notwithstanding harsh federal legislative and administrative treatment.  The court noted in *Harjo* that its conclusion, that the 1906 Five Tribes Act continued indefinitely the existence of the tribe, has been "confirmed by each court that has examined the question."

### B.      The UKB

25.      As recognized by the 2012 Decision, the UKB "sought federal recognition in the 1930's in order to organize as a separate band under the OIWA," but were denied such recognition by the Department of Interior.  This denial of recognition was based on an Opinion by the Solicitor of the Department that found that the UKB was not "a recognized tribe or band" of Cherokee Indians as required by 25 U.S.C. § 503 of the OIWA because it was "neither historically nor actually a governing unit of the Cherokee Nation, but a society of citizens within the Nation with common beliefs and aspirations."  Op. of July 29, 1937, reprinted in 1 Op. Sol. on Indian Affairs 774 (U.S.D.I. 1979).  Thus, as of 1937, the Department of the Interior had determined that the Keetoowahs were not an Indian tribe within the meaning of the OIWA.

26.      In 1945, Acting Secretary of the Interior (later Associate Justice of the United States Supreme Court) Abe Fortas informed Congress that "[i]n 1937 the Keetoowah Indians requested permission to organize under section 3 of the Oklahoma Indian Welfare Act on the

8

grounds that the society was, in effect, a recognized band of Indians residing in Oklahoma. The Department was compelled to decline this request because it seemed impossible to make a positive finding that the Keetoowah Indians were and are a tribe or band within the meaning of the Oklahoma Indian Welfare Act." Letter of Mar. 24, 1945 from the Acting Secretary to Chairman Jackson, Committee on Indian Affairs, *reprinted in* H.R. Rep. No. 79-447, at 2 (1945) and S. Rep. No. 79-978, at 3 (1946).

27.     In 1946, Congress specially authorized the UKB to organize as an Indian band under OIWA § 503. See Act of August 10, 1946, Pub. L. No. 79-715, sec. 1, 60 Stat. 976 ("*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the Keetoowah Indians of the Cherokee Nation of Oklahoma shall be recognized as a band of Indians residing in Oklahoma within the meaning of section 3 of the Act of June 26, 1936"). The Act did not create or recognize a reservation for the UKB nor did it give the UKB any land.

28.     Pursuant to the 1946 Act, by a vote of 1,414 in favor and 1 against, the UKB on October 3, 1950 adopted a constitution and bylaws under section 3 of the OIWA, 25 U.S.C. § 503.

29.     The Department has consistently determined that UKB has never had a reservation, as set out in a decision of the Assistant Secretary for Indian Affairs, issued April 17, 1987. The Assistant Secretary there advised UKB that the Department was denying an application to place land into trust on the grounds that the land at issue was within the Cherokee Nation and, under the regulations, could not be placed into trust without the Cherokee Nation's consent. The Assistant Secretary, in this letter, reasoned that:

> The first issue to be addressed is whether the United Keetoowah Band has a reservation as that term is used in the land acquisition regulations. We believe it

9

is clear that they do not. The regulations defined the term "Indian reservation," in the State of Oklahoma, "as that area of land constituting the former reservation of the tribe as defined by the Secretary." 25 C.F.R. 151.2(f). The United Keetoowah Band has never had a reservation in Oklahoma, and the Band has never exercised independent governing authority over any of the Cherokee Nation's reservation lands. Unlike the Creek Tribal Towns, historically, the Keetoowahs were considered to be merely a society since they never exercised any governmental authority. 1 *Op. Sol. Indian Affairs* 774 (U.S.D.I.1979). Because they lacked attributes of a political body, the legislation referenced above [Act of August 10, 1946, 60 Stat. 976] was required. *See Senate Report No. 79-978.* While the legislation recognized the society as a Band for the purposes of organizing under the Oklahoma Indian Welfare Act, it did not create or set aside a reservation for the Band. Neither did it purport to give the newly acknowledged Band any authority to assert jurisdiction over any lands belonging to the Cherokee Nation. (emphasis added)

30.     The Department has reiterated this position on multiple occasions, including in letters dated December 15, 1988, and February 1, 1989, from the Acting Regional Director of the Muskogee Regional Office (now known as the "Eastern Oklahoma Regional Office") to UKB, denying other UKB applications to have the Secretary acquire land in trust for the UKB.

31.     The Secretary's conclusions described in paragraphs 29 and 30, *supra*, have also been reached by the courts on multiple occasions. In *United Keetoowah Band v. Sec'y of the Interior*, No. 90-C-608-B (N.D. Okla. May 31, 1991), the UKB challenged, *inter alia*, the Department's conclusion that because the Nation was recognized as the sovereign over lands within the Cherokee Treaty Territory, the Nation's consent was required for any application by the UKB to have its land acquired in trust status. *Id.* at 1, 2. In holding that the Nation was an indispensable party to the case, the district court examined the history and relative roles of the UKB and the Nation and found that: (1) the BIA "has determined that the subject lands of the old [Nation's Treaty Territory] are under the jurisdiction of the new Cherokee Nation, not the UKB," *id.* at 6; (2) "[a]s to the old [Nation's Treaty Territory] lands, the Secretary has recognized one sovereign (Cherokee Nation of Oklahoma) over another (UKB)," *id.* at 6; (3) "[p]rior case law

indicates that neither Congress, the Secretary of the Interior, nor the courts have made a distinction between the Cherokee Nation at the time of Oklahoma statehood and the current Cherokee Nation of Oklahoma," *id.* at 12; and (4) "[t]he federal government has long recognized the special interests of the Cherokee Nation in these lands [i.e., "all 'Indian Country' within its former reservation"] . . ." *Id.* at 10.

32.     The same conclusion was reached by the court in *Buzzard v. Oklahoma Tax Commission*, No. 90-C-848-B (N.D. Okla. Feb. 24, 1992), *aff'd*, 992 F.2d 1073 (10th Cir. 1993). In that case, UKB claimed that it was a successor to the Nation and thus "heir to the unallotted lands within the original [Nation's Treaty Territory]," and that it was entitled to exercise tribal sovereignty over those lands, so that they were "transform[ed] into Indian country upon the UKB's purchase in fee." *Id.* at 7. The district court rejected this claim, stating that:

> The UKB . . . offers no authority to support its claim that it is heir to the original Cherokee Indian Reservation. The Act of August 10, 1946 [under which UKB was allowed to organize] simply recognizes the UKB as a "band of Indians residing in Oklahoma"; it does not set aside a reservation for the UKB or acknowledge the UKB's jurisdiction over the original Cherokee Indian Reservation. Also, while the Act's recognition of the UKB permitted the UKB to incorporate under Section 3 of the [Oklahoma Indian Welfare Act], nothing in Section 3 creates or recognizes the UKB's claim to the original Cherokee Indian Reservation.

*Id.* at 8 (emphasis added). The court further found that the United States has consistently recognized that the lands within the Nation's Treaty Territory are under the jurisdiction and control of the Nation, not the UKB:

> Contrary to the UKB's claim, the Secretary of the Interior has determined that the lands within the original Cherokee Indian Reservation are not under the jurisdiction of the UKB . . . . [T]he Secretary has recognized that the original Cherokee Indian Reservation is the former reservation of the Cherokee Nation, not the UKB . . . .

*Id.* at 8-9 (citation omitted). Based on these factors, the court concluded "that UKB has failed to show any treaty or Congressional act establishing UKB's 'inherited' right or claim to reservation land within the boundaries of the [Nation's Treaty Territory]." *Id.* at 9 (footnote omitted). The Tenth Circuit affirmed the district court's decision. 992 F.2d 1073 (10th Cir. 1993).

33.     The Court reached the same conclusion when the UKB challenged the Nation's authority to enforce its tobacco tax and licensing requirements on individual allotments that the UKB was using for smokeshops. *United Keetoowah Band v, Mankiller*, No. 92-C-585-B (N.D. Okla. 1993), aff'd 2 F3d 1161 (10th Cir. 1993). The district court held that the UKB's claim that its smokeshops were not subject to the Nation's authority "directly attack[ed] the sovereignty of the Cherokee Nation over the subject land . . ." 1993 WL 307937 at **4. The court further found that it had "previously decided that the Cherokee Nation is the only tribal entity with jurisdictional authority in Indian Country within the Cherokee Nation," and that it had "previously determined in [the two] prior cases that the Cherokee Nation's sovereignty is preeminent to that of the UKB in Cherokee Nation Indian Country." *Id.* at **2. The court concluded that, given the court's two prior holdings on the superiority of the Nation's interests and jurisdiction, principles of res judicata and collateral estoppel barred UKB from again raising the merits of its successor-in-interest claim. *Id.* at **5. The Tenth Circuit affirmed. 1993 WL 307937 (10th Cir. Aug. 12, 1993).


### C. The UKB Corporation

34.     Pursuant to the 1946 Act, the UKB adopted its 1950 constitution and bylaws under the OIWA. On the same date, the UKB separately adopted a corporate charter under the same section of the OIWA, forming the UKB Corporation. The UKB and the UKB Corporation

12

are not one and the same; they are distinctly separate legal entities. On information and belief, the UKB Corporation has no board, has never met as a corporate body, and has not taken any corporate action requesting that the subject land be taken into trust.

### D. The Subject Tract

35.    In 1986, the UKB entered into a contract for the purchase, by installment payments, of the Subject Tract located at 2403 South Muskogee Avenue, Tahlequah, Cherokee County, Oklahoma. By warranty deed executed November 30, 1990, and recorded by the Cherokee County Clerk on January 2, 1991, the UKB obtained fee simple title to the Subject Tract.

