## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OKLAHOMA

CHEROKEE NATION, and )
CHEROKEE NATION ENTERTAINMENT, )
LLC, )
       )
      **Plaintiffs,** )
vs. )
       )
S.M.R. JEWELL, )
*in her official capacity as* )    **Case No. 12-CV-493-GKF TLW**
Secretary of the Interior )
U.S. Department of the Interior, et al )
       )
      **Defendants,** )
       )
UNITED KEETOOWAH BAND OF )
CHEROKEE INDIANS IN OKLAHOMA, and )
UNITED KEETOOWAH BAND OF )
CHEROKEE INDIANS IN OKLAHOMA )
CORPORATION, )
       )
      **Intervenor Defendant(s).** )

## PLAINTIFFS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

William David McCullough,
OBA No. 10898
S. Douglas Dodd, OBA No. 2389
Doerner, Saunders, Daniel
 & Anderson, L.L.P.
Two West Second Street, Suite 700
Tulsa, Oklahoma 74103-3117
Telephone:  (918) 582-1211
Facsimile:  (918) 925-5316

Todd Hembree , OBA No. 14739
Attorney General
Cherokee Nation
P.O. Box 948
Tahlequah, OK  74465-0948
Telephone:  (918) 456-0671
Facsimile:  (918) 458-5580

L. Susan Work, OBA No. 3799
Hobbs Strauss Dean & Walker, LLP
101 Park Avenue, Suite 700
Oklahoma City, OK 73102
Telephone: (405) 602-9425
Facsimile: (405) 602-9426
*Attorneys for Cherokee Nation*

David E. Keglovits, OBA No. 14259
Amelia A. Fogleman, OBA No. 16221
GableGotwals
100 West Fifth Street, Suite 1100
Tulsa, Oklahoma 74103-4217
Telephone: (918) 595-4800
Facsimile: (918) 595-4990
*Attorneys for Cherokee Nation*
*Entertainment, LLC*

Plaintiffs, Cherokee Nation and Cherokee Nation Entertainment, LLC, pursuant to the Court's July 25, 2014 Minute Order [Doc. 146], submit the following Findings of Fact and Conclusions of Law.

## PROPOSED FINDINGS OF FACT

### A.  The Parties

1.      Plaintiff Cherokee Nation ("Cherokee Nation" or "Nation") is a federally recognized Indian tribe headquartered in Tahlequah, Oklahoma.  The Cherokee Nation's historic boundaries were established by treaties in the 1800s ("Treaty Territory").

2.      Plaintiff Cherokee Nation Entertainment, LLC ("CNE") is a wholly owned subsidiary of Cherokee Nation Businesses, LLC, which is wholly owned by the Cherokee Nation.  CNE operates several casinos, including casinos in Tulsa County and Cherokee County.  Cherokee Nation and CNE are referred to collectively as "Cherokee Plaintiffs."

3.      Defendant S.M.R. Jewell is the Secretary of the Interior, United States Department of the Interior.  She is the successor of Kenneth Salazar, who served as the Secretary of the Interior at the time the Assistant Secretary – Indian Affairs ("Assistant Secretary") for the United States Department of the Interior ("Department" or "DOI") issued the July 30, 2012 decision ("2012 Decision") challenged in this action.  Doc. 28-4, AR17-AR26.  Defendant Jewell has been sued in her official capacity.

4.      Defendant Kevin Washburn is the Assistant Secretary – Indian Affairs, United States Department of the Interior.  He is the successor of Michael Black, who, in his capacity as Acting Assistant Secretary – Indian Affairs, issued the challenged 2012 Decision announcing the Department's intent to take into trust for gaming purposes a 2.03 acre tract located in Cherokee County ("Tract"), within the Treaty Territory for the Intervenor/Defendant United Keetoowah Band of Cherokee Indians in Oklahoma Corporation ("UKB Corporation").  Defendant

Washburn has been sued in his official capacity.

5.     Intervenor/Defendant United Keetoowah Band of Cherokee Indians of Oklahoma ("UKB") is a federally recognized Indian band organized in 1950 under the Oklahoma Indian Welfare Act ("OIWA"), 25 U.S.C. §§ 501, *et seq.*

6.     Intervenor/Defendant UKB Corporation is a corporation with a federal charter approved in 1950 under the OIWA.

## B.  Background and History of the Cherokee Nation

7.     The Cherokee Nation is "a distinct organization capable of governing itself, consistent with its existence even prior to the signing of treaties with the United States." *Wheeler v. U.S. Dep't of the Interior*, 811 F.2d 549, 551 (10th Cir. 1987) (citing *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1 (1831)).

8.     The Cherokee Nation possesses rights of self-government which predate the formation of the United States and which are guaranteed by the United States in its treaties with the Nation.  *See Talton v. Mayes*, 163 U.S. 376, 380, 384 (1896).

9.     After Congress enacted the Indian Removal Act, Act of May 28, 1830, the Cherokee Nation ceded its lands east of the Mississippi River under the Treaty of New Echota, Treaty of December 29, 1835, 7 Stat. 478 (Proclamation, May 23, 1836) ("1835 Treaty").  In 1838, the Cherokee Nation acquired fee patent title to its lands in Indian Territory as required by article 1 and article 2 of the 1835 Treaty.

10.     Article 5 of the 1835 Treaty guarantees the Cherokee Nation the right "to make and carry into effect all such laws as they may deem necessary for the government and protection of the persons and property within their own country belonging to their people or such persons as have connected themselves with them," so long as consistent with the Constitution and laws enacted by Congress regulating trade with Indians.  7 Stat. 478.

11.     In 1839, the Nation adopted a written Constitution under the Nation's inherent sovereign authority.  Under the 1839 Constitution, which superseded an 1827 Constitution, the Cherokee Nation maintained a government with an executive, legislative, and judicial branch over its domain in Indian Territory.   Doc. 89-1 at 23-35.   The 1839 Cherokee Nation Constitution, art. I, sec. 1, defined the Nation's boundaries by reference to the 1833 Cherokee Nation Treaty, Act of Feb. 14, 1833, 7 Stat. 414 (Proclamation, Apr. 12, 1834), which contains the same legal description as the description in the 1835 Treaty, art. 2.

12.     Following the Civil War, the United States and the Cherokee Nation entered into another treaty.  Treaty of July 19, 1866, 14 Stat. 799 (Proclamation, Aug. 11, 1866) ("1866 Treaty").  Article 31 of the 1866 Treaty reaffirmed and declared in full force all provisions of prior treaties not inconsistent with the provisions of the 1866 Treaty – none of which affected the guarantees of self-governance contained in the 1835 Treaty.  Article 16 of the 1866 Treaty authorized the settlement of other "friendly Indians" on portions of Cherokee lands west of the 96th meridian (an area west of the Nation's Treaty Territory).  Article 26 of the 1866 Treaty protects the Cherokee Nation "against the hostilities of other tribes" by guaranteeing

> to the people of the Cherokee Nation the quiet and peaceable possession of their country and protection against domestic feuds and insurrections, and against hostilities of other tribes.  They shall also be protected against interruptions or intrusion from all unauthorized citizens of the United States who may attempt to settle on their lands or reside in their territory.

13.     The Cherokee Nation's treaties do not mention the Keetoowahs, the Keetoowah Society, or the Keetoowah Band.

14.     The Cherokee Nation's lands were reduced to its present Treaty Territory size under the 1866 Treaty and by agreement ratified by Congress by Act of March 3, 1893, ch. 209, 27 Stat. 612, 640, § 10.   The Nation's Treaty Territory comprises a 14-county area in

northeastern Oklahoma, including Cherokee County.

15.     In 1887, Congress passed the Dawes Act, also called the General Allotment Act. Act of February 8, 1887, ch. 119, 24 Stat. 388 (codified at 25 U.S.C. §§ 331, *et seq.*).  The Dawes Act provided for the allotment of tribal lands to individual tribal members, but it excluded from the Act the "Five Civilized Tribes" (the Cherokee, Chickasaw, Choctaw, Muscogee (Creek), and Seminole Nations) ("Five Tribes").  25 U.S.C. § 339.

16.     The Nation shares a common federal legal history with the other four of the Five Tribes, as reflected in a series of laws enacted between 1893 and 1906, intended to force allotment of their tribal lands in the eastern portion of Indian Territory.  *See Harjo v. Kleppe*, 420 F. Supp. 1110 (D.D.C. 1976), *aff'd sub nom.*, *Harjo v. Andrus,* 581 F.2d 949 (D.C. Cir. 1978).

17.     In 1893, Congress created the Dawes Commission and empowered it to seek allotment of the lands of the Five Tribes, including the Cherokee Nation.  Act of March 3, 1893, ch. 209, 27 Stat. 612.  The resulting individual allotment acts for each of the Five Tribes reflected a Congressional plan to dissolve the governments of the Five Tribes by 1906.  *See, e.g.*, Cherokee Nation Allotment Act of July 1, 1902, ch. 1375, 32 Stat. 716, 725 § 63 (stating that the "tribal government of the Cherokee Nation shall not continue longer than" March 4, 1906).

18.     The plan to dissolve the Five Tribes' governments was aborted two days before the deadline for dissolution when Congress approved a joint resolution on March 2, 1906, continuing the Five Tribes' existence and governments until completion of allotment.[1]

---

[1]     The joint resolution provides:  "That the tribal existence and present tribal governments of the Choctaw, Chickasaw, Cherokee, Creek, and Seminole Tribes or Nations or Indians in the Indian Territory are hereby continued in full force and effect for all purposes under existing laws until all property of such tribes, or the proceeds thereof, shall be distributed among the individual members of said tribes unless hereafter otherwise provided by law."  S.J. Res. No. 37, 59th Cong., 34 Stat. 822 (1906).

19.     The following month, on April 26, 1906, Congress enacted the Five Tribes Act, which continued the Five Tribes' governments "until otherwise authorized by law."[2]

20.     Cherokee Nation lands were allotted by issuance of deeds by the Principal Chief of the Nation under § 58 of the 1902 Cherokee Allotment Act and the 1906 Five Tribes Act. These laws contained no reference to Keetoowahs, the Keetoowah Society, the Keetoowah Band, UKB, or the UKB Corporation.

21.     There have been no Congressional enactments discontinuing the Five Tribes' governments, and the federal courts have recognized that the Five Tribes were never terminated. *See Creek Nation v. United States,* 318 U.S. 629, 638 (1943); *Cherokee Nation v. Oklahoma*, 461 F.2d 674, 678 (10th Cir. 1972);[3] *Groundhog v. Keeler*, 442 F.2d 674, 677 (10th Cir. 1971); *Harjo*, 420 F. Supp. at 1129.

22.     After Oklahoma statehood in 1907, Department officials and employees historically took the position that the Five Tribes had been terminated, refused to recognize tribal governmental actions, refused to release tribal funds to Five Tribes' governments, and misinterpreted section 6 of the 1906 Act, 34 Stat. 137, to justify their position that the chiefs of the Five Tribes could only be appointed by federal officials for purposes of signing deeds to tribal lands.  These actions were all found to be contrary to law in *Harjo v. Kleppe*, 420 F. Supp.

---

[2]     The Five Tribes Act provides:  "That the tribal existence and present tribal governments of the Choctaw, Chickasaw, Cherokee, Creek, and Seminole tribes or nations are hereby continued in full force and effect for all purposes authorized by law, until otherwise provided by law."  Act of April 26, 1906, ch. 1876, 34 Stat. 137, 148, § 28.

[3]     "The Supreme Court has said that 'when Congress has once established a[n] [Indian] reservation, all tracts included within it remain a part of the reservation until separated therefrom by Congress.'   There has been no separation here*;* the tribal governments still exist; and Oklahoma was admitted to the Union in 1907 upon compliance with the Enabling Act of June 16, 1906, 34 Stat. 267, which required a disclaimer of title to all lands owned 'by any Indian or Indian tribes.'"  *Cherokee Nation v. Oklahoma*, 461 F.2d at 678 (citation omitted).

1110.   As recognized in the *Harjo* decision:

> The available evidence clearly reveals a pattern of action on the part of the Department and its Bureau of Indian Affairs designed to prevent any tribal resistance to the Department's methods of administering those Indian affairs delegated to it by Congress.  This attitude, which can only be characterized as bureaucratic imperialism, manifested itself in deliberate attempts to frustrate, debilitate, and generally prevent from functioning the tribal governments expressly preserved by § 28 of the [Five Tribes] Act [of April 26, 1906, 34 Stat. 137].

*Id.* at 1130.

23.     In 1934, Congress enacted the Indian Reorganization Act, 25 U.S.C. §§ 461, et seq. ("IRA").  Section 16 of the IRA, codified at 25 U.S.C. § 476(a), includes a provision that an Indian tribe "shall have the right to organize for its common welfare, and may adopt an appropriate constitution and bylaws, and any amendments thereto . . ."4  Section 17 of the IRA, codified at 25 U.S.C. § 477, allows a tribe to obtain a charter of incorporation from the Secretary of the Department of the Interior.5  Section 13 of the IRA acknowledged the existence of the Cherokee Nation by naming it as one of numerous tribes in Oklahoma excluded from applicability of five of its sections.  25 U.S.C. § 473.  Sections 16 and 17 were each listed as

---

4       Section 16 included the following description of tribal constitutional powers:  "In addition to all powers vested in any Indian tribe or tribal council by existing law, the constitution adopted by said tribe shall also vest in such tribe or its tribal council the following rights and powers: To employ legal counsel; to prevent the sale, disposition, lease, or encumbrance of tribal lands, interests in lands, or other tribal assets without the consent of the tribe; and to negotiate with the Federal, State, and local governments."  25 U.S.C. § 476(e).

5       Section 17 provides:  "The Secretary of the Interior may, upon petition by any tribe, issue a charter of incorporation to such tribe: *Provided*, That such charter shall not become operative until ratified by the governing body of such tribe. Such charter may convey to the incorporated tribe the power to purchase, take by gift, or bequest, or otherwise, own, hold, manage, operate, and dispose of property of every description, real and personal, including the power to purchase restricted Indian lands and to issue in exchange therefor interests in corporate property, and such further powers as may be incidental to the conduct of corporate business, not inconsistent with law, but no authority shall be granted to sell, mortgage, or lease for a period exceeding twenty-five years any trust or restricted lands included in the limits of the reservation. Any charter so issued shall not be revoked or surrendered except by Act of Congress."  25 U.S.C. § 477.

inapplicable to these Oklahoma tribes.  *Id.* §§ 476, 477.[6]

24.    In 1936, Congress enacted the OIWA, which, among other things, authorized (but did not require) "[a]ny recognized tribe or band of Indians residing in Oklahoma" to organize and to adopt a constitution and by-laws, and obtain a corporate charter.  25 U.S.C. § 503.

25.    The Cherokee Nation continued to exercise governmental authority after statehood, notwithstanding the Department's actions described in the 1976 *Harjo* decision.  In the 1960s, the Cherokee Nation successfully litigated land claims against the United States.  *See Cherokee Nation or Tribe of Indians v. United States*, 12 Ind. Cl. Comm. 426 (Dkt. 173-A, Op. of the Comm., Aug. 8, 1963) and Act of Oct. 9, 1962, Pub. L. 87-775, § 1, 76 Stat. 776 (codified at 25 U.S.C. §§ 991-998) (claim award relating to the Cherokee Outlet).  In the early 1970s, the Cherokee Nation, with the Choctaw and Chickasaw Nations, also successfully litigated claims concerning the Arkansas Riverbed.  *See Choctaw Nation v. Oklahoma*, 397 U.S. 620 (1970); *Cherokee Nation v. Oklahoma*, 461 F.2d 674 (10th Cir. 1972).