36.    The Subject Tract is located within the Nation's Treaty Territory. This parcel is in an area that has long been recognized as within the exclusive boundaries of the Nation's Treaty Territory. BIA trust acquisition regulations provide that, for tribes situated in Oklahoma, the term "Indian reservation" means "that area of land constituting the former reservation of the tribe as defined by the Secretary." 25 C.F.R. § 151.3(f).

37.    The 2012 Decision states the "UKB owns the property in fee as evidenced by the Warranty Deed dated February 23, 2012." Contrary to this statement, the referenced warranty deed does not constitute evidence of UKB title to the Subject Property. The referenced warranty deed is part of the trust application. It identifies "the United Keetoowah Band of Cherokee Indians in Oklahoma" as the grantor and the "United States of America in trust for the United Keetoowah Band of Cherokee Indians in Oklahoma, a corporation chartered under the Act of

13

June 26, 1936 (49 Stat 1967) and the Act of August 10, 1946" as the grantee, and contains a blank line for approval of the deed by the Director of the Eastern Oklahoma Regional Office.

E.   NIGC Determined Subject Tract Not "Indian Lands" for Gaming Purposes

38.      The UKB began to conduct gaming on the Subject Tract in 1986 and has continued to conduct gaming on the parcel ever since.

39.      Gaming by Indian tribes is regulated by the Indian Gaming Regulatory Act of 1988, 25 U.S.C. § 2701 *et seq.* , but is permissible only if such gaming is conducted on "Indian lands within such tribe's jurisdiction." 25 U.S.C. § 2710(b)(1). IGRA defines "Indian lands" to mean (a) land within the limits of an Indian reservation or (b) land over which an Indian tribe exercises governmental power and that is either held in trust by the United States for the benefit of an Indian tribe or held by an Indian tribe subject to a restriction by the United States against alienation." 25 U.S.C. §2703(4) (emphasis added). IGRA also established the National Indian Gaming Commission (NIGC) to administer and enforce the Act. *Id.* § 2704.

40.      On July 21, 2011, the Chairman of the NIGC issued a final agency determination concluding that the Subject Tract "is not currently Indian land eligible for gaming under IGRA," and was therefore subject to the laws of the State of Oklahoma. Letter of July 21, 2011, from Tracie L. Stevens, Chairman, National Indian Gaming Commission, to George Wickliffe, Chief, United Keetoowah Band of Cherokee Indians in Oklahoma (emphasis added).

41.      The NIGC decision adopted and incorporated a memorandum dated July 18, 2011, from Lawrence Roberts, NIGC General Counsel, to the NIGC Chair, that analyzed the legal status of the Subject Tract ("Roberts Memorandum"), and was consistent with an earlier 2000 legal opinion issued by former NIGC General Counsel Kevin Washburn.

14

42.     The Roberts Memorandum concluded that "UKB's lands encompassing the Gaming Site are not within the limits of an Indian reservation within the meaning of IGRA." Roberts Mem. at 13. The Roberts Memorandum also concluded that the Subject Tract was not held in trust by the United States for UKB, nor subject to a restriction against alienation. *Id.* at 13-14. Accordingly, the UKB's gaming on the Subject Tract has always been and continues to be unlawful.

## GENERAL ALLEGATIONS

### A.     UKB Trust Application

43.     The UKB submitted an application to the BIA on or about a date in 2006, requesting that the Subject Tract be acquired in trust for the benefit of the UKB.   The Department never took final action on the original 2006 application.

44.     On August 15, 2011, the UKB submitted an amended application to the BIA's Eastern Oklahoma Regional Office requesting that the BIA acquire the foregoing gaming parcel in trust for the UKB.

45.     By letter dated November 4, 2011, the Eastern Oklahoma Regional Director notified the Nation of the UKB's amended application and provided the Nation with 30 days to comment on the application. On December 1, 2011, the Cherokee Nation filed comments with the BIA Eastern Oklahoma Regional office opposing the proposed trust acquisition.

### B.     2012 Decision

46.     On July 30, 2012, the Secretary issued the 2012 Decision recommending "that the property be accepted in trust for the benefit of the Tribe." Decision at p. 9.

47.     On August 7, 2012, the Secretary published his notice in the Federal Register stating the Secretary "decided to accept approximately 2.03 acres of land into trust for the United Keetoowah Band of Oklahoma Corporation." See Exhibit 2.

48.     The 2012 Decision asserts that the Keetoowah Society of Oklahoma Cherokees "existed as an organization of Cherokee Indians in Oklahoma" since the 1800s. Decision at 2, citing *Buzzard v. Okla. Tax Comm'n*, 1992 U.S.Dist. LEXIS 22864 (N.D. Okla., Mar. 3, 1992), *aff'd* 992 F.2d 1073 (10th Cir. 1993). The 2012 Decision did not discuss, and is not legally consistent with, other findings in the *Buzzard* case. See Complaint, ¶ 32.

49.     The 2012 Decision acknowledges that the UKB "sought federal recognition in the 1930's in order to organize as a separate band under the OIWA," but were denied such recognition by the Department in 1937, based on a Solicitor's Opinion. See Complaint, ¶ 26.

50.     The 2012 Decision recites that Congress in 1946 legislatively declared the UKB eligible to organize under 25 U.S.C. § 503, and that in 1950 the UKB adopted a constitution which was approved by the Secretary and then ratified by UKB's members. Decision at 2.

51.     The 2012 Decision states that "[a]s a tribe organized pursuant to the OIWA, the UKB is entitled to the same rights and privileges as tribes organized pursuant to the Indian Reorganization Act of 1934 (IRA)." Decision at 1. Section 5 of the IRA, codified at 25 U.S.C. § 465 provides authority to the Secretary of Interior to acquire land in trust for Indian tribes regardless of whether organized under the IRA, subject to certain statutory and regulatory restrictions.

52.     The 2012 Decision recognized that under IGRA, 25 U.S.C. § 2719, gaming may not be conducted on land acquired in trust after October 17, 1988 (the date of IGRA's enactment) unless such land satisfies one of several specific conditions.   The Secretary found

16

that, since the Subject Tract was not acquired in trust prior to 1988, gaming on such land must satisfy one of these conditions.   Among these conditions is that the Indian tribe has no reservation and the land is in Oklahoma and "within the boundaries of the Indian tribe's *former reservation, as defined* by the Secretary. . ."  Id. § 2719(a)(2)(A)(i).  ) (emphasis added).

53.    The 2012 Decision asserts that the Subject Tract is within the UKB "former reservation" and therefore meets the foregoing condition.  Decision at 4, 5.

54.    In the 2012 Decision, the Secretary states that neither IGRA nor its implementing regulations "address the question of whether two federally recognized tribes, one of which was formed under express congressional authorization from the citizens of the other, can share the same former reservation" for purposes of IGRA. *Id.*

55.    The 2012 Decision also concludes that, once acquired in trust for the UKB, "UKB may conduct gaming on this property pursuant to 25 U.S.C. § 2719(a)(2)(A)(i) ... ." *Id.*  The Department states that, due to the foregoing conclusions, it is not necessary for the Department to consider "[t]he two-part determination pursuant to Section 20 of IGRA, 25 U.S.C. § 2719(b)(1)(A)" (which governs gaming on newly-acquired lands not situated within a tribe's former reservation). *Id.* at 9.

56.    The Department's 2012 Decision to take the Subject Tract into trust was unlawful, unwarranted by the facts, and in excess of its authority in that the Department violated its own regulations and applicable law, abused its discretion, and acted arbitrarily and capriciously by making its final determination to take the land into trust in the absence of facts and law warranting the decision, all without observance of procedures required by law.

17

57.     By reason of the Department's unwarranted and unlawful decision to take the Subject Tract into trust, the Nation and CNE have suffered legal wrong and been adversely affected and aggrieved by the agency action.

### CLAIMS FOR RELIEF

FIRST CLAIM FOR RELIEF

**VIOLATION OF REGULATORY REQUIREMENTS REGARDING CHEROKEE NATION CONSENT BASED ON ERRONEOUS DETERMINATION OF UKB "FORMER RESERVATION"/"SHARED RESERVATION"**

(Unlawful Exercise of Trust Authority, 25 U.S.C. § 465)
(Administrative Procedures Act, 5 U.S.C. §§ 702, 706)
(Declaratory Judgment, 28 U.S.C. § 2201)

58.     Plaintiffs reallege the allegations set forth in Paragraphs 1 through 57 and same are incorporated as if fully set forth herein.

59.     The IRA, 25 U.S.C. § 465, and the OIWA, 25 U.S.C. § 501, confer upon the Secretary the discretionary authority to take land into trust.

60.     The Secretary's discretionary authority is subject to compliance with the Department's Land Acquisition Regulations, 25 C.F.R. Part 151, which were promulgated to implement both the IRA and the OIWA. 25 C.F.R. § 151.5 ("land may be acquired in trust status for an individual Indian or a tribe in the State of Oklahoma under [25 U.S.C. § 465], if such acquisition comes within the terms of this part [25 C.F.R. § 151]").

61.     Section 151.8 of the Land Acquisition Regulations states that an Indian tribe "may acquire land in trust on a reservation other than its own only when the governing body of the tribe having jurisdiction over such reservation consents in writing to the acquisition. . . ."