26.    Congress adopted two laws in 1970 that recognize the continuing existence of the Cherokee Nation government.  The first law, the Act of May 1970, authorized the escheat of restricted lands of citizens of the Cherokee, Chickasaw, Choctaw, and Seminole Nations to the tribe from which title derived.[7]   The second law, the Act of October 22, 1970, expressly

---

[6]    Section 13 of the IRA provides:  "That sections 4, 7, 16, 17, and 18 of this Act [25 U.S.C. §§ 464, 467, 476, 477, 478] shall not apply to the following-named Indian tribes, the members of such Indian tribes, together with members of other tribes affiliated with such named tribes located in the State of Oklahoma, as follows:  Cheyenne, Arapaho, Apache, Comanche, Kiowa, Caddo, Delaware, Wichita, Osage, Kaw, Otoe, Tonkawa, Pawnee, Ponca, Shawnee, Ottawa, Quapaw, Seneca, Wyandotte, Iowa, Sac and Fox, Kickapoo, Pottawatomi, Cherokee, Chickasaw, Choctaw, Creek, and Seminole."  25 U.S.C. § 473.

[7]    The Act of May 7, 1970, Pub. L. 91-240, 84 Stat. 203 (codified at 25 U.S.C. § 375d) provides:  "That upon the final determination of a court having jurisdiction or by decision of the Secretary of Interior after a period of five years from the death of the decedent, it is determined

recognized the authority of the Five Tribes' chiefs who were selected in accordance with procedures established by the governing entity of each tribe.[8]  The court found that "the fundamental congressional judgment underlying the Act was a desire to facilitate tribal self-determination to the maximum extent possible." *Harjo*, *420 F. Supp.* at 1141.

27.     The Nation's constitutional government has been in continual existence since its 1827 Constitution.  *See, e.g.*, *Wheeler*, 811 F.2d at 551 (citing *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 16 (1831)).  The Nation adopted a new Constitution in 1976, under the Nation's inherent sovereign authority rather than under the OIWA, pursuant to a referendum called by the Secretary of the Interior.  Article XVI of the 1976 Constitution provides:  "The provisions of this Constitution overrule and supersede the provisions of the Cherokee Nation Constitution enacted the 6th day of September 1839."  The 1976 Constitution references "the historic boundaries of the Cherokee Nation" in its residency requirement for the office of Principal Chief, and recognizes the seat of government of the Cherokee Nation at Tahlequah, Oklahoma.  1976 Constitution, art.VI, sec. 2; art. XVII.

28.     Consistent with the Nation's sovereign status, the Nation and the United States

---

that a member of the Cherokee, Chickasaw, Choctaw, or Seminole Nations or Tribes of Oklahoma or a person of blood of said tribes has died intestate without heirs, owning trust or restricted Indian lands in Oklahoma or an interest therein or rents or profits therefrom, such lands, interests, or profits shall escheat to the Nation or tribe from which title to the trust or restricted Indian lands or interest therein was derived and shall be held thereafter in trust by the United States for said nation or tribe."  *See also* Act of Aug. 29, 1967, Pub. L. 90-76, 81 Stat. 177, §3 (codified at 25 U.S.C. § 781(c)) (similarly requiring escheat of certain individual trust and restricted lands to the Creek Nation).

[8]     Section 1 of the Act of October 22, 1970, Pub. L. No. 91-495, 84 Stat. 1091, provides that "notwithstanding any other provisions of law, the principal chiefs of the Cherokee, Choctaw, Creek, and Seminole Tribes of Oklahoma and the governor of the Chickasaw Tribe of Oklahoma shall be popularly selected by the respective tribes in accordance with procedures established by the officially recognized tribal spokesman and/or governing entity."  In *Harjo*, the court rejected DOI's argument that the Act of October 22, 1970 was "a repeal of the tribes' right to constitutional self-government in favor of a one-man elected monarchy."  420 F. Supp. at 1140.

have maintained a continuous government-to-government relationship.  The Nation's government, like those of other tribes, was strengthened by the Indian Self-Determination and Education Assistance Act ("ISDEAA") of 1975.  Act of Jan. 4, 1975, Pub. L. No. 96-638, 88 Stat. 2203 (codified as amended at 25 U.S.C. §§ 450-450n, 455-458e, 458aa-458hh, 458aaa-458aaa-1).  The Cherokee Nation was one of a small group of tribes nationwide selected to participate when Congress amended the ISDEAA to authorize a self-governance demonstration project in 1988.  Act of Oct. 5, 1988, Pub. L. 100-472, 102 Stat. 2285, 2296; Cherokee Nation LA 06-90 (Aug. 11, 1990 Council approval of self-governance compact).  This program, which was made permanent and extended to additional tribes in 1994, enables compacting tribes to determine their individual funding needs and to utilize federal funds in accordance with multi-year funding agreements negotiated government-to-government between tribes and DOI.  Act of Oct. 25, 1994, Pub. L. 103-413, 108 Stat. 4272 (codified at 25 U.S.C. §§ 458aa–458hh) (including a finding that "the tribal right of self-government flows from the inherent sovereignty of Indian tribes and nations").

29.     In 1989, the Cherokee Nation adopted a gaming code, enacted as Title 4 of the Cherokee Nation Code Annotated ("C.N.C.A.").  The gaming code requires any person conducting gaming on Indian lands within the Nation's jurisdiction to have a valid and current public gaming license issued by the Gaming Commissioner of the Cherokee Nation.  4 C.N.C.A. § 21(a).  The code prohibits any other forms of public gaming operations being conducted within the jurisdiction of the Cherokee Nation without the written approval of the Cherokee Gaming Commissioner.  4 C.N.C.A. § 21(d).

30.     In the 2002 Cherokee, Choctaw, and Chickasaw Claims Settlement Act, Congress expressly recognized the Cherokee Nation's "most recent" 1976 constitution and the Nation's

relationship with the United States, as follows:

> The Cherokee Nation, a federally recognized Indian tribe with its present tribal headquarters south of Tahlequah, Oklahoma, having adopted *its most recent constitution* on June 26, 1976, and *having entered into various treaties with the United States*, including but not limited to the Treaty at Hopewell, executed on November 28, 1785 (7 Stat. 18), and the Treaty at Washington, D.C., executed on July 19, 1866 (14 Stat. 799), *has maintained a continuous government-to-government relationship with the United States since the earliest years of the Union*.

25 U.S.C. § 1779(3) (emphasis added).

31.   In 2003, the Cherokee Nation formally approved and adopted a new Constitution, which was drafted by convention in 1999, under the Nation's inherent sovereign authority.  The 2003 Constitution expressly supersedes the provisions of the Nation's predecessor Constitutions. 2003 Cherokee Nation Constitution, art. XVI.   The 2003 Constitution defines the Nation's boundaries in article II, entitled "Territorial Jurisdiction" as follows:   "The boundaries of the Cherokee Nation territory shall be those described by the patents of 1838 and 1846 diminished only by the Treaty of July 19, 1866, and the Act of March 3, 1893."  The 2003 Constitution, art. XVII, continues the seat of government of the Cherokee Nation at Tahlequah, Oklahoma.

32.   The Cherokee Nation's 1839, 1976, and 2003 Constitutions do not contain any references to the Keetoowah Society, the Keetoowah Band, the UKB, or UKB Corporation. Doc. 89-1 at 23-67.  None of the Nation's Constitutions establish or recognize that any clan, organization, town, group, society, or other entity may exercise any governmental authority within the Nation's Treaty Territory.  Instead, both the 1976 and 2003 Constitutions respect the rights of its citizens to participate in organizations, such as the UKB, as follows:  "Nothing in this Constitution shall be construed to prohibit the right of any Cherokee to belong to a recognized clan or organization in the Cherokee Nation."   1976 Constitution, art. XIV; 2003 Constitution, art. XIV.

33.     There is nothing in the Cherokee Nation's law preventing UKB members from enjoying the benefits of Cherokee Nation citizenship.  The 1976 and 2003 Cherokee Nation Constitutions and laws do not prohibit dual enrollment with the Nation and the UKB.  Doc. 89-1 at 37-67.

34.     The Cherokee Nation exercises executive, legislative, and judicial governmental functions and authority over Indian country within its Treaty Territory, including law enforcement by its Marshal Service, gaming regulation, tobacco sales, motor vehicle licenses, boat licenses, and promulgation and enforcement of other civil and criminal laws.  Doc. 121-1, AR5101-5102.

35.     The present day Cherokee Nation is the same Cherokee Nation that was originally organized under its 1827 and 1839 Constitutions.  *See, e.g.*, *Wheeler*, 811 F.2d at 551 (citing *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 16 (1831)).

### C.  Background and History of the UKB and the UKB Corporation

36.     The UKB never maintained a treaty relationship with the United States and never held title to the lands owned in fee by the Cherokee Nation.  The UKB and UKB Corporation have not asserted, and there is nothing in the administrative record indicating, that UKB members reside or resided in a specific geographic area within the Nation's Treaty Territory.

37.     In 1937, a group identified as the Keetoowah Society sought permission to organize under section 3 of the OIWA.  That same year, the DOI Solicitor determined that the Keetoowah Society was a voluntary society and could not be considered a "recognized band" under the OIWA:

> The primary distinction between a band and a society is that a band is a political body.  In other words, a band has functions and powers of government.  It is generally the historic unit of government in those tribes where bands exist. . . .

> This essential character is not possessed by the Keetoowah Society nor any of its factions.  It is neither historically nor actually a governing unit of the Cherokee Nation, but a society of citizens within the Nation with common beliefs and aspirations.

Op. of July 29, 1937.  Doc. 119-2, AR4915.

38.    On March 24, 1945 the Acting Secretary of the Interior informed Congress that the Department again declined the Keetoowah's request to organize under the OIWA because the Department could not make a positive finding that the society was a tribe or band within the meaning of the OIWA.  H.R. Rep. No. 79-447, at 2 (1945); S. Rep. No. 79-978, at 3 (1946).

39.    The next year Congress approved the Act of August 10, 1946, Pub. L. No. 79-715, § 1, 60 Stat. 976 ("1946 Act"), which consists of two sections.  Section 1 contains no mention of land acquisitions or UKB territorial jurisdiction.  It simply provides: "That the Keetoowah Indians of the Cherokee Nation of Oklahoma shall be recognized as a band of Indians residing in Oklahoma within the meaning of section 3 of the Act of June 26, 1936."  In contrast, section 2 of the same 1946 Act "set aside for the use and benefit of the Indians of the Cheyenne and Arapaho Reservation in Oklahoma" a specified school reserve tract.

40.    In 1950, the UKB organized under section 3 of the OIWA, 25 U.S.C. § 503.  The UKB Constitution and the separate Federal charter for the UKB Corporation were approved by the Department on May 8, 1950, and approved by voters by a vote of 1414 in favor and 1 against on October 3, 1950.  Doc. 45, AR1749-1758.  The UKB Charter is expressly subject to all limitations imposed by existing law.  Charter § 3, AR 1753.

41.    The UKB Constitution and the UKB Corporation Charter do not define or lay claim to any geographic or territorial jurisdiction and do not claim that the UKB has authority to exercise governmental authority in the Cherokee Nation's Treaty Territory or in any other defined geographic area.  Doc. 45, AR1749-1758.

42.     The United States holds no lands in trust for the UKB or the UKB Corporation. Doc. 28-4, AR17**.**

43.     The UKB does not provide law enforcement services to the Tract.  It has a security force, known as the Lighthorse, which monitors tribally-owned land but must report any suspicious activities to "the City and County law enforcement agencies so that those agencies can respond accordingly."  Doc. 121-1, AR5102.

44.     There is nothing in the Administrative Record to suggest that the UKB exercises governmental authority and control over the Tract.

45.     The Tract is within the Cherokee Nation's Treaty Territory.

### D.  History of Gaming on the Tract

46.     The Tract is fee land owned by the UKB.  It is not held in trust by the United States for the benefit of the UKB, the UKB Corporation, or an individual Indian, and it is not subject to statutory restrictions against alienation or encumbrance.  Doc. 121, AR5082-5083; Doc. 121-1, AR 5096.

47.     From 1986 until August 30, 2013, the UKB continuously operated a casino on the 2.03-acre Tract.  Doc. 121, AR5083; Doc. 28-4, AR18.  This gaming failed to comply with the UKB's own gaming ordinance, as approved by the Chairman of the National Indian Gaming Commission ("NIGC").  On March 22, 1995, NIGC approved the ordinance "for gaming only on Indian lands as defined in the IGRA."  Doc. 45, AR1974, 1981.  The approval letter stated that the UKB had no "Indian lands" under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701, *et. seq.* and "is not authorized to conduct class II or class III gaming."  *Id*.  The UKB did not appeal that finding and, according to a July 18, 2011 memorandum from NIGC counsel, "it also was not followed – not by the UKB or the NIGC."  Doc. 121, AR5084.

48.     On September 29, 2000, *i.e.,* five years after the 1995 approval of the UKB

gaming ordinance, the NIGC Chairman determined that the Tract is not Indian country, that the UKB has no jurisdiction over the tract, that the tract does not constitute "Indian lands" under IGRA, 25 U.S.C. § 2703(4), and that UKB gaming on the Tract is not subject to IGRA.  Doc. 45, AR1974-1979.  The Chairman left "the question of whether the land is subject to state gambling laws to the appropriate state officials."  Doc. 45, AR1979.

49.    In 2004, the State of Oklahoma sought to close the UKB casino.  *United Keetoowah Band v. Oklahoma*, Case No. 04-CV-340 (E.D. Okla.) (the "Eastern District Case").  In 2011, the Oklahoma Attorney General urged NIGC to make another decision on the "Indian lands" issue, as required by a 2006 court order in the Eastern District Case.  Doc. 120-3, AR4977-4978.  NIGC issued a decision on July 21, 2011.  Doc. 46, AR2790-2792.  The NIGC Chairman incorporated by reference and enclosed a July 18, 2011, NIGC general counsel memorandum finding that the Tract does not qualify as Indian lands under IGRA, that the NIGC does not have jurisdiction to regulate the gaming activities there, and that the Department's Office of the Solicitor concurred with the opinion.  Doc. 121, AR5077-5095.  Since issuance of the 2011 opinion, the NIGC has not changed its position that the Tract is not eligible for Class II or III gaming.

50.    The UKB casino was closed on August 30, 2013, under agreed orders in the Eastern District Case that required the UKB to close the casino if the Tract was not held in trust by the United States by that date.  Eastern District Case, Doc. 148, 150, 151.

51.    From 1986 until closure in 2013, the UKB operated the casino on fee land without Federal oversight, including IGRA's requirements that NIGC monitor tribal class II gaming on a continuing basis, inspect and examine all class II premises located on Indian lands, and "conduct or cause to be conducted such background investigations [of potential casino employees] as may

be necessary." 25 U.S.C. § 2706(b)(3).  Although IGRA, 25 U.S.C. § 2710(b)(2)(B), requires that tribes use net gaming revenues only for certain specified purposes (to fund tribal government operations or programs, to provide for the general welfare of the Indian tribe and its members, to promote tribal economic development, to donate to charitable organizations, or to help fund operations of local government agencies), there has been no Federal oversight to determine whether the UKB has used its gaming revenues for those purposes.