62.     The 2012 Decision acknowledges that "[c]onsistent with this regulatory provision, the Secretary has previously declined to take any lands in trust for the UKB within the

18

boundaries of the Nation's Treaty Territory without the consent of the Cherokee Nation.   The Cherokee Nation has consistently refused to grant its consent."   The 2012 Decision nevertheless concludes that the Cherokee Nation's consent is not required for placement of the Subject Tract into trust, based on a finding that "the former reservation of CNO [Nation's Treaty Territory] is also the former reservation of the UKB for purposes of applying the exception under 25 U.S.C. §2719(a)(2)(A)(i)," Decision at 4.

63.     Under the cited § 2719(a)(2)(A)(i) of IGRA, gaming may be conducted on land acquired in trust after October 17, 1988 (the date of IGRA's enactment) only if one of several specific conditions are met.   Among these conditions is that the Indian tribe has no reservation and the land is in Oklahoma and "within the boundaries of the Indian tribe's *former reservation, as defined by the Secretary*. . ." 25 U.S.C. § 2719(a)(2)(A)(i).

64.     The IGRA does not vest the Secretary with any authority to acquire land in trust. The IGRA vests primary authority to implement IGRA in the NIGC, not the Assistant Secretary. See ¶ 39, *supra*.   Nonetheless, the 2012 Decision includes a lengthy discussion setting forth the Secretary's new position that the reservation within which the subject land is located is actually the "former reservation" of the UKB.

65.     In the 2012 Decision, the Secretary asserts that the Secretary of the Interior has the discretion to make "the determination of whether the land is within the boundaries of a tribe's former reservation. . . ."  in order to determine whether the "former reservation" condition in IGRA has been met.   Decision at 4.   This assertion is not supported by IGRA, which authorizes the Secretary to *define* the term "former reservation," and to apply that definition in making a determination.

66.     The Secretary has *defined* the term "former reservation" in 25 C.F.R. 292.1 as: "lands in Oklahoma that are within the exterior boundaries of the last reservation that was established by treaty, Executive Order, or Secretarial Order for an Oklahoma tribe." Instead of considering this regulatory definition and recognizing that no treaty, Executive Order, or Secretarial order ever established a reservation for the UKB, the 2012 Decision simply concludes that "[t]here is no question that the UKB occupied the former Cherokee reservation nor that the Keetoowah Society of Oklahoma Cherokees was formed out of the Cherokee Nation of Oklahoma." Decision at 4.

67.     This conclusion returns to two concepts that the Department has previously entertained and then rejected:   (1) the idea that the UKB is a successor-in-interest to the "historic" Cherokee Nation; and (2) the ad hoc "rule" that the UKB shares a reservation with the Cherokee Nation, rendering Cherokee Nation consent to a trust acquisition unnecessary. This "rule," which has not been promulgated in accordance with the APA, appeared in DOI's 2001 unsuccessful attempt to promulgate regulations that would have made unnecessary the consent of a tribe to the trust acquisition by another tribe on a "shared reservation".  66 F.R. 3452-01, 2001, WL 31920.  Application of this unpromulgated "rule" is accordingly a violation of the APA.

68.     No treaty, act of Congress or regulation has ever established a reservation for the UKB Band.  Accordingly, UKB cannot now have a "former reservation."

69.     There is no lawful basis for the 2012 Decision conclusion that the Cherokee Treaty Territory also constitutes the "former reservation" of the UKB.  The conclusion is in defiance of the prior decisions of the Department, this Court and of this Circuit.  The Department is precluded from making any such legal determination by unanimous prior judicial decisions rejecting substantively identical assertions.

70.     For the foregoing reasons, the Department's decision to take the land into trust was contrary to law, arbitrary, capricious, and an abuse of discretion under the APA.

WHEREFORE, the Nation and CNE pray as hereinafter set forth.

SECOND CLAIM FOR RELIEF

## ABSENCE OF STATUTORY AUTHORITY FOR SECRETARIAL ACQUISITION OF LAND INTO TRUST ON BEHALF OF TRIBAL CORPORATION

(Unlawful Exercise of Trust Authority, 25 U.S.C. § 501, 503)<br>(Administrative Procedure Act, 5 U.S.C. §§702, 706)<br>(Declaratory Judgment, 28 U.S.C. § 2201)

71.     Plaintiffs  reallege the allegations set forth in Paragraphs 1 through 70 and same are incorporated as if fully set forth.

72.     Section 151.3 of the Land Acquisition Regulations states: "Land not held in trust or restricted status may only be acquired for an individual Indian or a tribe in trust status when such acquisition is authorized by an act of Congress."  In addition, section 151.10(a) of the Regulations states that in, evaluating a request for a trust acquisition, the Secretary will consider "the existence of statutory authority for the acquisition and any limitations contained in such authority."  25 C.F.R. § 151.10(a).  In accordance with this provision, the 2012 Decision states that "[l]and may be acquired in trust for tribes only when there is statutory authority to do so."  25 C.F.R. §151.3

73.     The 2012 Decision indicates that the Subject Tract will be taken into trust on behalf of the UKB "Tribe", but the published Notice of the decision indicates that the Subject Tract will be taken in trust for the UKB *Corporation.*  The 2012 Decision does not claim that the Secretary possesses express authority from Congress to acquire land in trust status for the UKB Corporation.  Nonetheless, the Decision asserts that "Section 3 of the OIWA, 25 U.S.C. § 503, implicitly authorizes the Secretary to take land into trust for the UKB Corporation."  Decision at

21

6 (emphasis added). To support this assertion, the Secretary cites to a September 10, 2010, decision by the Assistant Secretary (made in a separate administrative proceeding relating to a different UKB fee-to-trust application for a different parcel of land).

74.     The September 2010 decision found that Congress granted the Secretary implicit authority to take land into trust for the UKB Corporation because the UKB Corporation's corporate charter in section 3(r) permits the corporation to "hold ... property of every description," and because, somewhat cryptically, "[t]he Secretary has the authority to convey to corporations the authority to hold land in trust as one of the 'rights or privileges secure [sic] to an organized Indian tribe under [the IRA]'" (cryptically, because it is the Secretary which holds trust land, not the beneficiary). Decision of September 10, 2010, at 3 (quoting 25 U.S.C. § 503).

75.     The Nation's appeal of the September 10, 2010, decision is pending before the Interior Board of Indian Appeals, see *Cherokee Nation v. Eastern Oklahoma Regional Director*, No. IBIA 11-122 (appeal docketed July 12, 2011).

76.     Neither section 1 nor 3 of the OIWA authorizes the defendants to take land into trust for an OIWA corporation. The only authority granted to the Secretary to take land into trust under the OIWA for any entity is set forth expressly and in detail in section 1 of the OIWA, 25 U.S.C. § 501, and that section does not authorize trust land acquisitions for corporations. Section 3 of the OIWA, 25 U.S.C. § 503, does not authorize the Secretary to take land into trust for any entity, tribal or corporate. The Secretary's assertion that he possesses implied authority from the terms of UKB's corporate charter and from OIWA Section 3's "privileges and rights" provision is contrary to law.

77.     The Secretary's land acquisition regulations do not authorize one entity to apply to have land taken into trust for another entity. The Secretary's land acquisition regulations do

22

not authorize the Secretary to take lands into trust for an entity which does not possess the lands in fee title.  The Secretary's decision to acquire lands owned in fee by the UKB Band in trust for the UKB Corporation is thus contrary to law.

78.     For the foregoing reasons, the defendants are without authority to acquire the Subject Tract in trust on behalf of the UKB Corporation, and the Secretary's 2012 Decision and August 7, 2012 Notice to do so is arbitrary and capricious, an abuse of discretion and contrary to law under the APA.

WHEREFORE, the Nation and CNE pray as hereinafter set forth.

### THIRD CLAIM FOR RELIEF

### VIOLATION OF REGULATORY REQUIREMENTS REGARDING JURISDICTIONAL CONCERNS

(Unlawful Exercise of Trust Authority, 25 U.S.C. § 465)
(Administrative Procedure Act, 5 U.S.C. §§702, 706)
(Declaratory Judgment, 28 U.S.C. § 2201)

79.     Plaintiffs reallege the allegations set forth in Paragraphs 1 through 78 and same are incorporated as if fully set forth.

80.     Section 151.10(f) of the Land Acquisition Regulations requires the Department to consider "jurisdictional problems and potential conflicts of land use which may arise" from any proposed trust acquisition.  25 C.F.R. § 151.10(f).

81.     The 2012 Decision acknowledges and states  that the BIA Eastern Oklahoma Region "is concerned that jurisdictional conflicts will arise between the UKB and the CNO if the property is placed in trust for the UKB within the former reservation boundaries of the CNO." Decision at 8.

82.     However, the 2012 Decision refers to a June 24, 2009, determination by the Assistant Secretary made in a separate administrative proceeding relating to a different fee-to-trust application by the UKB.  In that decision, the Assistant Secretary "concluded that alleged jurisdictional conflicts between the Band and the Cherokee Nation would not prevent the Secretary from taking land into trust for the UKB Corporation to be governed by the Band on the former Cherokee Reservation."  Decision at 6.

83.     The 2012 Decision states that the June 24, 2009, analysis "supports the conclusion" that the Cherokee Nation and the UKB Band "can avail themselves of the same former reservation" for purposes of gaming under the IGRA.  *Id.*  The June 24, 2009, decision never characterized the Cherokee Treaty Territory as belonging to the UKB Band.  The July 30 Decision fails to note that the cited June 24, 2009, decision at issue is on appeal now pending before the Interior Board of Indian Appeals, see *Cherokee Nation v. Eastern Oklahoma Regional Director, Bureau of Indian Affairs*, *supra*.