### E. Trust Application Process
#### (i) The Trust Application for the 76-Acre Parcel

52.     The trust application for this Tract shares some common history with a separate UKB trust application for a non-contiguous, 76-acre "community services parcel" also located in Cherokee County (the "76-acre Parcel").  On June 9, 2004, the UKB submitted an application to the Department requesting that the 76-acre Parcel be taken into trust.  Doc. 45, AR 2176.  The Regional Director of the Eastern Oklahoma Regional Office, Bureau of Indian Affairs ("Regional Director") issued a decision on April 7, 2006 ("2006 Decision") denying the UKB's request.  Doc. 36-6, AR3909-3914.  The UKB appealed the 2006 Decision to the Interior Board of Indian Appeals ("IBIA").  Doc. 45, AR 2176.

53.     On April 5, 2008, then-Assistant Secretary Carl J. Artman directed the Regional Director to request remand from the IBIA and to reconsider the 2006 Decision ("2008 Directive").  Doc. 119-4, AR4931-4932.  The Regional Director requested remand on May 2, 2008, Doc. 119-5, AR4936-4937, and the IBIA remanded the matter for reconsideration on June 4, 2008.  *United Keetoowah Band v. E. Okla. Reg'l Dir.,* 47 IBIA 87 (2008), Doc. 119-6, AR4939-4945.  On August 6, 2008, the Regional Director issued a second decision ("2008 Decision"), again denying the UKB's application.  Doc. 119-7, AR4946-4971.  The UKB appealed the 2008 Decision to the IBIA.  Doc. 45, AR 2176.

54.     On September 4, 2008, before an IBIA decision, Acting Assistant Secretary George T. Skibine informed the IBIA that the Assistant Secretary was taking jurisdiction over the appeal pursuant to 25 C.F.R. § 2.20(c).  Doc. 120-1, AR4972.  The IBIA transferred the appeal to the Assistant Secretary.  Doc. 120-2, AR4974-4976.

55.     Following transfer of the appeal, Assistant Secretary Larry Echo Hawk issued four decisions involving the 76-acre Parcel over an 18-month time period, dated June 24, 2009, Doc. 35-4, AR3234-3246 ("June 2009 Decision"); July 30, 2009, Doc. 35-4, AR 3248-3251 ("July 2009 Decision"); September 10, 2010, Doc. 35-4, AR3253-3257 ("2010 Decision"); and January 21, 2011, Doc. 45, AR2229-2230.

56.     On February 24, 2009, the Supreme Court issued its decision in *Carcieri v. Salazar,* 555 U.S. 379 (2009).  In *Carcieri*, the Court concluded that the Department cannot accept land into trust under section 5 of the IRA for any Indian tribe that was not "under federal jurisdiction" in 1934 (*i.e.,* the year the IRA was enacted).  *Id.* at 382-83.

57.     The Assistant Secretary made no analysis to determine whether *Carcieri* precluded the Secretary from acquiring land into trust for the UKB and/or the UKB Corporation in the June 2009, the July 2009 or the 2010 Decisions.  In the June 2009 Decision, the Assistant Secretary concluded that the UKB was the successor-in-interest to the "historical" Cherokee Nation and thus already under federal jurisdiction in 1934 when the IRA was enacted.  Doc.45, AR2207, 2208, n. 1, 2209.  A month later, the Assistant Secretary issued the July 2009 Decision, stating that the June 2009 Decision was not "a final ruling on the status of the UKB as successor-in-interest" and was not intended "to make any binding findings regarding the status of the historic Cherokee Tribe."   Doc. 35-4, AR3248-3251.  The following year, the Assistant Secretary withdrew the successor-in-interest theory altogether in the 2010 Decision, and instead relied on alternative theories, without addressing the *Carcieri* requirements.  Doc. 35-4, AR3253.

58.     On October 5, 2010, the UKB amended its application by requesting that the 76-acre Parcel be taken into trust for the UKB Corporation.  Doc. 45, AR 2176.

59.     In the January 21, 2011 decision, the Assistant Secretary concluded that he possessed authority to approve the trust application under section 3 of the OIWA and that "*Carcieri* does not apply to this acquisition."  Doc. 45, AR2229.  On May 24, 2011, the Regional Director, stating he was bound by the Assistant Secretary's four decisions, issued a decision determining that the 76-acre Parcel would be taken into trust for the UKB Corporation ("the 2011 Decision").  Doc. 45, AR 2176-2186.  Because the 2011 Decision was issued by the Regional Director and thus not a final Department decision, the Nation filed an appeal of those limited aspects of that decision subject to further administrative review in *Cherokee Nation v. Coleman*, 58 IBIA 153.

60.     These four decisions were specifically referenced in the 2012 Decision involving the Tract.  Doc. 28-4, AR22, 24.

61.     On January 6, 2014, the IBIA entered an Order Dismissing Appeal.  *Cherokee Nation v. Coleman,* 58 IBIA 153.  On January 13, 2014, the Nation filed a separate action in this Court appealing the Department's decision to take the 76-acre Parcel into trust for the UKB Corporation.  *See Cherokee Nation v. Jewell,* 14-CV-19-GKF-FHM (N.D. Okla.).

**(ii)   The Trust Application for the 2.03-Acre Casino Tract**

62.     On April 10, 2006, the UKB filed its trust application for the 2.03-acre Tract.  Doc. 45, AR1650-1799.  The Tract is described as follows:

> A tract of land lying in and being part of the S/2 NE/4 SE/4 SW/4 and part of the N/2 SE/4 SE/4 SW/4 of Section T-16-N R-22-E Cherokee County Oklahoma more particularly described as follows to-wit Beginning at a point 175.0 feet South of the North boundary and 131.0 feet East of the West boundary of said 5/2 NE/4 SE/4 SW/4; thence S 2°-56' W, 159.8 feet; thence N 89°-12' W, 24.8 feet, thence S 3°- 30' W, 171.4 feet to point 175.0 feet South of the North boundary of said N/2 SE/4 SE/4 SW/4; thence S 89°-49' E, 384.32 feet to point on the West boundary of U.S. Highway No 62; thence N- 5°-25' W, along the West boundary

of U.S. Highway No 62, 332.0 feet thence N 89˚-49' W, 309.55 feet to the Point of Beginning Containing 2.63 acres LESS AND EXCEPT A parcel of land BEGINNING 155.00 feet North and 84.80 feet East of the SW Corner of the N/2 SE/4 SE/4 SW/4; thence N 3˚ 30' E a distance of 161.90 feet; thence S 89˚49' E a distance of 161.90 feet; thence S 3˚30' W a distance of 161.90 feet; thence N 89˚49' W a distance of 161.90 feet to the Point of Beginning.  Containing 0.60 acres more or less.

Doc. 45, AR1670.

63.     The UKB amended the application in August 2011, three months after the 2011 Decision involving the 76-acre Parcel, to request that the Tract be taken by the United States into trust for either the UKB or the UKB Corporation.  Doc. 35, AR3048.

64.     On April 19, 2012, the Regional Director issued a memorandum recommending approval of the Tract application.  The memorandum detailed the constraints imposed on the Regional Director by the Assistant Secretary, specifically referencing the June 2009 Decision and 2010 Decision.  Doc. 121-1, AR5095, AR 5098.

### F.   The 2012 Decision

65.     On July 30, 2012, Acting Assistant Secretary Michael Black issued the 2012 Decision, approving the application on behalf of the UKB Corporation, along with a memorandum to the Regional Director authorizing acceptance of the Tract into trust.  Doc. 28-4, AR17-AR26; Doc. 28-5, AR27-28.

66.     The Administrative Record makes no findings and contains no analysis of the impacts of the 2012 Decision on the Cherokee Nation or CNE.

67.     Citing only the 2010 Decision as authority, the Assistant Secretary found that section 3 of the OIWA "implicitly authorizes the Secretary to take land into trust for the UKB Corporation."  Doc. 28-4, AR22.  The Department concedes that the Assistant Secretary did not undertake a *Carcieri* analysis to determine whether the UKB or UKB Corporation was under federal jurisdiction in 1934.  *See* Doc. 135 at 38 (*Carcieri* "requires an often complex analysis,

one that Interior has not yet undertaken with respect to the UKB.").

68.     A "briefing paper" circulated at the time of the 2012 Decision identifed "Noteworthy Issues" decided by the Department.  Doc. 42-6, AR4380.  It stated:

> This decision and the one already made on the 76-acres are the ***first*** to find authority to acquire land in trust pursuant to section 3 of the OIWA.  These decisions marks *[sic]* the ***first*** trust acquisitions approved for a tribal corporation of a tribe first recognized after 1934.

*Id.* (emphasis added); *see also* Doc. 72.

69.     The Assistant Secretary also determined that gaming would be permissible on the Tract under IGRA based on his finding that the Cherokee Nation and UKB share a "former reservation" as defined by the Secretary under IGRA.  25 U.S.C. § 2719(a)(2)(A)(i).  Doc. 28-4, AR20.  The Assistant Secretary relied on this new theory to address IGRA's prohibition against gaming on land acquired in trust after October 17, 1988 ("after-acquired lands"), subject to certain conditions and exceptions.  25 U.S.C. § 2719.  The Assistant Secretary avoided the more stringent requirements in § 2719(b)(1)(A) for acquisition of after-acquired lands off-reservation,[9] by relying on IGRA's authorization of gaming on after-acquired lands in cases where the Indian tribe has no reservation and the land is in Oklahoma "within the boundaries of the Indian tribe's former reservation, as defined by the Secretary . . . ."  25 U.S.C. § 2719(a)(2)(A)(i).  Doc. 28-4, AR20.  This was the first time the Department had ever characterized the Cherokee Nation's Treaty Territory as the UKB "former reservation" for gaming purposes.  Doc. 28-4, AR21; *see also* Doc. 42-6, AR4380.

---

[9]     If an Oklahoma tribe has no "former reservation," then it must comply with § 2719(b)(1)(A), which provides that the after-acquired lands prohibition will not apply if "the Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination."

70.     The Assistant Secretary found that IGRA and the implementing regulations do not "address the question of whether two federally recognized tribes, one of which was formed under express congressional authorization from citizens of the other, can share the same former reservation for purposes of qualifying for the 'former reservation' exception." Doc. 28-4, AR20. However, he determined that the "express language" of IGRA "makes it clear" "that the determination of whether the land is within the boundaries of the tribe's former reservation is a determination for the Secretary to make." Doc. 28-4, AR20.

71.     The Assistant Secretary stated that it was necessary to discuss "only the background relevant to the limited question of whether the parcel is within the former reservation of the UKB within the meaning of Indian Gaming Regulatory Act (IGRA) and DOI's regulations at Parts 151 and 292." Doc. 28-4, AR17. The Assistant Secretary described the UKB history in a single paragraph, noting that the UKB was merely "an organization of Cherokee Indians" and that they were not allowed to organize under the OIWA until Congress enacted the 1946 Act. Doc. 28-4, AR18. The Assistant Secretary determined that "[t]here is no question that the UKB occupied the former Cherokee reservation nor that the Keetoowah Society of Oklahoma Cherokees was formed out of the Cherokee Nation of Oklahoma." Doc. 28-4, AR20. The Assistant Secretary then concluded that the UKB shared the former Cherokee Reservation based solely on the "origins of the [UKB] as composed of Cherokee Indians, reorganized and separately recognized under express authorization from Congress and a constitution approved by the Assistant Secretary of the Interior establishing its tribal headquarters in Tahlequah, Oklahoma, within the historic reservation boundaries . . . ." Doc. 28-4, AR20.

72.     The Assistant Secretary's reasoning is based upon his interpretation of the 1946 Act. However, the 1946 Act neither requires nor authorizes UKB separation from the Cherokee

Nation nor affects the ability of UKB members to enjoy all rights and privileges enjoyed by other Cherokee citizens.

73.     The only attempted "separation" of UKB members from the Cherokee Nation occurred almost 50 years after passage of the 1946 Act, when the UKB unilaterally attempted to establish separate citizenship through adoption of an enrollment ordinance on September 16, 1990. UKB Res. No. 90 UKB 9-4, Doc. 85-1, at 13-29 (also referenced in Doc. 36-3, AR3597). Section 16 of the ordinance prohibited an enrolled UKB member from being a "member of any other Tribe, Band, or Nation" and purported to disenroll UKB members who failed to relinquish membership with any other tribe by October 15, 1990.  *See United Keetoowah Band of Cherokee Indians in Okla. v. Muskogee Area Dir.*, 22 IBIA 75, 79, 85 (June 4, 1992).  The federally approved UKB Constitution and charter do not contain dual enrollment restrictions.  Doc. 45, AR1749-1758.  The UKB's attempted separation was unilateral action directed at limiting Cherokee Nation territorial jurisdiction established and recognized for more than two centuries. "The question of jurisdiction 'focuses principally on congressional intent and purpose, rather than recent unilateral actions' of a tribe."  *Oklahoma v. Hobia*, 2012 WL 2995044, at *15 (N.D. Okla. July 20, 2012) (citing *Kansas v. United States*, 249 F.3d 1213, 1229 (10th Cir. 2001) and *Miami Tribe of Okla. v. United States*, 656 F.3d 1129, 1145 (10th Cir. 2011)).

74.     The 2012 Decision extended the concept of a shared "former reservation" under IGRA to address 25 C.F.R. § 158 which requires a tribe that seeks a trust acquisition in another tribe's reservation to obtain the written consent of the tribe having jurisdiction over the land: "[N]ow that we have determined the former reservation of the Cherokee Nation is also the former reservation of the UKB for the purpose of applying the exception under 25 U.S.C. §2719(a)(2)(A)(i), the regulatory requirement for consent [25 C.F.R. § 151.8] of the Cherokee

Nation is no longer applicable."  Doc. 28-4, AR21.

### G.  The Current Litigation

75.     On August 7, 2012, the Department published a notice in the Federal Register of "a final agency determination" stating that the Assistant Secretary had "decided to accept approximately 2.03 acres of land into trust for the United Keetoowah Band of Oklahoma Corporation under the authority of the Oklahoma Indian Welfare Act Reorganization Act [sic] of 1936, 25 U.S.C. 503."  Doc. 2, Compl., Ex. 2.

76.     The Cherokee Plaintiffs filed this action on August 29, 2012.

77.     The Department originally stayed finalization of the trust acquisition for the Tract during the pendency of the present action.  The Department changed its position when the deadline for closure of the casino under agreed orders in the Eastern District Case approached, and on July 15, 2013, it notified the Cherokee Nation of its intent to take the Tract into trust in 30 days.

78.     On August 12, 2013, the Cherokee Plaintiffs obtained a preliminary injunction in the present action that prevented the Department's acceptance of a trust deed to the Tract.  The Department and the UKB sought a stay of the preliminary injunction, which was denied by this Court on August 12, 2013, and by the Tenth Circuit on August 26, 2013.  Doc. 91 and Doc. 106. In response to their requests for dismissal, the Tenth Circuit dismissed the Department's and UKB's appeals of this Court's Preliminary Injunction Order on November 25, 2013.

79.     The Court held a full day hearing in this matter on July 25, 2014, in which it heard arguments from all parties.

80.     Any finding of fact set forth herein that is more properly deemed a conclusion of law shall also constitute a conclusion of law.

**PROPOSED CONCLUSIONS OF LAW**

**I.        Jurisdiction and Venue.**

1.        This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and has jurisdiction over the parties to this action.

2.        Venue is proper under 28 U.S.C. § 1391(e)(1) because the impact of the 2012 Decision is not limited to the Tract at the center of this controversy but may impact all lands located in the Cherokee Nation's Treaty Territory, including eight counties in the Northern District of Oklahoma.  No party has opposed venue in this action.