84.     Subsection (g) of § 476 of the IRA (a section involving tribal constitutional reorganization, not trust acquisitions) provides:  "Any regulation or administrative decision or determination of a department or agency of the United States that is in existence or effect on May 31, 1994, and that classifies, enhances, or diminishes the privileges and immunities available to a federally recognized Indian tribe relative to the privileges and immunities available to other federally recognized tribes by virtue of their status as Indian tribes shall have no force or effect." (emphasis added).  The July 30 Decision cites the findings made by the Assistant Secretary in his June 24, 2009, decision that Section 476(g), "prohibits the Department from finding that the UKB lacks territorial jurisdiction while other tribes have territorial jurisdiction"

and "the UKB, like [the Cherokee Nation], possesses the authority to exercise territorial jurisdiction over its tribal lands." Decision at 8.

85.     Even though the BIA Eastern Regional Office concluded the proposed acquisition of the Subject Tract in trust for the UKB would result in serious jurisdictional conflicts between the Nation and the UKB, the Department ignored its own findings in issuing the notice of intent to place the Subject Tract into trust.   The Department's determination as to jurisdictional conflicts is arbitrary, capricious, and an abuse of discretion under the APA.

WHEREFORE, the Nation and CNE pray as hereinafter set forth.


## FOURTH CLAIM FOR RELIEF

### VIOLATION OF REGULATORY REQUIREMENTS REGARDING NEED FOR LAND

(Unlawful Exercise of Trust Authority, 25 U.S.C. § 465)
(Administrative Procedure Act, 5 U.S.C. §§702, 706)
(Declaratory Judgment, 28 U.S.C. § 2201)

86.     Plaintiffs reallege the allegations set forth in Paragraphs 1 through 85 and same are incorporated as if fully set forth.

87.     Section 151.10(b) of the Trust Acquisition Regulations mandates that the Department consider the "need" of the UKB for land to be taken into trust on its behalf.

88.     The 2012 Decision states that the NIGC determined the existing UKB gaming operation "is not located on Indian lands under Federal law. . . ." Notwithstanding the fact that this means that UKB has been conducting illegal gaming on the Subject Tract since 1986 in violation of state and federal law, the Department stated that the UKB may suffer "substantial

25

financial loss if the property is not placed in trust" and concluded that the UKB "now has an urgent need to have the property placed in trust."

89.     The Department's bootstrap reasoning—that it is the ongoing conduct of an illegal gaming operation that provides the basis for a finding of a "need" for a proposed trust acquisition in order to cure the illegality of the gaming—is arbitrary and capricious, an abuse of discretion and contrary to law under the APA.

WHEREFORE, the Nation and CNE pray as hereinafter set forth.

FIFTH CLAIM FOR RELIEF

**VIOLATION OF REGULATORY REQUIREMENTS REGARDING
IMPACT ON LOCAL GOVERNMENTS AND
THE ABILITY OF BIA TO PROVIDE SERVICES**

(Unlawful Exercise of Trust Authority, 25 U.S.C. § 465)
(Administrative Procedure Act, 5 U.S.C. §§702, 706)
(Declaratory Judgment, 28 U.S.C. § 2201)

90.     Plaintiffs reallege the allegations set forth in Paragraphs 1 through 89 and same are incorporated as if fully set forth.

91.     Section 151.10(g) of the Land Acquisition Regulations requires the Department to consider "whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities resulting from the acquisition of land in trust status."   Similarly, section 151.10(e) of the Regulations requires the Secretary to consider "the impact on the state and its political subdivisions resulting from the removal of the land from the tax rolls." *Id.* § 151.10(e).

92.     The 2012 Decision finds that the proposed trust acquisition of the UKB gaming parcel is within the Nation's Treaty Territory and that "the lands within the former treaty boundaries of the [Cherokee Nation] are the [Cherokee Nation]'s service area for purposes of

26

administering BIA programs under Indian Self-Determination and Education Assistance Act, Public Law 93-638 (25 U.S.C. §§ 450 et seq.)." Decision at 8. The Department further finds that pursuant to the Indian Self-Determination Act, the Cherokee Nation, through a self-governance compact awarded pursuant to 25 U.S.C. §§ 458aa *et seq*, administers "the program functions associated with the management of trust lands" that were previously provided by the BIA, including real estate services, tribal court services and law enforcement services. Decision at 8-9. The Department notes that all funds previously spent by the BIA to provide these services have been "transferred to the [Cherokee Nation] Compact." Decision at 9.

93.     The 2012 Decision concludes that "[t]here are no remaining direct service funds in the Region that have not been previously provided to the [Cherokee Nation] in its Self-Governing Compact." It also states that "the UKB would likely reject the authority of the [Cherokee Nation] employees and insist that the Region provide BIA direct services as it has done in the past with respect to other BIA services, e.g., processing of fee-to-trust acquisitions." Decision at 9.

94.     Although the Decision concludes that "additional duties" associated with the newly acquired trust land may "increase the workload" of the Eastern Oklahoma Regional office, and that no funds are available to carry out that work, the Decision recites that the Region "has concluded they are capable of providing services for UKB. . . ." Decision at 9.

95.     The Cherokee Nation has provided and continues to provide health, education, law enforcement and social services to all Indian people and all Indian country within the Nation's Treaty Territory. As the 2012 Decision states, all BIA programs within the Nation's Treaty Territory, and all associated funding for such programs, have already been transferred to the Nation pursuant to a self-governance compact under the ISDA, and as a consequence the

27

Tahlequah BIA Regional Office (which previously administered such programs) has been closed. Decision at 9.

96.        Under Nation law, UKB members are eligible to be members of the Nation and are eligible for governmental services (including Federal services) provided by the Nation through its ISDA programs.  But the 2012 Decision states that the UKB Band "would likely reject the authority" of the Nation to provide services formerly provided by the BIA and now provided by the Nation.  Decision at 9.  If the Subject Tract is taken into trust, the UKB will likely seek additional funds from the BIA, the IHS, the Department of Justice and other federal agencies to provide services to UKB members who are otherwise eligible for services from the Nation.  Any such federal funds obtained by UKB threaten to diminish the funds that would be provided to the Nation and to degrade the ability of the Nation to provide services to all Indians on the Nation's Treaty Territory.  Such payments to UKB also would result in unnecessary and duplicative costs to provide the same services already being provided by the Nation, to the detriment of the intended beneficiaries of such services.  The Department's failure to consider the impact of the proposed trust acquisition on the Nation and on its continued ability to receive funds under the Indian Self-Determination Act and to provide services under that Act to Indians on the Nation's Treaty Territory was arbitrary and capricious, an abuse of discretion and contrary to law under the APA.

WHEREFORE, the Nation and CNE pray as hereinafter set forth.

SIXTH CLAIM FOR RELIEF

**FAILURE TO APPLY *CARCIERI***

(Unlawful Exercise of Trust Authority, 25 U.S.C. § 465)
(Declaratory Judgment, 28 U.S.C. § 2201)

28

97.     Plaintiffs reallege the allegations set forth in Paragraphs 1 through 96 and same are incorporated as if fully set forth.

98.     The Secretary's 2012 Decision purports, in part, to implement the Secretary's authority under the IRA to acquire lands in trust for Indian tribes under 25 U.S.C. §465. Decision at 1. See also id. at 6 (citing September 2010 decision discussing the IRA); supra ¶ 57. The IRA does not authorize the Secretary to acquire lands in trust for a tribal entity that was not "under federal jurisdiction" on June 18, 1934. 25 U.S.C. § 479. See also Carcieri, 555 U.S. at 382. The Acting Assistant Secretary's Decision mentions the Carcieri decision only in passing on p. 6 of the decision, but does not address the application of it at all.

99.     The UKB indisputably became a legal entity on October 3, 1950, over 16 years past the Supreme Court's 1934 deadline. Therefore, the Secretary is barred by operation of law from granting its fee-to-trust application. It is true that a tribe organized under the OIWA may be granted a corporate charter which conveys to it, inter alia, any other rights or privileges secured to an organized Indian tribe under the IRA. Oklahoma Indian Welfare Act, § 3, 49 Stat. 1967 (codified a t25 U.S.C. § 503). But an "organized Indian tribe" under the IRA having the same characteristics as UKB - i.e., a tribe organized after 1934 - would not be eligible to receive land in trust under 25 U.S.C. § 465, as construed by Carcieri. In other words, section 3 of the OIWA does not grant OIWA-organized entities any rights greater than IRA-organized entities.

100.    Since the UKB was not federally recognized until 1946, the Secretary cannot, as a matter of law, invoke his discretionary authority under 25 U.S.C. § 465 to accept the Subject Tract into trust under Carcieri.

WHEREFORE, the Nation and CNE pray as hereinafter set forth.

## SEVENTH CLAIM FOR RELIEF
## **VIOLATION OF IGRA**

(Violation of IGRA, 25 U.S.C. § 2719)
(Declaratory Judgment, 28 U.S.C. § 2201)

101.    Plaintiffs reallege the allegations set forth in Paragraphs 1 through 100 and same are incorporated as if fully set forth.

102.    The 2012 Decision concluded that when the gaming parcel is taken into trust, "UKB may conduct gaming on this property pursuant to 25 U.S.C. § 2719(a)(2)(A)(i) and the implementing regulations set forth in 25 C.F.R. Part 292." Decision at 5.

103.    The Department determined that the "former reservation" exception applies to the gaming that is currently conducted by the UKB, even though this is gaming that the NIGC has specifically determined is <u>not</u> currently in compliance with IGRA.  For the reasons stated in Count I, *supra*, the Department's determination that the gaming parcel is within the "former reservation" of the UKB is arbitrary, capricious, an abuse of discretion and contrary to law.