**II.       Standard of Review.**

3.        Agency action shall be set aside under the Administrative Procedures Act, 5 U.S.C. § 706 ("APA"), if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 414 (1971), *overruled on other grounds in Califano v. Sanders*, 430 U.S. 99 (1977).

4.        "A decision is arbitrary and capricious if the agency has relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Wolfe v. Barnhart*, 345 F. Supp. 2d 1226, 1232 (N.D. Okla. 2004); *see also City of Colo. Springs v. Solis,* 589 F.3d 1121, 1131 (10th Cir. 2009) ("The critical question in answering this inquiry is 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'") (citations omitted); *Spadone v. McHugh*, 842 F. Supp. 2d 295, 304 (D.D.C. 2012) ("A decision is arbitrary or capricious under the APA if the Secretary failed to provide a reasoned explanation, failed to address reasonable arguments, or failed to consider an important aspect of the case.").

5.      In addition, an agency's action is arbitrary and capricious if the agency failed to follow its own rules or regulations in reaching the decision, *Cherokee Nation of Okla. v. Norton*, 389 F.3d 1074, 1087 (10th Cir. 2004), or if the agency has changed its position on an issue without "supply[ing] a reasoned analysis" for doing so. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983).

6.      A court is not required to defer to an agency's interpretation and application of case law.  In *Liberty Mutual Insurance Co. v. Commercial Union Insurance Co.*, the First Circuit found no basis for deference to a director's position because his "position concern[ed] merely his interpretation of the case law, not his interpretation of the controlling statute." 978 F.2d 750, 757 (1st Cir. 1992).  The court explained that "[i]t is nonsense to suggest that a federal court must defer to an administrative agency in determining the meaning and applicability of the court's own precedent." *Id.*; *see also Passamaquoddy Tribe v. Maine.*, 897 F. Supp. 632, 637 (D. Me. 1995) ("An agency chief, however, absent a congressional grant of authority, 'has no special expertise . . . to interpret case law.'").  Thus, unless Congress has given an agency specific authority to interpret case law, a court need not defer to an agency's interpretation of judicial precedent.

## III.      The Secretary Lacks Statutory Authority To Take The Tract Into Trust.

7.      The regulations governing the Secretary's land acquisition policy provide that "[l]and not held in trust or restricted status may only be acquired for an individual Indian or a tribe in trust status when such acquisition is authorized by an act of Congress." 25 C.F.R. § 151.3.

8.     A tribal corporation such as the UKB Corporation[10] constitutes a "tribe" for purposes of the land acquisition regulations only if the acquisition is made under the authority of 25 U.S.C. §§ 488 and 489 (which are not applicable here), or the acquisition is pursuant to "other statutory authority which ***specifically authorizes*** trust acquisitions for such corporations." 25 C.F.R. § 151.2(b)[11] (emphasis added).  Thus, the Secretary may acquire land into trust for the UKB Corporation only if the acquisition is specifically authorized by statute.

9.     The Assistant Secretary concluded that section 3 of the OIWA, codified at 25 U.S.C. § 503, "implicitly authorizes the Secretary to take land into trust for the UKB Corporation."  This was the first time the Department has ever determined that § 503 provides a statutory basis for taking land into trust,[12] and the parties have cited no other authority to support such a decision.

---

[10]     The UKB, a tribal constitutional entity, and the UKB Corporation, a tribal corporate entity, are separate and distinct legal entities.  *See Gaines v. Ski Apache*, 8 F.3d 726, 729 (10th Cir. 1993); *Native Am. Distrib. v. Seneca-Cayuga Tobacco Co.*, 491 F. Supp. 2d 1056, 1059 (N.D. Okla. 2007).

[11]     The 1980 comments accompanying 25 C.F.R. § 151.2(b) emphasized that few statutes specifically authorize trust acquisitions for federally chartered tribal corporations:

> Another criticism of this definition [of "tribe"] was its failure to include tribal corporations. Tribal corporations were not included because the acquisition authority in the [IRA] is limited to an 'Indian tribe or individual Indian'; however, it has been pointed out that other statutory authority does provide for the acquisition of land in trust for tribal corporations; namely section 2 of Public Law 91-229 (84 Stat. 120; 25 U.S.C. § 489).  In view of this, the definition has been changed to include corporations for limited purposes.

45 Fed. Reg. 62034 (Sept. 18, 1980).

[12]     In a "briefing paper" accompanying the 2012 Decision, the Department stated, "This decision and the one already made on the 76 acres are the first to find authority to acquire land in trust pursuant to section 3 of the OIWA."  Doc. 42-6, AR4380.

10.     The text of § 503 contains no mention of land acquisitions.  Rather, on its face, § 503 focuses on rights of tribal self-determination and the creation of tribal corporations.  25 U.S.C. § 503; *see also Cheyenne-Arapaho Tribes of Okla. v. Beard*, 554 F. Supp. 1, 3 (W.D. Okla. 1980) (describing § 503 as "merely provid[ing] statutory authority for a federally recognized Indian tribe residing in Oklahoma to organize and adopt a constitution and bylaws under rules and regulations prescribed by the Secretary of the Interior . . . and to obtain a charter of incorporation from the Secretary").  Section 503 states in pertinent part:

> Any recognized tribe or band of Indians residing in Oklahoma shall have the right to organize for its common welfare and to adopt a constitution and bylaws, under such rules and regulations as the Secretary of the Interior may prescribe.  The Secretary of the Interior may issue to any such organized group a charter of incorporation, which shall become operative when ratified by a majority vote of the adult members of the organization voting . . . . Such charter may convey to the incorporated group, in addition to any powers which may properly be vested in a body corporate under the laws of the State of Oklahoma, the right to participate in the revolving credit fund and to enjoy any other rights or privileges secured to an organized Indian tribe under the [IRA]. . . .

11.     According to the Assistant Secretary, the Secretary's authority to take land into trust for the UKB Corporation is implicit in § 503's provision that the charter of a tribal corporation "may convey to the incorporated group . . . the right to . . . enjoy any other rights or privileges secured to an organized Indian tribe under the [IRA]."  The Court concludes that this decision is arbitrary and capricious and holds that § 503 does not provide a statutory basis for taking land into trust for the UKB Corporation.

## A. Section 503 does not provide independent authorization for the Secretary to take land into trust.

12.     The Supreme Court has cautioned that "'we ordinarily resist reading words or elements into a statute that do not appear on its face.'"  *Dean v. United States*, 556 U.S. 568, 572 (2009) (citation omitted).  Further, "[t]he first step" in a statutory construction case "'is to

26

determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.' The inquiry ceases 'if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002) (internal citations omitted).

13.     Here, the plain and unambiguous language of § 503 authorizes the Secretary to do only one thing, *i.e.,* issue a charter of incorporation to organized Indian tribes or bands.  25 U.S.C. § 503.  The charter may vest in a ***tribal corporation*** the same rights and privileges available to a ***tribe*** under the IRA.  In other words, the relevant provision of § 503 merely addresses the formation of tribal corporations and lays the framework for such corporations to be treated similarly to tribes under the IRA.  It does not purport to vest the Secretary with additional authority of any kind.

14.     Despite this fact, the Assistant Secretary concluded that § 503 implicitly authorized the Secretary to take the Tract into trust for the UKB Corporation because the UKB Corporation's charter authorizes the corporation to acquire "property of every description, real and personal."

15.     Even if the UKB corporate charter could be read to authorize the UKB Corporation to request that land be taken into trust for its benefit (see below), this does not "necessarily" authorize the Secretary to take the land into trust.  At most, § 503 merely allows ***tribal corporations*** to be granted the same right that ***tribes*** have under the IRA to request that land be taken into trust.  This provision is meaningful because the IRA only authorizes the Secretary to take land into trust for an "Indian tribe or individual Indian," not tribal corporations. 25 U.S.C. § 465.  Thus, § 503 does not provide independent statutory authority for the Secretary to take land into trust for a tribal corporation.  Rather, at best, it could be read to allow the

Secretary to take land into trust for a tribal corporation under the IRA where § 465 would otherwise authorize it to take land into trust for a tribe or individual Indian.[13]

### B. Section 503 cannot be construed as implicit authority for the Secretary to take land into trust when a separate provision of OIWA explicitly addresses the Secretary's land-into-trust authority.

16.     As noted above, Section 503 contains no reference to land acquisitions.  The OIWA's only express provisions concerning land acquisitions are contained in section 1, codified at 25 U.S.C. §501.  Section 1 expressly authorizes the Secretary to take land into trust for an Indian "tribe, band, group or individual Indian" if the land is "agricultural [or] grazing land[] of good character and quality in proportion to the respective needs of the particular Indian or Indians for whom such purchases are made."  25 U.S.C. § 501.

17.     The United States Supreme Court has held that "[w]e do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest."  *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 341 (2005); *see also Elwell v. Oklahoma ex rel. Bd. of Regents of Univ. of Okla.*, 693 F.3d 1303, 1310 (10th Cir. 2012) ("'However inclusive may be the general language of a statute . . . it will not be held to apply to a matter specifically dealt with in another part of the same enactment.'") (quoting *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 228 (1957)).  Further, it is well established that the "'enumeration of specific powers [in a statute] operates to exclude those not enumerated.'"  *City of Tulsa v. Midland Valley R.R. Co.*,

---

[13]     Because the Assistant Secretary did not propose taking the land into trust pursuant to 25 U.S.C. § 465, the Court need not determine whether the Secretary would have authority to take land into trust for tribal corporations pursuant to that statute and makes no such determination here.

168 F.2d 252, 254 (10th Cir. 1948) (citation omitted); *see also Hillman v. Maretta*, 133 S. Ct. 1943, 1953 (2013) ("'Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of a contrary legislative intent.'") (citation omitted); *Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006) ("'Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'") (citation omitted).

18.     Here, Congress clearly and expressly set forth the circumstances under which the Secretary could take land into trust for Indians under OIWA.  If it had intended to include tribal corporations within this provision, it could and would have done so.  Moreover, if it had intended to authorize the Secretary to take non-agricultural lands into trust, it would not have included such a limitation in § 501.  It is contrary to well established rules of statutory construction to conclude, as the Assistant Secretary did, that Congress implicitly authorized the Secretary to take non-agricultural lands into trust for tribal corporations through § 503 – a provision that, on its face, merely authorizes the conveyance of corporate charters – where Congress expressly included in the same Act a land-into-trust provision that excluded such corporations and land.

### C. OIWA could not incorporate the IRA's land-into-trust rights without its qualification of those rights.

19.     Even if § 503 could be construed to implicitly authorize land to be taken into trust for tribal corporations, such a construction hinges on the theory that § 503 incorporates the land-into-trust provision of the IRA.  The Supreme Court has made clear that the Secretary's authority to take land into trust under the IRA is not unlimited.  *See Carcieri v. Salazar,* 555 U.S. 379 (2009).  In *Carcieri*, the Court concluded that the Department cannot accept land into trust under

section 5 of the IRA for any Indian tribe that was not "under federal jurisdiction" in 1934 (*i.e.,* the year the IRA was enacted). *Id.* at 382-83.[14]

20.     The administrative record contains no evidence supporting a conclusion that the UKB Corporation was "under federal jurisdiction" in 1934.  In fact, the UKB was not federally recognized until 1946, and the Secretary approved the UKB Corporation's charter in 1950. Accordingly, the administrative record provides no basis for concluding that the Secretary had authority to take land into trust for the UKB Corporation under § 465.  Indeed, the Assistant Secretary cited § 503 as the sole statutory authority for the acquisition.

21.     Section 503 permits a corporate charter to grant a tribal corporation "any other rights and privileges secured to an organized Indian tribe under the [IRA]."  It does not purport to endow tribal corporations with ***greater*** rights and privileges than tribes.  Thus, any IRA rights and privileges extended to tribal corporations by corporate charters issued under § 503 must necessarily be subject to the same qualifications and limitations applicable to tribes under the IRA.  OIWA cannot implicitly incorporate the "land-into-trust" provision of the IRA without also incorporating the limitations on that provision recognized by the Supreme Court in *Carcieri*. Indeed, the Department's own regulations require it to consider not only "[t]he existence of statutory authority for the [proposed] acquisition," but also "any limitations contained in such authority."  *See* 25 C.F.R. § 151.10(a).  Because there is no basis in the administrative record for concluding that the UKB Corporation was under federal jurisdiction in 1934, the Secretary is not

---

[14]     Section 5 of the IRA authorizes the Secretary to acquire lands for "Indians." 25 U.S.C. § 465.  Section 19 defines the term "Indian" as including "all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction."  25 U.S.C. §479. Neither of these sections was listed as inapplicable to Oklahoma tribes in section 13 of the IRA. 25 U.S.C. §473.

authorized to take land into trust for the UKB Corporation under § 503, even if § 503 extends the Secretary's authority under § 465 to tribal corporations like the UKB Corporation.

### D. "Implicit" authority is not "specific" authority.

22. As noted above, the Department cannot take land into trust for the UKB Corporation unless there is *specific* statutory authority for such an action. *See* 25 C.F.R. § 151.2(b). Yet the Assistant Secretary categorized § 503 as only "implicit" authority for the acquisition. This begs the question of whether "implicit" authority can provide the type of "specific" authority required by the land acquisition regulations. The Court concludes that it cannot.

23. Black's Law Dictionary defines "specific" to mean "[o]f, relating to, or designating a particular or defined thing; *explicit*." BLACK'S LAW DICTIONARY 1528 (9th ed. 2009) (emphasis added). Thus, under the common definition of the word "specific," the authority to take land into trust must be "explicit." Authority cannot be both "implicit" and "explicit," as those terms are opposites. OXFORD AMERICAN DESK DICTIONARY & THESAURUS 403, 745 (3d. ed. 2010) (listing "explicit" as a synonym for "specific" and an antonym for "implicit").

24. Moreover, courts routinely distinguish between "specific" and "implied" authority, recognizing that the terms have opposite meanings. *See Am. Postal Workers Union v. U.S. Postal Serv.*, 222 F. Supp. 2d 675, 682 (E.D. Pa. 2002) (holding that "a local union has 'implied authority' to pursue a federal action . . . even without specific authority"); *In re White Motor Credit Corp.*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (concluding that the "[a]bsence of specific statutory authority . . . poses no impediment" because such "authority is implicit"); *New Mexico v. Kovach*, 143 P.3d 192, 195 (N.M. Ct. App. 2006) ("Although the defendant had no specific authority to endorse checks for deposit, the court found entrustment because the

defendant had implied authority to deposit checks."); *Lanvale Props., LLC v. Cnty. of Cabarrus*, 731 S.E.2d 800, 810-815 (N.C. 2012) (holding that the county had neither implied authority nor specific authority to enact an ordinance).  Thus, "specific" authority cannot be "implicit" authority, rendering it arbitrary and capricious for the Assistant Secretary to determine that the "specific" statutory authority required to take land into trust for the UKB Corporation was "implicit" in a statute.