WHEREFORE, the Nation and CNE pray as hereinafter set forth.

## EIGHTH CLAIM FOR RELIEF

## **VIOLATION OF TREATY RIGHTS**
(Administrative Procedures Act, 5 U.S.C. §§ 702, 706)

104.    Plaintiffs reallege the allegations set forth in Paragraphs 1 through 103 and same are incorporated as if fully set forth.

105.     The Treaty provisions which granted the Reservation to the Cherokee Nation to be held by the Nation as a whole, and which reconfirm the Cherokee Nation's sovereign authority and rights of self-government— rights which are to be protected against the "intrusion" of all unauthorized citizens without Cherokee Nation consent—mean that the Cherokee Nation possesses exclusive sovereign authority over trust lands within the boundaries of the Nation's Treaty Territory and holds a veto power over the entry of other tribes upon such lands.

106.     The 2012 Decision violates the Cherokee Nation's right to exclusive sovereign authority over the Nation's Treaty Territory, as guaranteed by the 1866 Treaty, by purporting to provide conflicting territorial jurisdiction to the UKB Band over land within the Nation's Treaty Territory.

107.     The 2012 Decision violates the Cherokee Nation's right to "peaceable possession" of the Nation's Treaty Territory, and the right to be protected against "hostilities of other tribes" and against "intrusion" by others, as guaranteed by the 1866 Treaty, by purporting to acquire the gaming parcel in trust for the UKB Corporation on the Nation's Treaty Territory without the consent of the Cherokee Nation, thereby impairing the Cherokee Nation's exclusive sovereign authority over the Nation's Treaty Territory.

108.     The 2012 Decision violates the Cherokee Nation's right to "the quiet and peaceful possession of their country and protection . . . against hostilities of other tribes," as guaranteed by the 1866 Treaty, by acquiring land within the Nation's Treaty Territory in trust for the UKB Corporation, to be governed (as the Secretary sees it) by the UKB Band which, among other hostile acts, has sought to divert the distribution of federal funds from the Cherokee Nation and has conducted for decades an illegal gaming enterprise in competition with the Nation's legitimate, federally-regulated casinos which are lawfully operated by Cherokee Nation through

31

CNE pursuant to the IGRA, thus threatening the Cherokee Nation's peaceful possession of its country within the meaning of the 1866 Treaty.

109.     Because the July 30 Decision violates the Cherokee Nation's rights under the 1866 Treaty in multiple ways, the Decision is arbitrary and capricious, an abuse of discretion and contrary to law under the APA.

WHEREFORE, the Nation prays as hereinafter set forth.

## NINTH CLAIM FOR RELIEF

### VIOLATION OF REGULATORY REQUIREMENTS
### REGARDING ECONOMIC IMPACT ON NATION ENTERPRISES

(Unlawful Exercise of Trust Authority, 25 U.S.C. § 465)
(Violation of IGRA, 25 U.S.C. § 2719)
(Declaratory Judgment, 28 U.S.C. § 2201)

110.     Plaintiffs reallege the allegations set forth in Paragraphs 1 through 109 and same are incorporated as if fully set forth.

111.     The Department's 2012 Decision to take the Subject Tract into trust exceeds the statutory authority of the Department. Further, even if such authority did exist, the Department acted arbitrarily and capriciously in making its final determination to take the land into trust. The Decision is contrary to the prior decisions of the Department and the precedent of this Court. Moreover, the Decision is unwarranted by the facts and law of this case.

112.     CNE is currently the only entity that may legally conduct gaming within the Nation's Treaty Territory.  CNE has invested millions of dollars to build, operate, and promote its gaming venues in the Treaty Territory.  These investments were made in reliance on the

Nation's and CNE's belief that the Nation (acting through CNE) has the exclusive right to conduct gaming within the Nation's Treaty Territory.

113.    The Department's unauthorized and unlawful decision to take the Subject Tract into trust and its finding that, once such a taking occurs, the UKB may legally conduct gaming on the Subject Tract in compliance with IGRA unfairly and unlawfully expose CNE to legal gaming competition throughout the Nation's own Treaty Territory.  Thus, CNE has suffered a legal wrong and been adversely affected and aggrieved by the agency action.

WHEREFORE, the Nation and CNE pray as hereinafter set forth.

## TENTH CLAIM FOR RELIEF

### INJUNCTION

(Fed.R.Civ.P. 65)

114.    Plaintiffs reallege the allegations set forth in Paragraphs 1 through 113 and same are incorporated as if fully set forth.

115.    The Subject Tract cannot be taken into trust because the Nation has not given consent as required by 25 C.F.R. 151.8.

116.    The Secretary's conclusion that the Nation's consent is not required because the Nation and UKB share the Nation's Treaty Territory is inconsistent with previous Department determinations and developed case law.

117.    Since the UKB was not federally recognized until 1946, the Secretary has no authority under 25 U.S.C. § 465 to accept the Subject Tract into trust. See *Carcieri*. Moreover, even if the Secretary had such authority, he could not properly exercise it here because the prerequisites to such a discretionary acceptance of land into trust have not occurred.

118.    No lawful authority exists under which the Secretary can accept the Subject Tract into trust on behalf of the UKB or the UKB Corporation.

119.    Nation and CNE are entitled to injunctive relief temporarily, preliminarily,  and permanently enjoining and prohibiting the Secretary from accepting the Subject Tract into trust since there exists no legal authority empowering him to do so.  The Attorney General for the Cherokee Nation, Mr. Hembree, has been informed by counsel for the United States of American that the U.S.A. will not take the Subject Tract into trust during the pendency of the action without giving Plaintiffs thirty days written notice of such intent.

120.    If the Secretary is not enjoined from taking the Subject Tract into trust, the Nation and CNE will be irreparably harmed as they may or will lose the opportunity of judicial review of the Secretary's decision.

121.    Further, if the Secretary is not enjoined, or voluntarily agrees to  stay taking the Subject Tract into trust, both the Nation and CNE will be irreparably harmed by the improvident action and decision by the Department which threatens the sovereignty, authority and economic health of the Nation within and throughout its Treaty Territory and the established and future business opportunities of CNE on behalf of the Nation within and throughout the Nation's Treaty Territory.

122.    Absent a voluntary stay, by reason of the Secretary's unlawful issuance of the Notice of Final Agency Determination, the Nation is entitled to immediate injunctive relief to stay and annul the decision and to cause the Department to deny the trust application.

## PRAYER FOR RELIEF

WHEREFORE, the Nation respectfully requests that the Court enter judgment in its favor and against the Department as follows:

A.      Declaring that the Nation's Treaty Territory is not a "shared reservation" or the "former reservation" of the UKB;

B.      Declaring that the Department's 2012 Decision to take the Subject Tract into trust status is in violation of the treaties entered into between the Nation and the United States;

The Nation and CNE further request that the Court enter judgment in their favor and against the Department as follows:

C.      Declaring that the 2012 Decision to acquire the Subject Tract in trust for the UKB Corporation is arbitrary, capricious, an abuse of discretion and contrary to law;

D.      Declaring that the Department would act in excess of its legal and regulatory trust authority if it took the Subject Tract into trust;

E.      After notice by the USA of its intention to take the land into trust, enjoining the Department, its agents, employees, successors and assigns in office from taking any action to effectuate or implement the July 30, 2012 Decision to acquire the subject land in trust for the UKB or the UKB Corporation;

F.      Awarding the Nation and CNE costs and reasonable attorneys' fees to the extent permitted by law; and

G.      Granting such other and further relief as the court deems just and proper.

Respectfully submitted,

_____

Todd Hembree
Attorney General
Cherokee Nation
P.O. Box 948
Tahlequah, OK  74465-0948
Tel:  (918) 456-0671
Fax:  (918) 458-5580
todd-hembree@cherokee.org


Doerner, Saunders, Daniel
  & Anderson, L.L.P.

By:  _____

David McCullough, OBA No. 10898
S. Douglas Dodd, OBA No. 2389
Two West Second Street, Suite 700
Tulsa, Oklahoma 74103-3117
Telephone:  (918) 582-1211
Facsimile:  (918) 925-5316
dmccullough@dsda.com
sddodd@dsda.com

*Attorneys for The Cherokee Nation*

By: _____

David E. Keglovits, OBA #14259
Amelia A. Fogleman, OBA #16221
**GableGotwals**
1100 ONEOK Plaza
100 West Fifth Street
Tulsa, Oklahoma 74103-4217
(918) 595-4800 (telephone)
(918) 595-4990 (facsimile)
dkeglovits@gablelaw.com
afogleman@gablelaw.com

*Attorneys for Cherokee Nation
Entertainment, L.L.C.*



# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240

**JUL 30 2012**

Honorable George Wickliffe
Chief, United Keetoowah Band of Cherokee
  Indians of Oklahoma
P.O. Box 746
Tahlequah, Oklahoma  74465

Dear Chief Wickliffe:

On August 15, 2011, the United Keetoowah Band of Cherokee Indians of Oklahoma (UKB) submitted to the Bureau of Indian Affairs (BIA) Eastern Oklahoma Region (EOR) an amended application to acquire in trust approximately 2.03 acres of land, known as the Keetoowah Casino Property (Property), located in Cherokee County, Oklahoma.

By memorandum dated April 19, 2012, the EOR transmitted to the BIA its recommendation that the property be accepted into trust along with the Tribe's request and supporting documentation.[1] We have completed our review of the UKB's request, and the supporting documentation in the administrative record. For the reasons set forth below, it is our determination that the Property will be taken into trust.