### E.  The UKB corporate charter does not give UKB the right for land to be taken into trust.

25.     Finally, the Court notes that the Assistant Secretary's decision regarding the alleged statutory authority of § 503 is premised on his determination that the UKB's corporate charter "conveys the authority to the corporation the right to own land held in trust."  Doc. 35-4, AR3255.  In support of this assertion, the Assistant Secretary relies on section 3(r) of the charter, in which the Secretary authorized the UKB Corporation "'[t]o purchase, take by gift, bequest, or otherwise own, hold, manage, operate, and dispose of *property of every description*, real or personal.'"  (*Id.* (emphasis and alteration in original).)  Thus, the Assistant Secretary concluded that because the charter authorized the UKB Corporation to hold "property of every description," this equates to a right to "own lands held in trust."  (*Id.*)

26.     The Assistant Secretary's analysis confuses the issue.  Although the charter addresses the UKB Corporation's general right to own property, that right is not challenged here.  Rather, the issue presented is whether *the Secretary* may hold the title to the Tract in trust for the UKB Corporation.  In other words, the fact that the charter gives the UKB Corporation the right to own property is irrelevant because, if the Secretary is permitted to take the land into trust, the Department would own the Tract, not the UKB Corporation.

27.     Further, even if the charter gives the UKB the right to "own lands held in trust," it does not vest the Secretary with the requisite authority to take the land into trust.  Indeed, the Department itself has previously recognized the distinction between a tribe's right to request to have its land taken into trust and the Department's authority to grant such a request.  In an April 17, 1987 letter from the Acting Assistant Secretary to the Chief of the UKB, the Assistant Secretary wrote:

> We do not dispute the fact that the [UKB] is a viable and distinct federally recognized tribal body which has a somewhat undetermined relationship with the Cherokee Nation of Oklahoma.   Further, *we agree that the Band has the authority to request the Secretary to place lands in trust on its behalf*.  However, the 1946 Act, while recognizing the [UKB] as a band of Indians within the meaning of the [OIWA], can in no way be read as authorizing the Band to exercise concurrent jurisdiction over Cherokee lands within the former Cherokee Reservation.   Furthermore, because the subject lands fall within the Cherokee Nation's former reservation, their consent is required under 25 C.F.R. 151.8. *Therefore, we must . . . require the concurrence of the Cherokee Nation of Oklahoma before the Band's request for trust land can properly be evaluated* . . . .

Doc. 30-17, AR451-52 (emphasis added).  Thus, it is clear that that the mere fact that a tribe or band has the authority to request that land be placed into trust in no way authorizes the Department to grant the request or accept land into trust.

28.     Accordingly, the Assistant Secretary's conclusion that the UKB corporate charter conveys to the corporation the right to have land taken into trust for its benefit is a logical leap that is not supported by the charter itself, nor does the charter provide a statutory basis for the Secretary to take land into trust for the UKB Corporation.

29.     For all of the reasons set forth above, the Assistant Secretary's decision that the Secretary has statutory authority to take the Tract into trust for the UKB Corporation was arbitrary and capricious and contrary to law.

**IV.      Principles of Collateral Estoppel and Judicial Estoppel Preclude Relitigation of the "Shared Reservation" Issue Here.**

30.      Two key components of the 2012 Decision hinge on the Assistant Secretary's determination that the UKB shares the "former reservation" of the Cherokee Nation.  The many flaws in these conclusions are discussed separately below, but as an initial matter, the Court holds that the doctrines of collateral estoppel and judicial estoppel preclude the UKB, UKB Corporation, and the Department from urging their "shared reservation" theory in this Court.

### A. The Northern District Trilogy.

31.      During the 1990s, this Court decided three cases addressing the UKB's claim to the Cherokee Nation's Treaty Territory.

### 1.   *UKB v. Secretary of the Interior.*

32.      In *United Keetoowah Band of Cherokee Indians in Oklahoma v. Secretary of the Department of the Interior*, Case No. 90-C-608-B (N.D. Okla.), the UKB brought an action against the Secretary, asserting, *inter alia*, that the UKB is entitled to use or acquire trust lands within the "former reservation" of the Cherokee Nation.  Specifically, the UKB challenged the Department's longstanding position that, because the Cherokee Nation was the Tribe with sovereign authority over Indian country lands within its Treaty Territory, the Nation's consent was required for any application by the UKB to have land acquired in trust status within the Treaty Territory.  The Department moved to dismiss the UKB's complaint on the ground that the Cherokee Nation was an indispensable party to the case.  The Court granted the Department's motion, holding that the Cherokee Nation was an indispensable party to the case whose sovereign immunity prevented its joinder.  In so holding, the Court noted that prior case law indicated that Congress, the Secretary, and the courts had made no distinction between the Cherokee Nation at the time of Oklahoma statehood and the current Cherokee Nation.  The Court

thus concluded that "[t]he record before the Court is clear that the Cherokee Nation of Oklahoma has an interest in the subject lands and its interest has long recognized by the federal government."  May 31, 1991 Order at 10.

### 2.  *Buzzard v. Oklahoma Tax Commission*.

33.     In *Buzzard v. Oklahoma Tax Commission*, No. 90-C-848-B (N.D. Okla.), the UKB and some of its members brought suit against the Oklahoma Tax Commission ("OTC"), seeking injunctive relief prohibiting the enforcement of Oklahoma's tobacco tax laws in smokeshops allegedly owned and licensed by the UKB and located within the boundaries of the original Cherokee reservation.   The parties agreed that "the only issue before the Court is whether the subject smokeshops are located in Indian country."  Feb. 24, 1992 Order at 4, *aff'd*, 992 F.2d 1073 (10th Cir. 1993).  The UKB asserted two arguments in support of its claim that that it exercised tribal sovereignty over the subject lands: (1) "they are reservation lands, and the UKB is heir to these unallotted lands within the limits of the original Cherokee Indian Reservation;" and (2) despite the fact that the lands were held in fee by the UKB, the lands were subject to certain restrictions and thus similar to "trust lands."  *Id.* at 7.

34.     Rejecting the first argument, the Court held that the UKB "offers no authority to support its claim that it is heir to the original Cherokee Indian Reservation."  *Id.* at 8.  The Court reasoned:

> The Act of August 10, 1946 simply recognizes the UKB as a "band of Indians residing in Oklahoma"; it does not set aside a reservation for the UKB or acknowledge the UKB's jurisdiction over the original Cherokee Indian Reservation.  Also, while the Act's recognition of the UKB permitted the UKB to incorporate under Section 3 of the [Oklahoma Indian Welfare Act], nothing in Section 3 creates or recognizes the UKB's claim to the original Cherokee Indian Reservation.  Neither does the UKB's Corporate Charter, Constitution or By-Laws grant the UKB jurisdiction over the reservation lands.

*Id.*

35.     The Court further found, "[c]ontrary to the UKB's claim" *id.*, that the Secretary had consistently recognized that

> the original Cherokee Indian Reservation is the former reservation of the Cherokee Nation, not the UKB, thereby necessitating the UKB's procurement of the Cherokee Nation's consent before the Secretary will acquire any such land in trust for the UKB pursuant to 25 U.S.C. *§ 465.  See 25 C.F.R. § 151.8.*

*Id.* at 9.  The Court thus held "that UKB has failed to show any treaty or Congressional act establishing UKB's 'inherited' right or claim to reservation land within the boundaries of the old Cherokee Indian Reservation."  *Id.*

36.     The Court also rejected the UKB's second argument, *i.e.,* that the subject tract could not be conveyed under 25 U.S.C. §177,[15] and was the equivalent of trust lands for purposes of determining "Indian Country."  *Id.* at 10-13.   Therefore, the Court held that the subject smokeshops were not in Indian country and were subject to the taxing authority of the State of Oklahoma.

37.     The UKB appealed the Court's ruling.  *Buzzard v. Okla. Tax Comm'n*, 992 F.2d 1073 (10th Cir. 1993).  The Tenth Circuit specifically noted that on appeal, the UKB abandoned its heirship claim and relied only on its second argument, *i.e.,* that its fee lands were equivalent to trust lands:

> The UKB also asserted [in the district court] that its smokeshops were in Indian country because the land was part of the old Cherokee Indian Reservation and it is an heir to the Cherokee Nation.  The district court held, however, that the UKB is not an heir to the Cherokee Nation and the UKB has not challenged this ruling.

*Id.* at 1075 n.5.

---

[15]     The subject lands in that case were not restricted lands under statutes governing the restricted status of individual allotments of the Five Tribes, which constitute Indian country.  See United States v. Sands, 968 F.2d 1058, 1062 (10th Cir. 1992).

### 3. *UKB v. Mankiller.*

38.     In the third case of the trilogy, the UKB brought a declaratory judgment suit against the Department and various Cherokee Nation officials, challenging the Cherokee Nation's authority to enforce its tobacco tax and licensing requirements on individual restricted allotments that the UKB used for smoke shops. *United Keetoowah Band v. Mankiller*, No. 92-C-585-B (N.D. Okla.).   The Court held that the UKB's challenge "directly attack[ed] the sovereignty of the Cherokee Nation over the subject land . . . ." Jan. 27, 1993 Order, *attached to and aff'd,* 1993 WL 3079372, at *4 (10th Cir. 1993).   The Court noted that it had "previously decided that the Cherokee Nation is the only tribal entity with jurisdictional authority in Indian Country within the Cherokee Nation," and that it had "previously determined . . . that the Cherokee Nation's sovereignty is preeminent to that of the UKB in Cherokee Nation Indian Country." *Id*. at *4-5.   Citing its two prior holdings confirming the superiority of the Nation's interests and jurisdiction, the Court concluded that principles of res judicata and collateral estoppel barred the UKB from again raising the merits of its claim to the original Cherokee lands. *Id.* at *5.   The Court then dismissed the case based on its determination that the Cherokee Nation was an indispensable party and was protected from suit by sovereign immunity and on res judicata grounds.

### B.  Collateral Estoppel (Issue Preclusion).

39.     "Under collateral estoppel, 'once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.'"   *Sil-Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1520 (10th Cir. 1990) (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)).   Collateral estoppel, or issue preclusion, thus serves to "'relieve parties of the cost and vexation of multiple

lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, ***encourage reliance on adjudication***.'"  *Id.* at 521 (quoting *Allen*, 449 U.S. at 94) (emphasis added).

40.     Issue preclusion will apply if the issue decided in the prior case was "necessary to the judgment" in that case and if the following four elements are met:

> (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

*Frandsen v. Westinghouse Corp.*, 46 F.3d 975, 978 (10th Cir. 1995) (citations omitted).

41.     "Trial courts are granted broad discretion in the application of collateral estoppel."  *Klein v. Comm'r of Internal Rev.*, 880 F.2d 260, 264 (10th Cir. 1989) (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979)).

> The Supreme Court instructs that, when determining whether collateral estoppel applies, a court must[] examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and that the inquiry must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.

*United States v. Rogers*, 960 F.2d 1501, 1508 (10th Cir. 1992) (quotations omitted).  Utilizing this discretion and applying the standards outlined above, the Court concludes that collateral estoppel bars relitigation of the "shared reservation" issue here.

### 1.  Necessary to judgment.

42.     For issue preclusion to apply, the issue must have been actually litigated and have been necessary to the prior decision.  *See Bobby v. Bies*, 556 U.S. 825, 829 (2009) (holding that issue preclusion "bars relitigation of determinations necessary to the outcome of a prior proceeding").  As noted above, the UKB advanced two arguments in *Buzzard* to support its claim that that its fee lands within the boundaries of the historic Cherokee Reservation were Indian

country not subject to taxation by the Oklahoma Tax Commission: "(1) they are reservation lands, and the UKB is heir to these unallotted lands within the limits of the original Cherokee Nation Reservation; and (2) these lands, while held by the UKB in fee, are similar to 'trust lands,' as they are subject to restrictions imposed by 25 U.S.C. § 177." *Buzzard*, Feb. 24, 1992 Order at 7. In granting summary judgment to the defendants and dismissing the case, the Court necessarily had to reject *both* arguments. The Court's determination that the "UKB has failed to show any treaty or Congressional act establishing the UKB's 'inherited' rights or claim to reservation within the boundaries of the old Cherokee Indian Reservation," *Buzzard id* at 9, was thus necessary to the judgment entered in the case and is preclusive here.

### 2. Identity of issues.

43.      Establishing identity of issues requires consideration of "whether the issues presented are *in substance* the same as those resolved in the earlier litigation . . . [and] whether the controlling facts or legal principles have changed *significantly* since the earlier judgment." *Klein*, 880 F.2d at 262-63 (emphasis added).

44.      In *Jarvis v. Novel/Sysco Food Services Co.*, 985 F.2d 1419 (10th Cir. 1993), the Tenth Circuit noted that "[issue p]reclusion generally is appropriate if both the first and second action involve application of the same principles of law to *an historic fact setting that was complete by the time of the first adjudication*." *Id.* at 1425 (quoting 18 Charles Alan Wright et al., *Federal Practice and Procedure*, § 4425 at 243) (emphasis added).

45.      Similarly, the doctrine of issue preclusion operates unless there have been "major changes in the law" relevant to the issue in question. *See Montana v. United States*, 440 U.S. 147, 161 (1979); *Klein*, 880 F.2d at 263 (requiring "significant" change in controlling legal principles). Such changes might include a state court's judicial declaration intervening between the two proceedings, a modification or growth in legal principles as enunciated in intervening

decisions of the Supreme Court, or an interposed alteration in pertinent statutory provisions or regulations. *See Comm'r of Internal Rev. v. Sunnen*, 333 U.S. 591, 600-01 (1948). *Montana* makes clear, however, that these changes must be "major" to prevent application of issue preclusion.

46.     The different factual "scenarios" giving rise to the Northern District Trilogy and to this case (*see* Hr'g Tr. at 119:18-120:3), are of no consequence to the specific legal issue determined in *Buzzard* and at issue again here – *i.e.*, whether the UKB is an heir to the Cherokee Nation such that it has a right to acquire lands into trust within the boundaries of the historic Cherokee Nation Reservation without Cherokee Nation consent.   The facts essential to determination of this issue are historic and were complete at the time of the first adjudication. Whether the question arises in the context of taking land into trust for gaming or taxation of smokeshops, the pure legal issue is the same.[16]

47.     Moreover, there have been no "major changes in the law" relevant to this issue. The only two legal developments identified by the UKB and the Secretary that occurred since 1992 are not sufficiently "significant" to bar application of issue preclusion.

48.     First, the UKB and the Secretary contend that a 1999 appropriations rider providing that "no funds shall be used to take into trust within the boundaries of the original

---

[16]     The Department's position in the present case is legally inconsistent with the United States' reliance on the legal precedents established in *Buzzard* in its ongoing defense in a UKB claims suit involving UKB claims of successorship to Cherokee Nation trust resources and seeking damages against the United States. *See United Keetoowah Band of Cherokee Indians in Okla. v. USA*, U.S. Ct. Fed Claims, Case No. 06-cv-936, Doc. 98, August 17, 2012, United States Answer at 7 ("To the extent that Plaintiff asserts claims that it or its privies asserted or could have asserted in a prior adjudication in which a court of competent jurisdiction entered a final judgment, including but not limited to, *Buzzard v. Oklahoma Tax Comm'n*, 992 F. 2d 1073 (10th Cir.), *cert, denied sub nom, United Keetoowah Band of Cherokee Indians v. Oklahoma Tax Comm'n*, 510 U.S. 994 (1993), those claims are barred in whole or in part by the doctrines of res judicata and/or collateral estoppel.").