## BACKGROUND

The UKB is a federally recognized Indian tribe, but it does not possess any land that is held in trust or restricted status by the Federal Government. Its status as a federally recognized Indian Tribe was confirmed in 1946 when Congress passed legislation recognizing the UKB as an Indian Band within the meaning of the Oklahoma Indian Welfare Act of June 26, 1936, 25 U.S.C. § 503 (OIWA). As a tribe organized pursuant to the OIWA, the UKB is entitled to the same rights and privileges as tribes organized pursuant to the Indian Reorganization Act of 1934 (IRA).

The history of the UKB has been discussed at length in Assistant Secretary decisions, Associate Solicitor opinions and Federal court orders, such as that of March 3, 1992 in *Buzzard v. Oklahoma Tax Commission*, 1992 U.S. Dist. LEXIS 22864 (N.D. Okla., March 3, 1992), and thus only the background relevant to the limited question of whether the parcel is within the former reservation of the UKB within the meaning of Indian Gaming Regulatory Act (IGRA) and the Department's regulations at Parts 151 and 292 is discussed below.

---

[1] SPRO Transmittal Memorandum.

Exhibit 1

Since the 1800s, the Keetoowah Society of Oklahoma Cherokees existed as an organization of Cherokee Indians in Oklahoma. *Buzzard v. Oklahoma Tax Commission*, 1992 U.S. Dist. LEXIS 22864 (N.D. Okla., March 3, 1992), *aff'd Buzzard v. Oklahoma Tax Commission*, 992 F.2d 1073 (10th Cir. 1993). The Keetoowahs sought federal recognition in the 1930s in order to organize as a separate band under OIWA. In an opinion dated July 29, 1937, the Solicitor found that the Keetoowahs were a society of full-bloods organized nearly a century before for the preservation of Indian culture and traditions. He found that the Keetoowahs did not constitute a band of Cherokee Indians within the meaning of the OIWA and therefore were not eligible to reorganize under it. Opinion of July 29, 1937, 1 *Op. Sol. on Indian Affairs* (U.S.D.I. 1979). In response, Congress enacted the Act of August 10, 1946, which provided that "the Keetoowah Indians of the Cherokee Nation of Oklahoma shall be recognized as a band of Indians residing in Oklahoma within the meaning of section 3 of the Act of June 26, 1936." 60 Stat. 976; *see* S. Rep. No. 79-978 (1946). The Band formally reorganized under OIWA in 1950 by adopting a constitution, by-laws, and a corporate charter that were approved by the Assistant Secretary of the Interior on May 8, 1950, and ratified by the members on October 3, 1950.

The gaming parcel is located in the City of Tahlequah in the S1/2 NE1/4 SE1/4 and part of the N1/2 SE1/4 SE1/4 SW1/4 of Section 4, Township 16 North, Range 22 East, Cherokee County, Oklahoma. The Band submitted an amended application requesting that the gaming parcel be taken into trust for the United Keetoowah Band of Cherokee Indians, a federally chartered corporation (UKB Corporation) under Section 3 of the OIWA.

The gaming parcel is owned in fee by the Band. Neither the Band nor the UKB Corporation have any lands held in trust by the United States. The Band began to offer public bingo on the gaming parcel in 1986. The gaming parcel currently is utilized for an existing gaming facility for the benefit of the Band and its members. It is the Band's only gaming facility and the gaming revenues support Tribal programs, including Human Services, Emergency Funds, Housing Rehabilitation, Family Services, Education, Clothing Voucher and Elder Assistance, all of which benefit the UKB Tribal members.

The gaming parcel is located within the last treaty boundaries of the Cherokee Nation as defined by the terms of the Treaty of New Echota, 7 Stat. 478 (December 29, 1835), and the 1866 treaty between the Cherokee Nation and the United States, 14 Stat. 799 (July 19, 1866), in an area generally identified as the former Cherokee reservation. *See* April 19, 2012 Memorandum from Acting Regional Director, Eastern Oklahoma Region, Proposed Findings of Fact. This area has long been recognized as the former reservation of the Cherokee Nation of Oklahoma (CNO), a federally recognized Indian tribe. *United Keetoowah Band v. Secretary*, No 90-C-608-B (N.D. Okla., May 31, 1991); *United Keetoowah Band of Cherokee Indians v. Mankiller*, No 92-C-585-B (N.D. Okla., January 27, 1993), *aff'd* 2 F.3d 1161 (10th Cir. 1993).

## DESCRIPTION OF THE PROPERTY

The 2.03 acres are located in Tahlequah, Cherokee County, Oklahoma and described as follows:[2]

> A tract of land lying in and being a part of the S/2 NE/4 SE/4 SW/4 and part of the N/2 SE/4 SE/4 SW/4 of Section 4, T-16-N, R-22-E, Cherokee County, Oklahoma, more particularly described as follows, to-wit: BEGINNING at a point 175.0 feet South of the North boundary and 131.0 feet East of the West boundary of said S/2 NE/4 SE/4 SW/4; thence S 02°56'W, 159.80 feet; thence N 89°12'W, 24.80 feet; thence S 03°30'W, 171.40 feet to a point 175.00 feet South of the North boundary of said N/2 SE/4 SE/4 SW/4; thence S 89°49'E, 384.32 feet to a point on the West boundary of U.S. Highway No. 62; thence N 05°25'W, along the West boundary of U.S. Highway No. 62, 332.00 feet; thence N 89°49'W, 309.55 feet to the Point of Beginning. Containing 2.63 acres;

> LESS AND EXCEPT A parcel of land BEGINNING 155.00 feet North and 84.80 feet East of the Southwest Corner of the N/2, SE/4 SE/4 SW/4; thence N3°30'E a distance of 161.90 feet; thence S89°49'E a distance of 161.90 feet; thence S3°30"W a distance of 161.90 feet; thence N89°49'W a distance of 161.90 feet to the Point of Beginning. Containing 0.60 acres more or less.

## TITLE TO THE PROPERTY

The UKB owns the property in fee as evidenced by the Warranty Deed dated February 23, 2012.[3] The Warranty Deed legal description excepts the 0.60 acre parcel because that parcel was part of the Keetoowah Justice Complex.

An updated commitment for title insurance policy dated November 30, 2011, was provided by the UKB. A preliminary title opinion has been issued by the Tulsa Field Solicitor's Office dated February 13, 2012. In his opinion, the Field Solicitor noted the Summary Appraisal Report dated January 9, 2012, states that the value of this property is $1,080,000.00. However, the appraisal bases this value on the cost to reconstruct the casino on the property. The Summary Appraisal Report states that the value of the property itself, based on a comparison of sales of similar properties in the area is $265,000.00. The BIA believes this "comparable sales value" of this property is the most accurate value to consider for purposes of determining the amount of title insurance to require under the peculiar circumstances of this case. Title Commitment No. T2011120146, issued by the Old Republic National Title Insurance Company, reflects a policy amount of $91,250.00 which is the minimum amount of title insurance required under the DOJ Title Standards.

---

[2] UKB Application Tab 1C.

[3] UKB Application Tab 9

## COMPLIANCE WITH THE INDIAN GAMING REGULATORY ACT

The UKB is composed of Cherokee Indians, reorganized under a constitution approved by the Department expressly establishing its tribal headquarters in Tahlequah, Oklahoma. Tahlequah is the same town where the Property is located. We believe the former reservation of the CNO is also the former reservation of the UKB for the purposes of applying the exception under 25 U.S.C. § 2719(a)(2)(A)(i), making this specific trust application a unique circumstance.

The IGRA prohibits gaming on Indian lands accepted by the Secretary into trust for the benefit of an Indian tribe after October 17, 1988, unless the lands fall within certain statutory exceptions. See 25 U.S.C. § 2719. One such exception arises if the Indian tribe has no reservation and the lands are in Oklahoma and within the boundaries of the Indian tribe's former reservation, as defined by the Secretary. 25 U.S.C. § 2719(a)(2)(A)(i).

Under the Indian canons of construction, "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985). Courts have found that the Indian canon of statutory construction applies to IGRA. *Sault Ste. Marie Tribe of Chippewa Indians v. United States*, 576 F. Supp. 2d 838, 848-49 (W.D. Mich., 2008); *County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation*, 502 U.S. 251, 269 (1992). There is no question that the UKB occupied the former Cherokee reservation nor that the Keetoowah Society of Oklahoma Cherokees was formed out of the Cherokee Nation of Oklahoma. S. Rep. No. 79-978 at 2-3 (1946). The term "former reservation" in IGRA is ambiguous as applied to the facts at hand. Interpreting the provision to the benefit of the Band would permit the gaming parcel to be taken into trust pursuant to 25 U.S.C. § 2719(a)(2)(A)(i).

The Department's regulations define "former reservation" to mean: "lands in Oklahoma that are within the exterior boundaries of the last reservation that was established by treaty, Executive Order, or Secretarial Order for an Oklahoma tribe." 25 C.F.R. § 292.2. Neither the text of IGRA, nor the Department's regulations implementing the exceptions to the general prohibition of gaming on lands acquired in trust after October 1988, 25 U.S.C. § 2719, address the question of whether two federally recognized tribes, one of which was formed under express congressional authorization from the citizens of the other, can share the same former reservation for purposes of qualifying for the "former reservation" exception in 25 U.S.C. § 2719(a)(2)(A)(i). The express language of the statute makes it clear, however, that the determination of whether the land is within the boundaries of a tribe's former reservation is a determination for the Secretary to make. *Id.*

In view of the origins of the Band as composed of Cherokee Indians, reorganized and separately recognized under express authorization from Congress and a constitution approved by the Assistant Secretary of the Interior expressly establishing its tribal headquarters in Tahlequah, Oklahoma, within the historic reservation boundaries, I believe the former reservation of the Cherokee Nation is also the former reservation of the UKB for the purposes of applying the exception under 25 U.S.C. § 2719(a)(2)(A)(i).