Cherokee territory in Oklahoma without the ***consultation*** with the Cherokee Nation" repeals substantive Department regulations permitting a tribe to "acquire trust land on a reservation other than its own only when the governing body of the tribe having jurisdiction over such reservation ***consents*** in writing to the acquisition."  25 C.F.R. § 151.8.  But courts will not construe an appropriations act to amend substantive law unless it is clear that Congress intended to change the substantive law.  *United States v. Will*, 449 U.S. 200, 221 (1980); *see Calloway v. Dist. of Columbia*, 216 F.3d 1, 9-10 (D.C. Cir. 2000) (recognizing "very strong presumption" that appropriations acts do not amend substantive law).  And no such "clear intent" to repeal the Department's land acquisition regulations is present in the 1999 rider.  Moreover, the appropriations rider contains no language whatsoever demonstrating an intention to abrogate the clear precedent of this Court.

49.     Second, the UKB contends that the 1994 amendment of section 476 of the IRA, 25 U.S.C. § 476(f) and (g), prohibits the Secretary from classifying one tribe as inferior to another and, thus, mandated the Secretary's finding that the UKB has shared rights to the historic Cherokee Reservation.  Despite the enactment of these provisions, though, the Supreme Court has held that the Department can – and must – draw historical distinctions between federally recognized tribes for purposes of taking land into trust.  *See Carcieri*, 555 U.S. 379 (permitting distinction between federally recognized tribes based on date of recognition).  Indeed, it is only logical that differently situated tribes may be treated differently.  Nor does a general requirement to avoid discrimination among tribes require the Secretary and this Court to rewrite history or to reverse 20 year-old precedent.  The 1994 amendment to § 476, then, did not effect a "major change in the law" such that issue preclusion cannot apply here.

### 3. Final adjudication on the merits.

50.     In *Buzzard*, the Court granted summary judgment in favor of the Oklahoma Tax Commission and affirmatively held that the UKB smokeshops were subject to Oklahoma tax laws. The fact that the UKB chose not to appeal this determination in *Buzzard* does not permit it to avoid collateral estoppel and essentially appeal that decision now. Quite simply, "[f]ailure to raise issues on appeal does not alter their preclusive effect." 18 James Wm. Moore *et al., Moore's Federal Practice* ¶ 132.03[4][k][vii] (3d ed. 2014); *see Angel v. Buffington*, 330 U.S. 183, 189 (1947) ("If a litigant chooses not to continue to assert his rights after an intermediate tribunal has decided against him, he has concluded his litigation as effectively as though he had proceeded through the highest tribunal available to him."); *GAF Corp. v. Eastman Kodak Co.*, 519 F. Supp. 1203, 1213 (S.D.N.Y. 1981) (collecting cases). This was clearly a final adjudication on the merits for purposes of issue preclusion.

### 4. Party or in privity with party.

51.     The Cherokee Plaintiffs invoke the doctrine of issue preclusion against the UKB and two parties who are clearly in privity with the UKB. Privity "is a label that seeks to convey the existence of a relationship sufficient to give courts confidence that the party in the former litigation was an effective representative of the current party's interests." *Entek GRB, LLC v. Stull Ranches, LLC*, __ F.3d __, 2014 WL 3953773, at *5 (10th Cir. Aug. 14, 2014). The Tenth Circuit recently recognized that privity exists where a litigant is "'so identified in interest with a party to former litigation that [it] represents precisely the same right in respect to the subject matter involved.'" *Id.* (quoting *Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1052-53 (9th Cir. 2005)).

52.     Here, there can be no doubt that the UKB Corporation is in privity with its tribal counterpart. Their interests in this case are identical and interchangeable. The Tract is owned by

the UKB, but the proposed trust acquisition is on behalf of the UKB Corporation.  Indeed, the UKB itself submitted the original trust application and later amended the application to request the land be taken into trust for the UKB Corporation after *Carcieri* was decided.  Thus, they clearly are in privity with each other.  *See Menominee Indian Tribe of Wis. v. Thompson*, 943 F. Supp. 999, 1019 (W.D. Wis. 1996) (holding a tribe's affiliated corporate entity to be in privity with the tribe for purposes of issue preclusion).

53.     In addition, the Department also is in privity with the UKB for purposes of applying collateral estoppel under the facts of this case.  The UKB – the party in *Buzzard* – is the real party in interest in this litigation.  The UKB and the Department not only assert "precisely the same right" but the Department asserts that right here **on behalf of the UKB**.  *See Heckman v. United States*, 224 U.S. 413, 446 (1912) (holding that a suit brought by the federal government pursuant to its trust relationship with Indians binds both the United States and the Indians it represents in the litigation); *see also Canadian St. Regis Band of Mohawk Indians v. New York*, 146 F. Supp. 2d 170, 189-90 (N.D.N.Y. 2003) (for purposes of res judicata, "privity clearly exists between the United States and the St. Regis Tribe by virtue of the United States' role as trustee").  The doctrine of collateral estoppel would be rendered meaningless if the UKB is precluded from asserting the "shared reservation" argument but the Department – which urges the "shared reservation" theory solely for the benefit of the UKB – remains free to make that previously rejected argument.  Thus, the UKB, UKB Corporation, and the Department are bound by Judge Brett's decision in *Buzzard*.

### 5.  Full and fair opportunity to litigate the issue.

54.     The Tenth Circuit has recognized that

[t]he requirement that the party against whom the prior judgment is asserted had a full and fair opportunity to be heard centers on the fundamental fairness of

preventing the party from relitigating an issue he has lost in a prior proceeding. Often, the inquiry will focus on whether there were significant procedural limitations in the prior proceeding, whether the party had the incentive to litigate fully the issue, or whether effective litigation was limited by the nature or relationship of the parties.

*Sil-Flo*, 917 F.2d at 1521 (citations omitted).

55.     The UKB had a full and fair opportunity to litigate its claim to the former Cherokee reservation before the Northern District in *Buzzard*, and again on appeal, which it opted not to do.  When the UKB attempted to litigate the issue again in *Mankiller*, the Northern District correctly held (urged by the Secretary) that the UKB was barred from doing so by the principle of collateral estoppel.  Yet the UKB, joined by the Secretary this time, once again attempts to collaterally attack the Court's prior determination of the issue.  As the Tenth Circuit noted in *Jones v. United States*, 446 F.2d 131 (10th Cir. 1972), the "litigation of issues at some point must come to an end."  *Id.* at 136 (quotation omitted).  The doctrine of issue preclusion demands that result here and now.

56.     Because the UKB already has litigated and lost its claim that it shares the "former reservation" of the Cherokee Nation, the UKB, UKB Corporation, and the Department are all precluded from asserting that claim again in these proceedings.  Accordingly, the Court need not and will not revisit that issue here.

### C.  Judicial estoppel.

57.     "'[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.'"  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citation omitted).  A court thus has discretion to apply the equitable doctrine of judicial estoppel "'to protect the integrity of the judicial process by prohibiting parties from deliberately changing

positions according to the exigencies of the moment. . . . [and] to prevent improper use of judicial machinery.'"   *Queen v. TA Operating, LLC*, 734 F.3d 1081, 1087 (10th Cir. 2013) (citations omitted).  Three factors typically inform this decision:

> First, a party's subsequent position must be clearly inconsistent with its former position.  Next, a court should inquire whether the suspect party succeeded in persuading a court to accept that party's former position, so that judicial acceptance of an inconsistent position in a later proceeding would create the ***perception*** that either the first or the second court was misled[.]  Finally, the court should inquire whether the party seeking to assert an inconsistent position would gain an unfair advantage in the litigation if not estopped.

*Id.* (quotations and citations omitted) (alterations and emphasis in original).

58.      In *New Hampshire v. Maine*, the Supreme Court applied judicial estoppel against the state of New Hampshire, rejecting the state's argument that the doctrine should not preclude the government from taking inconsistent positions in judicial proceedings.  532 U.S. at 755-56. The Court recognized that governmental entities should be held to the same standards as other litigants, unless judicial estoppel "would compromise a governmental interest in enforcing the law," or "where the shift in the government's position is 'the result of a change in public policy,' or the result of a change in facts essential to the prior judgment."  *Id.*   District courts have followed the same rationale to judicially estop federal agencies from taking inconsistent positions in litigation.  *See Ismie Mut. Ins. Co. v. U.S. Dep't of Health & Human Servs.*, 413 F. Supp. 2d 954, 958-59 (N.D. Ill. 2006).

59.      Here, the Department makes an argument clearly inconsistent with its position in the *Mankiller* case, now asserting that issue preclusion does not bar this Court's determination of the UKB's rights to lands within the historic Cherokee Nation reservation, when the Department previously persuaded the court that collateral estoppel barred consideration of this issue. Permitting the Department to change its position "according to the exigencies of the moment"

would work an injustice on the Cherokee Plaintiffs, who are entitled to rely on the final determinations of the judiciary.  Indeed, the *Ismie* court recognized that the doctrine of judicial estoppel protects the same reliance interest as the requirement that an agency provide a legitimate, reasoned explanation before departing from its own precedent.  *Id.* at 959 n.4.  Where the Department has failed to do so, it cannot argue that its change in position in this litigation is the result of a reasoned "change in public policy" that would warrant an exception to application of the doctrine.  The Court thus holds that the Department is judicially estopped from taking an inconsistent position here.

### V.     The Assistant Secretary's Decision That Gaming Is Permissible On The Tract Under IGRA Was Arbitrary And Capricious.

60.     As noted above, the "former reservation" issue is relevant to two key issues presented in this case.  The first such issue is the Assistant Secretary's flawed decision that gaming would be permissible on the Tract under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701, *et seq.*

61.     IGRA establishes requirements regarding whether trust lands may be used for purposes of tribal gaming.  IGRA prohibits gaming on land acquired in trust after October 17, 1988 except in certain circumstances.  One of those circumstances exists where the lands "are within the boundaries of the Indian tribe's former reservation as defined by the Secretary . . . ." 25 U.S.C. § 2719(a)(2)(A)(i).  Further, IGRA only authorizes an Indian tribe to engage in gaming on "Indian lands within such tribe's jurisdiction."  25 U.S.C. § 2710(b)(1).

62.     In reaching his decision that the UKB could conduct gaming on the Tract, the Assistant Secretary concluded that (1) the Tract is within the former reservation of the UKB, which is "shared" with the Cherokee Nation, and (2) the Tract is within the jurisdiction of the UKB.  Both of these decisions are incorrect, arbitrary, and capricious.

**A. The UKB does not share the "former reservation" of the Cherokee Nation.**

63.     The Assistant Secretary's decision that the UKB and Cherokee Nation share the former reservation of the Cherokee Nation is arbitrary and capricious and contrary to law for at least four reasons.

**1. This Court previously has held that the UKB has no claim to the original Cherokee reservation.**

64.     As discussed above, this Court squarely held in *Buzzard* that the UKB has no right or claim to the land within the boundaries of the Cherokee Nation's Treaty Territory. Accordingly, the UKB, UKB Corporation, and Department are precluded from relitigating that issue here.

65.     Further, although the Assistant Secretary acknowledged the existence of past court rulings concerning the lack of UKB territorial jurisdiction, he failed to apply them in reaching the conclusion that the UKB shares the Cherokee Nation's "former reservation." Thus, this conclusion is contrary to law as established in those decisions.

**2. The Assistant Secretary provides no reason or support for the Department's reversal of its long-held position that the UKB has no former reservation.**

66.     The Assistant Secretary acknowledged a long line of past departmental rulings concerning the lack of UKB territorial jurisdiction.[17]   Indeed, Judge Brett quoted two of those

---

[17]     *See, e.g.*, Doc. 30-17, AR450-452 (1987 Assistant Secretary decision finding that the 1946 Act did not create a reservation for the UKB or purport to give the UKB any authority to assert jurisdiction, that the UKB "has never had a reservation in Oklahoma, that the Band has never exercised independent governing authority over any of the Cherokee Nation's reservation lands," and that the UKB could not take land into trust without Cherokee Nation consent); Doc. 30-17, AR454, 456, 1 (1988 and 1989 letters from Regional Director reiterating that conclusion); Doc. 30-17, AR533, (2002 Regional Director letter stating that the "UKB is not the Cherokee Nation nor does the UKB have any claim as a successor or have interest as an entity of the Cherokee Nation"); Doc. 30-17, AR535-538, 540-545, 546-548 (2002 and 2003 letters from Department declining to approve UKB proposal to enter into a PL 638 contract for law

rulings in his Order in *UKB v. Secretary of the Interior*, noting that "the Secretary of the Interior, or his designee, has determined that the subject lands of the Old Cherokee Reservation are under the jurisdiction of the new Cherokee Nation, not the UKB."  May 31, 1999 Order at 6.  Yet the Assistant Secretary provided no explanation as to how his new finding that the UKB shares the Nation's "former reservation" can be harmonized with those decisions.

67.     When an agency departs from its prior interpretation of a statute it is charged with implementing, the agency must justify the change of interpretation with a reasoned analysis. *Pub. Lands Council v. Babbitt*, 167 F.3d 1287, 1306 (10th Cir. 1999); *see Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 57 (1983) (noting that an agency that changes its position on an issue "'must supply a reasoned analysis' for doing so"); *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs*., 545 U.S. 967, 981 (2005) ("Unexplained inconsistency is . . . a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act.").  "Patently inconsistent application of agency standards to similar situations lacks rationality and is arbitrary." *Sierra Club N. Star Chapter v. LaHood*, 693 F. Supp. 2d 958, 974 (D. Minn. 2010)(quotation and citation omitted).

68.     An agency changing its position must not only acknowledge that it is changing position, but also "must show that there are good reasons for the new policy." *F.C.C. v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009).  The court cannot accept "counsel's *post hoc*

---

enforcement, realty, and tribal court programs, and including statements that the "UKB lacks a jurisdictional land base over which it can exercise territorial jurisdiction"); Doc. 119-7, AR4952-4953 (noting that the UKB "lacks authority to exercise territorial jurisdiction over any area of Indian Country;" and that the Secretary "has consistently opined that the [Cherokee] Nation exercises exclusive jurisdiction over trust and restricted lands within the former Cherokee treaty boundaries"); Doc. 119-7, AR4948 (Aug. 6, 2008 Regional Director decision denying the UKB 76-acre trust application and stating:  "The UKB does not have a 'former reservation' of its own. . . .  There are no treaties, statutes or Executive Orders that set aside lands for the UKB.").

rationalizations for agency action." *Sierra Club N. Star*, 693 F. Supp. 2d at 974 (quotation and citation omitted). Moreover, the agency's duty to explain a change in policy is heightened "when its prior policy has engendered serious reliance interests that must be taken into account." *F.C.C. v. Fox*, 556 U.S. at 515 (citation omitted).

69. Here, although the Assistant Secretary acknowledged the change in policy (*see* Doc. 28-4, AR21), he offered *no* analysis – much less a reasoned analysis – justifying the Department's change in position. Nor did he identify any change in the law or any new evidence to support the decision to unilaterally make the Cherokee Nation's historic reservation the former reservation of the UKB. The Department's dramatic and unexplained about-face on this issue provides a textbook example of an arbitrary and capricious decision.

70. Moreover, the Assistant Secretary also acted arbitrarily and capriciously in failing to consider the reliance interests of the Cherokee Plaintiffs. The Supreme Court has instructed federal agencies to consider reliance interests in making policy changes. In fact, in *F.C.C. v. Fox*, the Supreme Court explained that "[i]t would be arbitrary and capricious to ignore" that the agency's "prior policy has engendered serious reliance interests." *Id.* Thus, an agency making a policy change must consider the reliance interests that would be implicated by that change.