4

We conclude that when taken into trust, the UKB may conduct gaming on this property pursuant to 25 U.S.C. § 2719 (a)(2)(A)(i) and the implementing regulations set forth in 25 C.F.R. Part 292.

The UKB's Gaming Ordinance was approved by the National Indian Gaming Commission on March 22, 1995.

## COMPLIANCE WITH 25 C.F.R. PART 151

The procedures and policies governing the Secretary's exercise of discretion for acquiring lands in trust for Indian tribes and individuals are set forth in authorizing legislation and in 25 C.F.R. Part 151. This acquisition is within the former reservation of the UKB. The Department, therefore, considers the factors contained in 25 C.F.R. § 151.10, "On-reservation Acquisitions" to be applicable.

## A.      25 C.F.R. 151.3 Land Acquisition Policy.

Land may be acquired in trust for tribes only when there is statutory authority to do so. Section 151.3(a) states that land may be acquired in trust for a tribe when (1) the land is located within the exterior boundaries of the tribe's reservation or adjacent thereto, or within a tribal consolidation area; or (2) when the tribe already owns an interest in the land; or (3) when the Secretary determines that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing. Here, the property is located within the former reservation of the UKB, the UKB owns a fee interest in the land, and the Secretary has determined the acquisition in necessary to facilitate economic development.

Although we have concluded that the former Cherokee reservation is also the former reservation of the UKB within the meaning of IGRA, historically, the Cherokee Nation of Oklahoma has been recognized as the "primary" Cherokee tribe. *See, e.g.,* Judge Brett's Amended Order in *Buzzard, supra.* The Department's regulations at 25 C.F.R. § 151.8 provide that an Indian tribe "may acquire land in trust status on a reservation other than its own only when the governing body of the tribe having jurisdiction over such reservation consents in writing to the acquisition." Consistent with this regulatory provision, the Secretary has previously declined to take any lands into trust for the UKB within the boundaries of the former Cherokee reservation without the consent of the Cherokee Nation. The Cherokee Nation has consistently refused to grant its consent. (There is an extensive administrative record related to these matters.) However, now that we have determined the former reservation of the Cherokee Nation is also the former reservation of the UKB for the purposes of applying the exception under 25 U.S.C. § 2719(a)(2)(A)(i), the regulatory requirement for consent of the Cherokee Nation is no longer applicable. By receiving and considering the comments of the Cherokee Nation on the instant acquisition, as well as in the case of the recent acquisition of the community services parcel, the Department has satisfied any requirements to consult with the Cherokee Nation.

The Assistant Secretary's June 24, 2009 Decision, remanded the application back to the Regional Director to apply the categorical exclusion checklist, as clarified by a July 30, 2009 Decision, Motion to Reconsider and Withdraw Decision requesting additional briefing from UKB and CNO on the issue of the import, if any, of the *Carcieri v. Salazar* decision and concluded that alleged jurisdictional conflicts between the Band and the Cherokee Nation would not prevent the Secretary from taking land into trust for the UKB Corporation to be governed by the Band on the former Cherokee Reservation. *Id.* at 6-7, 11; *see also* Assistant Secretary's September 10, 2010 Decision (reaffirming a decision that land could be taken into trust on the former Cherokee reservation for the UKB Corporation.)  This analysis supports the conclusion that the two tribes can avail themselves of the same former reservation for purposes of 25 U.S.C. § 2719(a)(2)(A)(i).

### B.   25 C.F.R. 151.10(a)  The existence of statutory authority for the acquisition and any limitations contained in such authority.

The Assistant Secretary's September 10, 2010 Decision which was clarified in a January 21, 2011 letter to the UKB, concluded that Section 3 of the OIWA, 25 U.S.C. § 503, implicitly authorizes the Secretary to take land into trust for the UKB Corporation.

### C.   25 CFR 151.10(b)  The need of the Tribe for additional land.

Neither the UKB nor the UKB Corporation currently have any lands held in trust by the United States.  The proposed site is owned in fee simple status and the UKB states the need for the fee-to-trust request is for economic development.

The Property is the UKB's only gaming facility.  The UKB has received a determination by the National Indian Gaming Commission that the facility is not located on Indian lands under Federal law; the UKB now has an urgent need to have the property placed in trust.  The UKB may suffer substantial financial loss if the property is not placed in trust.  In 2010, the UKB utilized $1,234,933.30 of the gaming revenue for Tribal programs including Human Services, Emergency Funds, Housing Rehabilitation, Family Services, Education, Clothing Voucher and Elder Assistance which benefited the UKB Tribal members.  Additional economic development will allow the UKB to support governmental functions, which should decrease dependence upon limited Federal and state funds.  In order for the UKB to continue to sustain its programs and operations as a means to providing needed services and assistance to its members, the acquisition of the property into trust would allow the UKB to continue to focus on the unmet needs of the UKB and its people without interruption.  The UKB's application has sufficiently justified the need for this additional land.

### D.   25 CFR 151.10(c)  The purposes for which the land will be used.

The application states that the UKB intends to continue utilizing the property for economic development for the benefit of the UKB and its members and the site will be utilized for gaming purposes.  I find that this request adequately describes the purpose for which the land will be used.

**E.     25 CFR 151.10(e)  If the land to be acquired is in unrestricted fee status, the impact on the state and its political subdivision resulting from the removal of the land from the tax rolls.**

The UKB currently owns this land in fee simple status.  Comments on the potential impacts of the proposed acquisition on regulatory jurisdiction, real property taxes and special assessments were solicited from the state and local political subdivisions.  By correspondence dated November 4, 2011, comments regarding the proposed acquisition were invited from the following State, County and City Officials:

Governor of Oklahoma – No Response
Oklahoma Tax Commission – No Response
Cherokee County Commissioners – No Response
Sheriff of Cherokee County – No Response
Mayor of Tahlequah – No Response
Chief of Police of Tahlequah – No Response
Principal Chief of the Cherokee Nation – No Response
Cherokee County Assessor – Response dated November 10, 2011
Cherokee County Treasurer – Response dated November 8, 2011

Cherokee County Assessor – By response dated November 10, 2011, a copy of the Real Property Assessment Record to the Region stated the tax on the property is assessed at $1,709.00.  There are no special assessments or outstanding tax assessments.[4]

Cherokee County Treasurer – By response dated November 8, 2011, the Treasurer provided information which reflects $1,709.00 was paid for 2010 taxes.[5]

Real property in Oklahoma is subject to state ad valorem taxes, which is collected by the respective counties to fund a variety of countywide services; the largest share of these taxes goes to the local school districts.  The subject property is currently carried on the Cherokee County Assessor's rolls as taxable.

In a letter dated May 17, 2011, the Attorney General of the State of Oklahoma wrote to express his concerns about the amount of time taken to reach a determination on these matters.  We have reviewed the Attorney General's comments as well as all comments and information submitted to the Department on this matter.  This decision is reached after full consideration of these issues and the administrative record.

The Regional Director finds that the impact on the state and local governments resulting from the removal of the subject property from the tax rolls will be insignificant, we concur.

---

[4] EOR Application Tab 46

[5] ERO Application Tab 45

7

**F.    25 CFR 151.10(f)  Jurisdictional problems and potential conflicts of land use which may arise.**

The EOR is concerned that jurisdictional conflicts will arise between the UKB and the CNO if property is placed into trust for the UKB within the former reservation boundaries of the CNO. The Assistant Secretary has previously stated in the June 24, 2009 Decision that 25 U.S.C. § 476(g) mandates that the "department or agencies of the United States shall not ... make any decision or determination pursuant to the IRA, or any other Act of Congress, with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes." The Assistant Secretary found that this section of the IRA "prohibits the Department from finding that the UKB lacks territorial jurisdiction while other tribes have territorial jurisdiction," and "the UKB, like CN, possesses the authority to exercise territorial jurisdiction over its tribal lands."

The EOR identified a potential jurisdictional issue on a survey of the Property.  Specifically, a portion of the casino building encroaches onto a separate tract of property owned in fee by the UKB ("parking lot tract").  While the UKB's ownership of the parking lot tract satisfies the Department that no legal liabilities will arise as a result of the encroachment, it recognizes the potential for jurisdictional issues given that a portion of the casino building would be subject to state jurisdiction.  To address the concern, the UKB provided Tribal Resolution No. 12-UKB-33, stating that the UKB intends to make application to place the parking lot tract in trust in the near future and that, in the meantime, the UKB will not conduct gaming activities on the portion of the property that lies outside of the Property tract.

Fire, water, ambulance, and sanitation services for the property are currently provided by the city of Tahlequah.  Law enforcement services for the property are currently provided by an informal agreement with the City of Tahlequah and Cherokee County law enforcement agencies whereby the Keetoowah Lighthorse, the UKB's security force, monitors tribally-owned land and reports any suspicious activities immediately to the City and County law enforcement agencies so that those entities can respond accordingly.

While there may be jurisdictional disputes in the future, the Regional Director believes that there is adequate foundation for resolving them, and we concur.