71. In this case, the Cherokee Plaintiffs have long relied on the Department's interpretations of statutes and regulations in developing their business practices throughout the Cherokee Treaty Territory. For example, CNE has invested millions of dollars building and promoting various gaming venues throughout the former Cherokee reservation in reliance on the Department's long-held position that CNE would be protected from inter-tribal competition within its own Treaty Territory. The Court is cognizant of the UKB's claim that the Cherokee Plaintiffs did not raise their well-known reliance as a factor to be considered by the Department

49

and thus the Department did not need to consider it.[18]   However, the Supreme Court requires an

agency making a policy change to "provide a more detailed justification . . . when its prior policy

has engendered serious reliance interests," *id.,* and the Court concludes that this imposed upon

the Assistant Secretary an affirmative obligation to determine whether such reliance interests

existed, even if not raised in the administrative proceedings by the interested parties.   Moreover,

any discussion satisfying either a consent or consultation requirement (*see* section VI), or a

discussion concerning jurisdictional conflicts (*see* section VII), presumably would be insufficient

if it did not include an understanding of the impacts of a pending decision on existing reliance

interests.   Thus, the 2012 Decision is also arbitrary and capricious because the Assistant

Secretary failed to consider the reliance interests implicated by his new determination that the

UKB shares a "former reservation" with the Cherokee Nation.

> **3.   The Tract is not within a "former reservation" of the UKB within the meaning established by the Department's own regulations governing implementation of the after-acquired lands provisions in IGRA.**

72.   The 2012 Decision misreads IGRA in holding that the Secretary has authority

simply to declare a specific tract to be a tribe's "former reservation" for purposes of IGRA's

after-acquired lands provisions, 25 U.S.C. §2719.   The Assistant Secretary concluded that the

"express language" of IGRA "makes it clear" "that the determination of whether the land is

within the boundaries of the tribe's former reservation is a determination for the Secretary to

make."  Doc. 28-4, AR20.  In other words, the Assistant Secretary determined that the Secretary

may retroactively declare land to be within a tribe's "***former*** reservation" even if the Secretary

---

[18]      Notably – and commendably – the Department did not make this same argument.

had never recognized the tribe as having had a reservation.  This appears to be the first time that the Department has taken this position.[19]

73.     The Assistant Secretary appears to be suggesting that the Secretary may make a determination on a case by case basis, without reliance on the Department's own regulatory definition of "former reservation" as the "last reservation that was established by treaty, Executive Order, or Secretarial Order for an Oklahoma tribe."  25 C.F.R. § 292.  The use of the past tense "was established" shows that the term applies to reservations established at some point in the past.  Here, it is undisputed that no reservation has ever been established for the UKB by treaty, Executive Order, or Secretarial Order.  Therefore, it was arbitrary and capricious for the Assistant Secretary to conclude that the Tract falls within the UKB's "former reservation" when, based on the unambiguous regulatory definition of that term, the UKB has never had a reservation.

### 4.  The Indian canons of construction are not applicable here.

74.     In the 2012 Decision, the Assistant Secretary applied the Indian canons of construction, which provide that "statutes are to be construed liberally in favor of Indians, with ambiguous provisions interpreted to their benefit."  Doc. 28-4, AR20 (citations omitted).  This reliance on the Indian canons of construction in construing IGRA's "after-acquired lands" requirements in favor of the UKB is arbitrary and capricious and contrary to law.

75.     First, as shown above, there is no ambiguity in the term "former reservation" in IGRA; that term is defined by regulation, 25 C.F.R. § 292.2, and is easily applied to the facts of this case.

---

[19]     In a "briefing paper" accompanying the 2012 Decision, the Department stated "This decision is the *first* time the Department has recognized two tribes as having the same former reservation for purposes of qualifying for the exception in IGRA for acquiring land in trust after 1988."  Doc. 42-6, AR4380.

76.     Second, this canon of statutory construction does not apply where, as here, there are Indians on both sides of the issue and construing the statute in favor of some Indians will adversely impact other Indians.  *See Utah v. Babbitt*, 53 F.3d 1145, 1150 (10th Cir. 1995); *Cherokee Nation of Okla. v. Norton*, 241 F. Supp. 2d 1374, 1380 (N.D. Okla. 2002) (finding the canon to be inapplicable in case involving "judicial review of a Federal agency decision that hinged in part on the interpretation of Federal laws . . . affecting competing Native American interests").  The 2012 Decision indisputably involves competing interests and poses a threat of real harm to the Cherokee Plaintiffs.  The Cherokee Nation has strongly opposed the UKB application throughout the agency process as a threat to the Nation's sovereign authority over its Treaty Territory.  A precedent enabling the UKB Corporation to obtain trust status of other tracts in the Nation's Treaty Territory would also undercut the economic viability of the Cherokee Nation's sovereignty.  Congress should not be assumed to favor one ward over another.  Here, the Department has done just that.  Accordingly, the Assistant Secretary acted arbitrarily and capriciously and contrary to law in applying this canon of construction to these facts.  Thus, the Secretary's reliance on this inapplicable canon is arbitrary, capricious, and contrary to law.

77.     For each of these reasons, the Court concludes that the Assistant Secretary's decision that the UKB shares the "former reservation" of the Cherokee Nation was arbitrary, capricious, and contrary to well established law.

## B. The Tract is not within the jurisdiction of the UKB, nor does the UKB exercise governmental power over such land.

78.     Under IGRA, an Indian tribe may engage in Class II gaming only on "Indian lands within such tribe's jurisdiction."  25 U.S.C. § 2710(b)(1).  Similarly, Class III gaming may occur on "Indian Lands" only pursuant to an ordinance or resolution adopted by the governing body of the Indian tribe having jurisdiction over such lands."  *Id.* § 2710(d)(1)(A)(i).

79.     "Indian lands" includes "any lands title to which is . . . held in trust by the United States for the benefit of any Indian tribe or individual  . . . *and* over which an Indian tribe exercises governmental power."  *Id.* § 2703(4)(B) (emphasis added); *see also* 25 C.F.R. § 502.12(b)(1) (defining "Indian land" as "[l]and over which an Indian tribe exercises governmental power *and* that is . . . [h]eld in trust by the United States for the benefit of any Indian tribe or individual . . . .") (emphasis added).  "Courts have uniformly held tribal jurisdiction is a threshold requirement to the exercise of governmental power as required under IGRA's definition of Indian lands."  *Oklahoma v. Hobia*, No. 13-CV-054-GKF-TLW, 2012 WL 2995044, at *15 (N.D. Okla. July 20, 2012) (citing *Kansas v. United States*, 249 F.3d 1213, 1229 (10th Cir. 2001) ("[B]efore a sovereign may exercise governmental power over land, the sovereign, in its sovereign capacity, must have jurisdiction over that land"); and *Miami Tribe of Okla. v. United States*, 927 F. Supp. 1419, 1423 (D. Kan. 1996) ("Absent jurisdiction, the exercise of governmental power is, at best, ineffective, and at worst, invasion.")).  "The question of jurisdiction 'focuses principally on congressional intent and purpose, rather than recent unilateral actions' of a tribe."  *Id.* (citing *Kansas v. United States*, 249 F.3d at 1229 and *Miami Tribe of Okla. v. United States*, 656 F.3d 1129, 1145 (10th Cir. 2011)).

80.     Although IGRA expressly limits Class II and Class III gaming to lands within the gaming tribe's jurisdiction, the Assistant Secretary conducted no real analysis regarding whether the Tract falls within the jurisdiction of the UKB.  Instead, he merely determined that 25 U.S.C. § 476(g) "'prohibits the Department from finding that the UKB lacks territorial jurisdiction while other tribes have territorial jurisdiction.'"  Doc. 28-4, AR24.  As discussed above, the anti-discrimination provision of the IRA does not require the Department to treat differently situated tribes in the same manner.  Nor should it be read to convey jurisdiction to a tribe where none

exists – especially where, as here, that lack of jurisdiction has been definitively decided by the courts.  *See Buzzard*, Feb. 24, 1992 Order.  Because the UKB does not possess jurisdiction over Indian country within the Cherokee Nation's Treaty Territory, it cannot conduct legal gaming on those lands under IGRA.

81.     Further, the Assistant Secretary made no finding that the UKB exercises governmental powers over the Tract within the meaning of IGRA, 25 U.S.C. § 2703(4)(B).  Meeting the "exercise of governmental power" requirement "does not depend upon the Tribe's theoretical authority, but upon the presence of concrete manifestations of that authority."  *Rhode Island v. Narragansett Indian Tribe,* 19 F.3d 685, 703 (1st Cir. 1994).  In determining whether a tribe exercises governmental power over a location, courts consider a variety of factors, including: (1) whether the area is developed; (2) whether tribal members reside in those areas; (3) whether any governmental services are provided and by whom; (4) whether law enforcement on the lands in question is provided by the Tribe or by a different entity; and (5) other indicia as to who exercises governmental power over those areas.  *See Cheyenne River Sioux Tribe v. South Dakota,* 830 F. Supp. 523, 528 (D.S.D. 1993).

82.     The 2012 Decision identifies no governmental authority exercised by the UKB over the tract.  In fact, it reflects that fire, water, ambulance, and sanitation services for the property are provided by the City of Tahlequah.  Doc. 28-4, AR24. Further, "[l]aw enforcement services for the property are currently provided by an informal agreement with the City of Tahlequah and Cherokee County law enforcement agencies whereby the Keetoowah Lighthorse, the UKB's security force, monitors tribally-owned land and reports any suspicious activities immediately to the City and County law enforcement agencies so that those entities can respond accordingly."  (*Id.*)  This type of security force is more akin to the security guards in privately

owned casinos than to law enforcement provided by a governmental authority.  There is simply no evidence the UKB has delivered any substantive governmental services through or at the Tract, as described in *Cheyenne River Sioux Tribe* and as required for the Tract to constitute "Indian Lands."

83.    The Court thus holds that the Assistant Secretary acted arbitrarily, capriciously and contrary to law in finding that the UKB exercised jurisdiction over the Tract and that the Tract constituted Indian Lands for purposes of IGRA.

**VI.    The Proposed Trust Acquisition – Over the Objection of the Cherokee Nation – Violates the Department's Own Land Acquisition Regulations.**

84.    The "shared reservation" issue also underlies the Assistant Secretary's decision that the Department has the authority to take the land into trust without the consent of the Cherokee Nation.  The Department's own regulations provide that a tribe[20] "may acquire land in trust status on a reservation other than its own only when the governing body of the tribe having jurisdiction over such reservation consents in writing to the acquisition."  25 C.F.R. *§* 151.8.  The Assistant Secretary concedes that prior to the application at issue in this case, the Department applied § 151.8 in connection with all land-into-trust applications submitted by the UKB and declined to take any land into trust for the UKB without Cherokee consent.  The Cherokee Nation consistently has denied such consent.

85.    In the 2012 Decision, the Assistant Secretary concluded – for the first time – that the UKB shares the "former reservation" of the Cherokee Nation, thus purportedly eliminating any need to obtain Cherokee consent under § 151.8.  Because this Court already has determined

---

[20]    As discussed above, a tribal corporation such as UKB Corporation may be considered a "tribe" for purposes of the land acquisition regulations only if it is specifically authorized by statute to acquire the land.

in *Buzzard* that the UKB does not share the "former reservation" of the Cherokee Nation, the Court will not revisit that issue here.

86.    Even in the absence of *Buzzard*, as shown above, the "shared reservation" decision is arbitrary and capricious.  Thus, just as this flawed theory invalidates the Assistant Secretary's decision that gaming would be permissible under IGRA, it also nullifies the finding that Cherokee consent is not required before the Secretary may take the Tract into trust for the UKB.[21]

87.    In addition to the "shared reservation" theory, the Department and UKB argue that Cherokee consent was not required because a 1999 appropriations rider (the "Appropriations Act") purports to permit land to be taken into trust for the UKB upon mere consultation with the Cherokee Nation.  The Appropriations Act provides:

> [U]ntil such time as legislation is enacted to the contrary, no funds shall be used to take land into trust within the boundaries of the original Cherokee territory in Oklahoma without consultation with the Cherokee Nation.

Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105-277, Oct. 21, 1998, 112 Stat. 2681-246.  The Assistant Secretary incorrectly concluded in two 2008 memoranda, in the June 2009 Decision, and in the 2011 Decision involving the 76-acre

---

[21]    This conclusion is also contrary to law because the Department has in effect attempted to implement draft regulations proposed by the Department in 2000 that, if promulgated, would have made it unnecessary to obtain the consent of a tribe to the trust acquisition by another tribe on a "shared reservation."  66 Fed. Reg. 3452-01, 2001 WL 31920, proposed rule 25 C.F.R. § 151.11(b) (stating that a tribe, including tribes in Oklahoma, may acquire land in trust on another tribe's reservation if the recognized tribe's governing body consents in writing, except that no consent is required if the proposed acquisition is inside a reservation "that is shared by two or more tribes, and the acquisition is for one of these tribes …'"").  This application of the 2000 draft rule violates the APA, 5 U.S.C. § 553, which establishes procedures for the promulgation of rules.  The draft rule upon which the Assistant Secretary now attempts to implement has never been finalized under these procedures.

tract that the Appropriations Act superseded the regulatory consent requirement for trust acquisitions and requires only consultation with the Cherokee Nation.

88.    The 2012 Decision did not mention the Appropriations Act, but its reliance on that act is reflected in the Regional Director's April 19, 2012 memorandum recommending approval of the application for the 2.03-acre Tract, which specifically cited the June 2009 Decision's interpretation of the Appropriations Act.  The 2012 Decision's reliance on the act is also reflected in a statement in the 2012 Decision that "[b]y receiving and considering the comments of the Cherokee Nation on the instant acquisition" and regarding the 76-acre parcel, "the Department has satisfied any requirements to consult with the Cherokee Nation."  Doc. 28-4, AR21.

89.    The Assistant Secretary's interpretation of the Appropriations Act is contrary to law.[22]  The plain wording of the act merely imposed an additional consultation requirement prior to the use of certain specified federal funds in trust acquisitions within the Cherokee Nation

---

[22]    It is equally clear from the context of the 1999 Appropriations Act, which appropriated funding for the BIA for "expenses necessary for the operation of Indian programs, as authorized by law . . .," that the proviso only concerns use of federal funding.  In light of DOI's recognition of the significance of tribal territorial sovereignty in the consent requirement in 25 C.F.R. § 151.8, there is no rational basis for an argument that the 1999 Appropriations Act was intended to limit the Cherokee Nation's power to grant or withhold consent with respect to applications involving use of federal funds.  *See United Keetoowah Band of Cherokee Indians in Okla. v. Acting Reg'l Dir.*, 1996 WL 432580, (IBIA 1996) (rejecting the UKB's claim that the 1992 appropriations provision requiring Cherokee Nation consent to trust acquisitions within the Nation's boundaries applied only if federal funds were used to process the trust application; and rejected its claim that the Nation's consent would not be required if tribal funds were used to process the application).  The UKB entered into a Contract for Deed in 1986, requiring the UKB to make 84 installment payments in the amount of $10,915.20 per month for the purchase of the 2.03 acre Tract.  AR 4897-4901.  The UKB received a warranty deed for the Tract on November 30, 1990.  AR 4908.  The Tract was purchased more than nine years prior to implementation of the 1999 Appropriations Act.