**G.    25 CFR 151.10(g)  If the land to be acquired is in fee status, whether the Bureau of Indian Affairs (BIA) is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status.**

The land proposed for trust acquisition is within the jurisdictional boundaries of the BIA's EOR.  The Secretary has determined that the lands within the former treaty boundaries of the CNO are the CNO's service area for purposes of administering BIA programs under Indian Self-Determination and Education Assistance Act, Public Law 93-638 (25 U.S.C. § 450 et seq.), as amended.  The CNO administers the program functions associated with the management of trust lands formerly provided by the BIA's Tahlequah Agency and EOR Office

through a Self-Governance Compact pursuant to 25 U.S.C. § 458aa, et seq. These programs include, but are not limited to, real estate services and tribal court services, as well as law enforcement services. As a result of the BIA's Self-Governance Compact with the CNO, the BIA agency with jurisdiction over BIA programs within the treaty boundaries of the former CNO-the Tahlequah Agency-was closed and the funds used to operate that agency, along with Regional Office funds utilized for direct services to the CNO and all Indians within that area (regardless of tribal affiliation), were transferred to the CNO Compact. There are no remaining direct service funds in the Region that have not been previously provided to the CNO in its Self-Governance Compact. Although the CNO has numerous full time employees available to provide BIA services, the UKB would likely reject the authority of the CNO employees and insist that the Region provide BIA direct services as it has done in the past with respect to other BIA services, e.g., processing of fee-to-trust acquisitions. The additional duties may increase the workload on the Region unless additional appropriations or budget allocations are obtained to off-set the additional direct services to be provided by the Region. The EOR has concluded they are capable of providing services for UKB and we concur.

**H.      25 CFR 151.10 (h).  The extent to which the applicant has provided information that allows the Secretary to comply with 516 DM 6, Appendix 4, National Environmental Policy Act Revised Implementing Procedures, and 602 DM2, Land Acquisitions:   Hazardous Substances Determinations.**

By memorandum dated October 6, 2011, the Chief, Division of Environmental Safety and Cultural Resources Management (DESCRM), EOR, determined the revised Phase I ESA was prepared in accordance with the American Society for Testing and Materials (ASTM) Standard for ESA's, ASTM Standard E 1527-05. Pursuant to the review by the DESCRM, the ESA was found to be in compliance with the ASTM Standard E1527-05.

This acquisition is considered to be categorically excluded under NEPA pursuant to 516 DM 10, Section 10.5-I, Land Conveyances and Other Transfers. A categorical exclusion checklist was completed by DESCRM on in accordance with NEPA and the BIA NEPA Handbook, 59 IAM 3-H. We concur with this finding.

## TWO PART DETERMINATION UNDER SECTION 20 OF IGRA

The two-part determination pursuant to Section 20 of IGRA, 25 U.S.C. § 2719(b)(1)(A) is not applicable because "such lands are located in Oklahoma and are within the boundaries of the Indian tribe's former reservation" 25 U.S.C. § 2719 (a)(2)(A)(i).

## REGIONAL DIRECTOR'S RECOMMENDATION

By memorandum dated April 19, 2011, the Regional Director recommended that the property be accepted in trust for the benefit of the Tribe.

9

**DECISION**

Our evaluation of the Tribe's request indicates that the Federal requirements for acquiring this Property into trust have been satisfied.  The Regional Director will be authorized to approve the conveyance document accepting the property in trust for the Tribe subject to any condition set forth herein, approval of all title requirements by the Office of the Regional Solicitor, and expiration of the thirty day period following publication in the *Federal Register* of the notice required in 25 C.F.R. § 151.12(b).

Sincerely,

Michael S. Black
Acting Assistant Secretary – Indian Affairs

10

| State and county | Location and case No. | Chief executive officer of community | Community map repository | Online location of Letter of Map Revision | Effective date of modification | Community No. |
|---|---|---|---|---|---|---|
| Loudoun ......... | Town of Leesburg (11–03–1482P) | The Honorable Kristen C. Umstattd, Mayor, Town of Leesburg, 25 West Market Street, Leesburg, VA 20176. | Department of Plan Review, 25 West Market Street, Leesburg, VA 20176. | http://www.rampp-team.com/lomrs.htm. | July 12, 2012 ...... | 510091 |
| Prince William | Unincorporated areas of Prince William County (11–03–1518P). | The Honorable Melissa S. Peacor, County Executive, Prince William County, James J. McCoart Administration Building, 1 County Complex Court, Prince William VA 22192. | James J. McCoart Administration Building, 1 County Complex Court, Prince William, VA 22192. | http://www.rampp-team.com/lomrs.htm. | July 30, 2012 ...... | 510119 |

(Catalog of Federal Domestic Assistance No. 97.022, "Flood Insurance.")

Dated: July 18, 2012.

**Sandra K. Knight,**

*Deputy Associate Administrator for Mitigation, Department of Homeland Security, Federal Emergency Management Agency.*

[FR Doc. 2012–19219 Filed 8–6–12; 8:45 am]

**BILLING CODE 9110–12–P**

## DEPARTMENT OF THE INTERIOR

### Bureau of Indian Affairs

**Land Acquisitions; United Keetoowah Band of Cherokee Indians of Oklahoma**

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Notice of final agency determination.

**SUMMARY:** The Assistant Secretary— Indian Affairs made a final agency determination to acquire approximately 2.03 acres of land into trust for the United Keetoowah Band of Cherokee Indians of Oklahoma on July 30, 2012.

**FOR FURTHER INFORMATION CONTACT:** Paula L. Hart, Director, Office of Indian Gaming, Bureau of Indian Affairs, MS– 3657 MIB, 1849 C Street NW., Washington, DC 20240; Telephone (202) 219–4066.

**SUPPLEMENTARY INFORMATION:** This notice is published in the exercise of authority delegated by the Secretary of the Interior to the Assistant Secretary— Indian Affairs by 209 Departmental Manual 8.1 and is published to comply with the requirements of 25 CFR 151.12(b) that notice be given to the public of the Secretary's decision to acquire land in trust at least 30 days prior to signatory acceptance of the land into trust. The purpose of the 30-day waiting period in 25 CFR 151.12(b) is to afford interested parties the opportunity to seek judicial review of final administrative decisions to take land in trust for Indian tribes and individual Indians before transfer of title to the

property occurs. On July 30, 2012, the Assistant Secretary—Indian Affairs decided to accept approximately 2.03 acres of land into trust for the United Keetoowah Band of Oklahoma Corporation under the authority of the Oklahoma Indian Welfare Act Reorganization Act of 1936, 25 U.S.C. 503.

The 2.03 acres are located approximately in Tahlequah, Cherokee County, Oklahoma, and described as follows:

A tract of land lying in and being a part of the S/2 NE/4 SE/4 SW/4 and part of the N/2 SE/4 SE/4 SW/4 of Section 4, T–16–N, R–22–E, Cherokee County, Oklahoma, more particularly described as follows, to-wit: BEGINNING at a point 175.0 feet South of the North boundary and 131.0 feet East of the West boundary of said S/2 NE/4 SE/4 SW/4; thence S 02·56, W, 159.80 feet; thence N 89·12, W, 24.80 feet; thence S 03·30, W, 171.40 feet to a point 175.00 feet South of the North boundary of said N/2 SE/4 SE/4 SW/4; thence S 89·49, E, 384.32 feet to a point on the West boundary of U.S. Highway No. 62; thence N 05·25, W, along the West boundary of U.S. Highway No. 62, 332.00 feet; thence N 89·49, W, 309.55 feet to the Point of Beginning. Containing 2.63 acres; LESS AND EXCEPT A parcel of land BEGINNING 155.00 feet North and 84.80 feet East of the Southwest Corner of the N/2, SE/4 SE/4 SW/4; thence N3·30, E a distance of 161.90 feet; thence S89·49, E a distance of 161.90 feet; thence S3·30, W a distance of 161.90 feet; thence N89·49, W a distance of 161.90 feet to the Point of Beginning. Containing 0.60 acres more or less.

Dated: July 30, 2012.

**Michael S. Black,**

*Acting Assistant Secretary—Indian Affairs.*

[FR Doc. 2012–19205 Filed 8–6–12; 8:45 am]

**BILLING CODE 4310–4N–P**

## DEPARTMENT OF THE INTERIOR

### Bureau of Land Management

**[LLCAC09000, 16100000.DQ; CACA 051408]**

**Public Land Order No. 7795; Withdrawal of Public Lands, Clear Creek Serpentine Area of Critical Environmental Concern; California**

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Public Land Order.

**SUMMARY:** This order withdraws 28,727 acres, more or less, of public lands from location and entry under the United States mining laws for a period of 20 years, to minimize impacts to human health, safety, and the environment from hazardous emissions of airborne asbestos fibers within the Clear Creek Serpentine Area of Critical Environmental Concern. In addition, approximately 3,889 acres of non-Federal lands located inside of the boundary of the withdrawal area, if acquired by or returned to the United States, will also be included in the withdrawal. The withdrawal will have no effect on the non-Federal lands until such time as title passes to the United States.

**DATES:** *Effective Date:* August 7, 2012.

**FOR FURTHER INFORMATION CONTACT:** Christine Sloand, Realty Specialist, Bureau of Land Management (BLM), Hollister Field Office, 20 Hamilton Court, Hollister, California 95023, 831–630–5022 or via email at *csloand@blm.gov.* Persons who use a telecommunications device for the deaf (TDD) may call the Federal Information Relay Services (FIRS) at 1–800–877–8339 to contact the above individual. The FIRS is available 24 hours per day, 7 days per week, to leave a message or question with the above individual. You will receive a reply during normal business hours.

**SUPPLEMENTARY INFORMATION:** The BLM ordered the temporary closure of the public lands in the Clear Creek

Exhibit 2