Treaty Territory.   The Appropriations Act does not state or imply that it affects any other existing law or regulation, including the tribal consent requirements in 25 C.F.R. § 151.8.[23]

90.     Because the Appropriations Act does not mention § 151.8, any repeal caused by the Act necessarily would have to occur by implication.  Section 151.8 is a substantive regulation. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 296, 302 (1970) (explaining that a substantive regulation is one "affecting individual rights and obligations" and that "properly promulgated, substantive agency regulations have the 'force and effect of law'").  Because § 151.8 is a substantive regulation, a repeal of the regulation by implication is not favored. *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 189 (1978) (holding that it is a "'cardinal rule . . . that repeals by implication are not favored.'") (quoting *Morton v. Mancari*, 417 U.S. 535, 549 (1974)).  In fact, the United States Supreme Court has held "in no uncertain terms, that 'the intention of the legislature to repeal must be clear and manifest.'" *Id.* (quoting *Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936)).  Unless there is "some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Id.* (quoting *Morton*, 471 U.S. at 549).  It is clear that the Appropriations Act cited by the UKB does not show a clear and manifest intent to repeal § 151.8.  It is equally clear

---

[23]     For example, the Conference Report on H.R. 4328 (Oct. 19, 1998) does not mention consent or explain the difference in wording.  It simply states:  "That the sixth proviso under Operation of Indian Programs in Public Law 102-154, for the fiscal year ending September 30, 1992 (105 Stat. 1004), is hereby amended to read as follows:  '*Provided further*, That until such time as legislation is enacted to the contrary, no funds shall be used to take land into trust within the boundaries of the original Cherokee territory in Oklahoma without consultation with the Cherokee Nation:'"  House Report 105-825, also fails to mention consent or explain the difference in wording: "The Committees have included language that allows the Bureau of Indian Affairs to deal with the United Keetoowah Band of Cherokees and the Delaware Band of Indians on issues of funding, but prevents these tribes from establishing trust holdings within the Cherokee's original boundaries without Cherokee consultation."

that § 151.8's consent requirement is not "irreconcilable" with the Appropriation Act's consultation requirement. Accordingly, there was no "repeal by implication."

91. Moreover, the cardinal rule against repeals by implication "applies with especial force when the provision advanced as the repealing measure was enacted in an appropriations bill." *United States v. Will*, 449 U.S. 200, 221-22 (1980). There is a "'very strong presumption' that appropriations acts do not amend substantive law," and, as a result, appropriations language must be construed narrowly. *Calloway v. District of Columbia*, 216 F.3d 1, 9-10 (D.C. Cir. 2000) (quotation and citation omitted). Thus, the UKB's argument that the Appropriations Act supersedes, repeals, or negates § 151.8 is simply unsupportable. The consent requirement of § 151.8 continues to regulate trust applications.[24]

92. The Assistant Secretary's conclusion in the 2012 Decision that Cherokee Nation consent is not required under the Appropriations Act is also contrary to Cherokee Nation treaty rights. First, it is contrary to article 5 of the 1835 Treaty, which expressly protects the Cherokee Nation's right to self-government within its treaty territory. Second, it is contrary to article 26 of the 1866 Treaty, which protects the Cherokee Nation from hostilities of "other tribes" threatening the "quiet and peaceful possession" of the Nation's Treaty Territory. Although UKB membership consists of those Cherokees by blood who have enrolled as UKB members,

---

[24]    It is equally clear from the context of the Appropriations Act, which appropriated funding for the BIA for "expenses necessary for the operation of Indian programs, as authorized by law . . .," that the proviso only concerns use of federal funding. In light of the Department's recognition of the significance of tribal territorial sovereignty in the consent requirement in 25 C.F.R. § 151.8, there is no rational basis for an argument that the Appropriations Act was intended to limit the Cherokee Nation's power to grant or withhold consent with respect to applications involving use of federal funds. *See United Keetoowah Band of Cherokee Indians in Okla. v. Acting Reg'l Dir.*, 29 IBIA 229 (1996) (rejecting the UKB's claim that the 1992 appropriations provision requiring Cherokee Nation consent to trust acquisitions within the Nation's boundaries applied only if federal funds were used to process the trust application; and rejected its claim that the Nation's consent would not be required if tribal funds were used to process the application).

the UKB falls within the intent of article 26, because the UKB has attempted to separate from the Nation, prohibits its members from also maintaining citizenship in the Cherokee Nation, and seeks to usurp the territorial jurisdiction of the government of the Cherokee Nation, as expressed by UKB's intent to "exercise sole jurisdiction over the land rather than allow the Cherokee Nation to continue its jurisdiction over Indian lands" within the Nation's Treaty Territory. Doc.119-7, AR4953. The conflict is one of identity, and the relationship is a "hostile" one. There must be "clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the Treaty." *United States v. Dion*, 476 U.S. 734, 739-40 (1986). The Department provided no evidence that Congress made such a choice in the 1999 Appropriation Act or in any other enactment.

VII.     **The Proposed Acquisition – Without Consideration of Jurisdictional Conflicts – Violates the Department's Own Land Acquisition Regulations.**

93.     The Assistant Secretary made no finding as to whether "[j]urisdictional problems and potential conflicts of land use . . . may arise" from the proposed trust acquisition as required by 25 C.F.R. § 151.10(f).

94.     The Regional Director recommended approval of the trust application for the Tract in her April 19, 2012 memorandum, although she found, consistent with similar findings in 2006 and 2008,[25] that jurisdictional issues were "likely." She further stated, as "the Bureau office closest to tribal affairs in northeastern Oklahoma," the Bureau "remains concerned that

_____

[25]     *See* Doc. 36-6, AR3912-3913 (2006 Decision denying the 76-acre parcel application, finding that the Cherokee Nation "exercises exclusive jurisdiction" over trust lands within its treaty territory and that "jurisdictional problems and significant land use issues exist"); Doc. 119-7, AR4953 (2008 Regional Director decision denying 76-acre parcel application, stating that the "Region finds that the potential for jurisdictional problems is of utmost concern and weighs heavily against approval of this acquisition at this time.").

jurisdictional conflicts will arise between the UKB and the [Nation] if property is placed into trust for the UKB within the former reservation boundaries of the [Nation]."   Doc. 121-1, AR5102.   The Regional Director stated that likely conflicts include conflicts involving taxing and gaming regulation.   Doc. 121-1, AR5101-5102.   She repeated concerns regarding law enforcement conflicts in her 2012 memorandum.   Doc. 121-1, AR 5102.

95.     After detailing all these potential jurisdictional conflicts, the Regional Director concluded the Tract should go into trust because the "Assistant Secretary's findings and conclusions [in the 76-acre trust acquisition] on this issue [jurisdictional conflicts] are binding on the Region."   Doc. 45, AR2183; *see also* Doc. 35-4, AR3245.   The Assistant Secretary stated in the 2012 Decision that "there may be jurisdictional disputes in the future," but added that "the Regional Director believes that there is adequate foundation for resolving them, and we concur." Doc. 28-4, AR24.

96.     Contrary to that conclusion, there is no discussion in the Regional Director's April 19, 2012 memorandum or elsewhere in the record indicating that there are adequate means to address jurisdictional conflicts.   Equally important, the Assistant Secretary did not address any of the Regional Director's specific concerns regarding jurisdictional conflicts.   The Assistant Secretary's failure to address jurisdictional conflicts as required by 25 C.F.R. § 151.10(f) was arbitrary and capricious.   An agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of the APA, 5 U.S.C. § 706.   *See, e.g.*, *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *Comcast Corp. v. F.C.C*, 579 F.3d 1, 8 (D.C. Cir. 2009).

VIII.    **The Assistant Secretary Failed To Consider the BIA's Ability to Discharge Additional Responsibilities, Thus Violating the Department's Own Land Acquisition Regulations.**

97.    The Assistant Secretary made no findings as to "whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities resulting from the acquisition of land in trust status" as required by 25 C.F.R. § 151.10(g).

98.    The Assistant Secretary provided a detailed list of problems related to the ability of the BIA to discharge its duties: (1) the proposed UKB Tract trust acquisition is within the Nation's Treaty Territory and "the lands within the former treaty boundaries of the [Cherokee Nation] are the [Cherokee Nation]'s service area for purposes of administering BIA programs;" (2) the Cherokee Nation, through a self-governance compact, "administers the program functions associated with the management of trust lands" that were previously provided by the BIA; (3) all funds previously spent by the BIA to provide these services have been "transferred to the [Cherokee Nation] Compact" and as a consequence the Tahlequah BIA Regional Office (which previously administered such programs) has been closed; and (4) "[t]here are no remaining direct service funds in the Region that have not been previously provided to the [Cherokee Nation] in its Self-Governing Compact."  Doc. 28-4, AR24-25.

99.    The Assistant Secretary then found that "additional duties" associated with the newly acquired trust land may "increase the workload" of the BIA, that no funds are available to carry out that work, but that the BIA "has concluded they are capable of providing services for UKB and we concur."  Doc. 28-4, AR25.  This statement ignores the specific finding in the Regional Director's April 2012 memorandum that the "additional duties may be a hardship on the Region unless additional appropriations or budget allocations are obtained to off-set the additional direct services to be provided by the Region."  Doc. 121-1, AR5103.  The Assistant Secretary did not identify where the BIA would obtain additional funds.

100. The Department's failure to consider the impact of the proposed trust acquisition on the ability of the BIA to provide services within the Cherokee Nation's Treaty Territory, was arbitrary and capricious, an abuse of discretion, and contrary to law.

101. Any conclusion of law set forth herein that is more properly deemed a finding of fact is hereby adopted as such.

## IX.     Remedies

102. Where, as here, the agency decision is erroneous based on the record before the agency and there is no need for agency expertise or experience to reach a *legal* conclusion, the proper remedy is a permanent injunction, not remand to the agency. *See McDonnell Douglas Corp. v. NASA*, 895 F. Supp. 316, 319 (D.D.C. 1995) ("[The agency] is not entitled to a second bite of the apple just because it made a poor decision – if that were the case, administrative law would be a never ending loop from which aggrieved parties would never receive justice."). Thus, the Court grants the Cherokee Plaintiffs' request for a permanent injunction prohibiting the Secretary from taking the Tract into trust for the UKB Corporation.

103. In addition, the Court grants Plaintiffs' request for declaratory judgment and declares as follows:

> a. The Nation's Treaty Territory is not the "former reservation" of the UKB under IGRA, 25 U.S.C. §2719(a)(2)(A)(i). The Tract cannot be acquired for gaming purposes for the benefit of the UKB or the UKB Corporation after the effective date of IGRA under requirements in IGRA, *id.*, and the Assistant Secretary's determination that the Tract is in the "former reservation" of the UKB is arbitrary, capricious, and contrary to law.

b.  The Cherokee Nation possesses jurisdiction over Indian country within its Treaty Territory, exclusive of the jurisdiction of the UKB or any other tribe, as recognized by prior decisions of this Court to which the Department and the UKB were parties.   The Assistant Secretary is bound by these decisions and his failure to act consistent with these prior decisions of this Court in reaching the 2012 Decision is contrary to law.

c.  No statutory authority exists authorizing the Secretary to acquire the Tract into trust for the UKB Corporation.   Neither the UKB Constitution nor the UKB Corporation Charter confers authority upon the Assistant Secretary to accept the Tract into trust for the benefit of the UKB Corporation.  The Assistant Secretary's decision to place the Tract in trust for the UKB Corporation was arbitrary, capricious, and contrary to law.

d.  The UKB and the UKB Corporation were organized in 1950, after the 1934 effective date of the IRA.  Under *Carcieri v. Salazar*, 555 U.S. 379 (2009), the Assistant Secretary was required to determine whether the UKB was "under federal jurisdiction" in 1934 and whether acceptance of the Tract into trust for the use of the UKB Corporation is permissible under that decision.  The Assistant Secretary's failure to make this determination was arbitrary and capricious and contrary to law.

e.  The placement of the Tract into trust would not automatically confer the status of "Indian lands" on the tract under IGRA, 25 U.S.C. § 2703(4), for purposes of UKB gaming operations, because the UKB does not possess jurisdiction within the Cherokee Nation Treaty Territory or exercise governmental authority over the Tract.  The Assistant Secretary's determination that the acceptance of the Tract into trust for the use of the UKB Corporation would automatically confer jurisdiction to the UKB over the Tract was arbitrary and capricious and contrary to law.

f.  The 1999 Appropriations Act does not supersede the requirement in 25 C.F.R. § 151.8 that an Indian tribe "may acquire land in trust status on a reservation other than its own only when the governing body of the tribe having jurisdiction over such reservation consents in writing to the acquisition."  The Assistant Secretary's determination that the Tract can be accepted into trust for the use of the UKB Corporation absent the Cherokee Nation's consent was arbitrary and capricious and contrary to law.

g.  The 1994 amendment of the IRA, 25 U.S.C. § 476, does not relieve the Department from complying with the requirement in 25 C.F.R. § 151.10(f) to consider "jurisdictional problems and potential conflicts of land use which may arise" from any proposed trust acquisition.  The Assistant Secretary's reliance upon this statutory provision as justification for his failure to consider

important aspects of the issues in addressing regulatory requirements pertaining to likely jurisdictional conflicts is arbitrary and capricious and contrary to law.

h. The Assistant Secretary's failure to consider important aspects of the issues in addressing regulatory requirements in 25 C.F.R. § 151.10(g) pertaining to the ability of the BIA to provide services was arbitrary and capricious and contrary to law.

104. Plaintiffs' prayer for attorney fees and costs will be separately considered upon filing of an appropriate motion and brief.

WHEREFORE, Plaintiffs, Cherokee Nation and Cherokee Nation Entertainment, LLC, respectfully request that the Court adopt and enter these proposed Findings of Fact and Conclusions of Law and enter judgment in their favor and against the Federal Defendants and Intervenor Defendants United Keetoowah Band of Cherokee Indians in Oklahoma and United Keetoowah Band of Cherokee Indians in Oklahoma, a federal charter Corporation.

Respectfully submitted,

*s/Todd Hembree*
Todd Hembree
Attorney General
Cherokee Nation
P.O. Box 948
Tahlequah, OK  74465-0948
Telephone:  (918) 456-0671
Facsimile:  (918) 458-5580
todd-hembree@cherokee.org

*s/William David McCullough*
Wm. David McCullough, OBA No. 10898
S. Douglas Dodd, OBA No. 2389
Doerner, Saunders, Daniel
 & Anderson, L.L.P.
Two West Second Street, Suite 700
Tulsa, Oklahoma 74103-3117
Telephone:  (918) 582-1211
Facsimile:  (918) 925-5316
dmccullough@dsda.com
sddodd@dsda.com

*s/L. Susan Work*
L. Susan Work, OBA No. 3799
Hobbs, Straus, Dean & Walker, LLP
101 Park Ave., Suite 700
Oklahoma City, OK 73102
Telephone: (405) 602-9245
Facsimile:  (405) 602-9426
swork@hobbsstraus.com

*Attorneys for Cherokee Nation*

*and*

*s/David E. Keglovits*
David E. Keglovits, OBA No. 14259
Amelia A. Fogleman, OBA No. 16221
GableGotwals
100 West Fifth Street, Suite 1100
Tulsa, Oklahoma 74103-4217
Telephone: (918) 595-4800
Facsimile: (918) 595-4990
dkeglovits@gablelaw.com
afogleman@gablelaw.com

*Attorneys for Cherokee Nation*
*Entertainment, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 8, 2014, I electronically transmitted the foregoing document to the Clerk of the U.S. District Court for the Northern District of Oklahoma using the ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants.

*s/William David McCullough*
William David McCullough

3177978v1